## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **MARK GRAMS,**<br>**an individual Alabama citizen,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.:  3:23-CV-_____** |
| | ) | |
| **TREIS BLOCKCHAIN, LLC,** | ) | |
| **CHAIN ENTERPRISES, LLC,** | ) | |
| **CEVON TECHNOLOGIES, LLC,** | ) | **JURY TRIAL DEMANDED** |
| **STRONGHOLD DIGITAL MINING,** | ) | |
| **LLC, DAVID PENCE, MICHAEL** | ) | |
| **BOLICK, SENTER SMITH,** | ) | |
| **BRIAN LAMBRETTI, AND** | ) | |
| **JOHN CHAIN,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiff Mark Grams, by and through undersigned counsel, states for his Complaint and Jury Demand as follows:

## INTRODUCTION

1.     In December of 2021 Defendant Treis Blockchain, LLC sold one thousand computers to Defendant Stronghold Digital Mining LLC for several million dollars.

2.     The value of the computers lay not in their hardware but their firmware.

3.     The computers were specialized machines that function to mine cryptocurrency in cyberspace.

4.     As detailed within, the computers operate on firmware that boosts them to run faster than virtually any competitor in the world—critical for machines that race to profit by finding and mining cryptocurrency.

5.     The problem with the sale is that Treis knew it did not own the firmware, had no right to sell it, and was, in fact, responsible for maintaining its secrecy.

## PARTIES

6.     Plaintiff Mark Grams is a resident citizen of the State of Alabama, residing at all times material hereto in Alexander City, Tallapoosa County, Alabama.

7.     Defendant Treis Blockchain, LLC ("Treis") is a limited liability company formed under the laws of the State of South Carolina.  Treis resides at 601 Hitech Court, Greer, South Carolina, 29650.   Treis's membership includes Defendants Bolick, Lambretti, Pence, and Smith.   As set forth below, Treis's members are all foreign citizens; therefore, Treis is also a foreign citizen.

8.     Defendant Chain Enterprises, LLC ("CEL") is a limited liability company formed under the laws of the State of Nevada.  CEL resides at 3900 S. Hualapai, Suite 110, Las Vegas, Nevada 89147.  On information and belief, CEL's

2

sole member is Defendant Chain.  As set forth below, Chain is a citizen of the South Dakota; therefore, CEL is also a foreign citizen.

9.      Defendant Cevon Technologies, LLC ("Cevon") is limited liability company formed under the laws of the State of Delaware.  Cevon resides at 850 New Burton Road Suite 201, Dover, Delaware 19904.  On information and belief, Cevon's sole members are Treis and CEL, both of which, as set forth above, are foreign citizens; therefore, Cevon is also a foreign citizen.

10.     Defendant Stronghold Digital Mining LLC ("Stronghold") is a limited liability company formed under the laws of the State of Delaware.  Stronghold resides at 2151 Lisbon Road, Kennerdell, Pennsylvania 16374.  On information and belief, Cevon's parent member is Q Power, Inc.  Q Power, Inc. resides in Parainen, Finland.  Stronghold appears to be a publicly traded entity.

11.     Defendant Michael Bolick is a resident citizen of the State of South Carolina.  On information and belief, Bolick is a member of Treis and a Treis Blockchain Manager for Cevon.

12.     Defendant Senter Smith is a resident citizen of the State of South Carolina. On information and belief, Smith is a member of Treis and a Treis Blockchain Manager for Cevon.

13.    Defendant John Chain is a resident citizen of the State of South Dakota. On information and belief, Chain is sole member of CEL and a Chain Enterprises Manager for Cevon.

14.    Defendant Brian Lambretti is an individual citizen of the State of South Carolina. On information and belief, Lambretti is a member of Treis.

15.    Defendant David Pence is an individual who resides in the State of South Carolina. On information and belief, Pence is a member of Treis.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff brings this action under 18 U.S.C. § 1836, 18 U.S.C. § 1964, and 18 U.S.C. § 1962(c). Subject matter jurisdiction is also predicated on 28 U.S.C. § 1332 because there exists complete diversity between the parties, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. This Court has subject matter jurisdiction over Plaintiff's state-law claims pursuant to 18 U.S.C. § 1367(a).

17.    Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in Tallapoosa County, Alabama, which is located in the Eastern Division of the Middle District of Alabama, 28 U.S.C. 81(b)(3), or, alternatively,

pursuant to 28 U.S.C. 1391(b)(3) because all Defendants are subject to this Court's personal jurisdiction.

## FACTUAL ALLEGATIONS

**I.**     **Cryptocurrency and how anyone can "mine" for it**[1]

18.     Cryptocurrency is intangible digital currency.

19.     Transactions applying the currency are recorded and verified in a decentralized system using cryptography.

20.     The first digital currency was Bitcoin, which launched in 2009.

21.     Since then, Bitcoin alternatives, referred to as "altcoin," have exploded onto the market, including Ethereum, Tether, USD Coin, Binance Coin, XRP, Binance USD, and Cardano.

22.     There are approximately 18,000 variants of cryptocurrency available.

23.     There are three ways to acquire cryptocurrency:

a.     Purchase cryptocurrency on an exchange market;

b.     Accept cryptocurrency as compensation in a transaction;

c.     "Mine" for it—like gold

24.     This case involves machines that mine for cryptocurrency.

---

[1] Information for this background section was assembled from internet sources, including: www.simplilearn.com/bitcoin-mining-explained-article, www.crunchbase.com/organization/whatsminer, www.investopedia.com/terms/a/asic.asp#:~:text

25.   For a mining transaction to be recorded on the ledger it must be validated by solving a complicated mathematical puzzle called a proof of work.

26.   Crytocurrency "miners" perform this function, manifesting new digital "coins" which can then be used in their exchange market.

27.   Mining is as mentally taxing as goldmining was physically taxing—it requires advanced machines with high computing power applied to solve complicated mathematical equations.

28.   Computers have entered the market whose sole purpose is to mine for cryptocurrency—they are called "miners."

29.   The faster the miners can operate the more lucrative they will be.

30.   The instructions that tell the computer how to mine are called firmware.

31.   Whereas software programs are user-facing and interactive, firmware tells the machine itself how to operate.

32.   Firmware in this context does not interact with a user; it tells a machine how to mine for cryptocurrency.

33.   The firmware may be stored on an application-specific integrated circuit (ASIC) chip that is integrated into the machine's hardware.

34.   Each ASIC chip functions to mine a specific digital currency.

35.   Miners that use ASIC chips are referred to as "ASIC miners."

36.    A leading manufacturer of ASIC miners sells them under the brand name Whatsminer.

37.    "Whatsminers" are some of the most cost effective and efficient machines on the market.

38.    Plaintiff Mark Grams figured out how to make them better.

## II.    Plaintiff Grams creates firmware to optimize the industry leading "Whatsminers"—making them faster, more efficient, and more lucrative

39.    Grams is old school—his father was a computer engineer back in the 70s, took him underwing, and Grams grew up obsessed with tinkering with computers and other electronic devices.

40.    He had a knack for it, reverse-engineering machines as they came onto the market and figuring out ways to make them run faster and perform better.

41.    In 2017, Grams learned about cryptocurrency and began pioneering code to optimize miners.

42.    Just two years later he sold his first firmware code optimization ("FCO").[2]

43.    His 2019 FCO improved the Antminer S17 Series machines.

44.    He sold the 2019 FCO to Immersion Systems, LLC for $30,000.

---

[2] Source code can be written to optimize firmware to perform functions beyond those publicly known and available—such code optimizations are proprietary trade secrets.

45.    Brokering the deal between Immersion Systems and Grams was Defendant John Chain.

46.    Grams went on to pioneer code to optimize the industry leading Whatsminers—his MicroBT Whatsminer Asic Miner FCO ("WAO").

47.    Whereas the firmware sold to Immersion Systems, LLC covered only one model of software, WAO covers about one hundred.

48.    In February of 2020, Chain learned that Grams had succeeded and asked if he could help Grams monetize WAO.

49.    Monetizing firmware can take many forms.

50.    Users can pay a fee up-front for a license to use the firmware, or they can agree the developer will retain a percentage of the cryptocurrency as it is mined, referred to as a "developer fee," or "Dev Fee" for short.

51.    Grams recognized that he himself was a tech guy with little business or marketing acumen.

52.    Grams agreed Chain could try to find companies interested in using WAO and that he would pay Chain fifty percent of any new contracts Chain could procure.

53.    Grams also pursued opportunities independently, including with Vnish Mining Software Company.

### III.   Chain Mishandles the First Deal

54.   In the Spring of 2020, Chain tried to market WAO to Asic.World.

55.   Chain mishandled the negotiations, failed to protect the intellectual property, and Asic.World stole WAO the day of its scheduled public release.

56.   Asic.World never paid Grams or Chain anything—they did not acquire a license to use WAO, and they never paid any developer fees.

57.   Once firmware has been published, its value diminishes significantly.

58.   Potential purchasers know that at least one other competitor is using the firmware and that there is no longer any way to prevent public dissemination.

59.   Chain promised Grams he would retain counsel to pursue legal claims against Asic.World but never followed through.

60.   Meanwhile, Grams was forced to spend significant time re-engineering WAO so that he could market an uncompromised product.

61.   Grams designed his second version of the firmware, WAO2.

### IV.   Grams agrees to let Treis test out WAO2

62.   During discussions with Asic.World, Chain had also been negotiating with Defendant Treis, who wanted to install WAO on their Whatsminers.

63.   Initially, Treis had agreed to pay a five percent Developer Fee to install WAO on 400 of their machines to test out WAO's efficacy.

64.     When Treis learned WAO had been compromised they agreed to use WAO2.

65.     However, they demanded the Dev Fee be reduced to 3%.

66.     In summer of 2020 Treis's testing phase initiated.

67.     Over the following eighteen months, Grams spent thousands of uncompensated hours customizing WAO2 to suit Treis's goals.

68.     In fall of 2020 Treis, apparently satisfied with Grams's progress, began negotiating with Chain to purchase WAO2 outright.

69.     WAO2, which had optimized the best machine on the market, was valued between seven and eight figures.

70.     According to Treis's directors, Chain tricked them into believing his entity, Chain Enterprises, LLC ("CEL"), owned the firmware and Grams was a mere employee.

71.     Not one of them asked Grams whether this was the case.

72.     Instead, Treis offered to buy WAO2 from CEL for $100.

73.     The deal was funneled through a subsidiary created for the purpose, Cevon Technologies, LLC ("Cevon").

74.     Cevon is owned 50% by Treis and 50% by CEL.

75.     According to Cevon's Limited Liability Company Agreement, Treis's initial capital contribution was $100.

76.     And CEL's initial capital contribution was "all intellectual property that it owns or exclusively licenses related to firmware and dual phase immersion cooling systems for crypto-currency and blockchain applications."

77.     In other words, CEL promised to contribute all intellectual property it owned, which was none.

78.     And Treis promised to contribute $100, which is also, essentially, nothing.

79.     Whether Treis knew or should have known that neither Chain nor CEL owned WAO2, or that WAO2's developer Grams had never been Chain's employee, **or that no one would sell the world's fastest cryptocurrency mining firmware for $100, is worthy of consideration.**

80.     But regardless, as set forth below, it is beyond dispute that by April of 2021, Treis knew that Chain had never owned WAO or WAO2 and that Grams was the developer and sole owner.

## V.     <u>Treis learns it bought nothing—for $100</u>

81.     Throughout 2020, Grams had been focused on customizing WAO2 for Treis.

82.     He worked tirelessly on the customization because the more Trei's machines mined, the more he would collect, through his Dev Fee.

83.     However, Grams became increasingly concerned that he was not receiving any substantial Dev Fees, which was his only form of compensation.

84.     It began to dawn on Grams that the business guys may be trying to shoulder him out of the profits.

85.     On information and belief, Chain and Treis were making hundreds of thousands of dollars in cryptocurrency value using WAO2, while Grams received only $4,300.

86.     In April 2021 Grams announced that he was not comfortable with the way things were being handled.

87.     He told Treis that he suspected Chain was in breach of their agreement and that he would no longer be working with Chain.

88.     Grams told Chain that he was redirecting the Dev Fees to an account under Grams's sole management.

89.     And he informed Treis that if they wanted to continue using WAO2 they had three options:

     a.     Maintain the *status quo*: continue using WAO2 on Treis's internal machines only subject to the 3% development fee; or

     b.     Purchase WAO2 outright and own the exclusive right to use it for $1,000,000; or

     c.     Remove WAO2 from all their machines.

90.   Treis chose to stay the course and continue paying the Dev Fee.

91.   In turn, Grams continued customizing WAO2 for Treis.

92.   In the fall of 2021 Grams offered to sell Treis a license to include WAO2 on machines they would sell to third parties.

93.   Treis declined the offer.

## VI.   **The Franking Project**

94.   Grams continued to respond to Treis's requests for improvements to the mining project.

95.   Treis encountered a physical problem with its miners' use of WAO2.

96.   Grams developed a two-part mechanical solution:

   a.   He designed an insert to divert the airflow on air cooled miners;

   b.    He removed the miner's middle board.

97.   Grams's solution boosted the miners to faster speeds by diverting more power to their remaining boards.

98.   At Treis's request, Grams shared the design for this workaround with Treis's metal sheet fabricator.

99.   Working from Gram's designs Treis then made cosmetic changes and patented it as their own without Grams's knowledge or consent.

## VII.   <u>Protecting the secrecy of the firmware's code</u>

100.   Throughout the process, Grams had been working primarily from his heavily-secured personal site in Alabama.

101.   However, Treis's machines, operating on WAO2, were housed in Pennsylvania and South Carolina.

102.   When developing and using proprietary software it is critical to protect the integrity of the code.

103.   After firmware is in final version it can be encrypted, but not during a testing phase in which it is constantly undergoing updates.

104.   Accordingly, Grams insisted and Treis agreed that all devices using WAO2 would be password protected, locked, and otherwise secured.

105.   Grams himself keeps all copies of WAO2 only on password-protected devices, with a camera system recording all access, on private property.

106.   He requested that Treis similarly install cameras at all entry points to record anyone accessing the miners.

107.   In September 2021, Grams traveled to the Scrubgrass Power Plant to service machines Treis was storing there.

108.   Grams was shocked to learn there was no security whatsoever safeguarding the firmware.

109.   WAO2 was installed on computers that had no passwords.

110.  The computers were stored in containers that had no locks on them. The containers were located on a publicly accessible site.

111.  In sum, anyone could simply walk up to one of the containers, open Treis's computers, and steal Grams's WAO2.

112.  Grams alerted Treis to the situation and accepted their confirmations the security issues would be immediately remedied.

## VIII. *Treis v. Chain*

113.  In November of 2021, Treis sued Chain and CEL for falsely representing that Chain owned WAO2 in *Treis Blockchain, LLC v. John Chain and Chain Enterprises, LLC,* 2021-0764-PAF, Delaware Chancey Court.

114.  Chain and CEL countersued Treis for selling machines containing WAO2 in circumvention of Cevon's purported rights.

115.  Nobody named Grams, the actual owner of the code, as a party.

## IX. **Treis tricks Grams into customizing WAO2 to meet Treis's undisclosed buyer's demands**

116.  Throughout Grams's time working with Chain and Treis, WAO2 was completely unique:

  a.  It was the world's only firmware product for air-cooled miners;

  b.  It was the world's best firmware for immersion-cooled miners.

117.  However, Treis kept pushing for WAO2 to be faster and more efficient.

118.   To keep up with Treis's demands, Grams was coding improvements to WAO2 and the machines ten to fourteen hours a day, seven days a week, for no direct compensation.

119.   In early 2022, Treis insisted that at least 1000 of its Whatsminers, through WAO2, needed to reach sixty trillion hashes per second (60,000,000,000,000 hashes per second or "60PH")—a rate unprecedented in the industry.

120.   Grams believed Treis wanted WAO2 optimized to better mine for cryptocurrency, that he would receive his development fee for what was mined, and thereby his efforts would ultimately benefit him.

121.   In reality, Treis was in undisclosed negotiations with Defendant Stronghold, to sell Whatsminers with WAO2 installed, even though Treis had no ownership or licensing rights to do so.

122.   In no version of these multiple layers of fraud did Treis *ever* believe it owned WAO2:

> a.   Treis had offered to pay a 5% Dev Fee in exchange for a nonexclusive license to use WAO internally;
>
> b.   Treis agreed to pay a 3% Dev fee in exchange for a nonexclusive license to use WAO2 internally;

      c.     Cevon (not Treis) had purportedly acquired WAO2 from Chain during Cevon's formation.

123.   Eight months before the Stronghold deal Treis reaffirmed to Grams its contract for a nonexclusive license to use WAO2 subject to the Dev Fee.

124.   The speed which could be achieved only through WAO2's optimization was a **material condition** of Stronghold's offer—without WAO2 Stronghold could have simply bought machines directly from Whatsminer.

125.   In order to seal the deal with Stronghold, Treis (through Grams) had to achieve 60PH.

126.   On information and belief Treis also had to fraudulently warrant it owned WAO2, or at least a license for Stronghold to use it.

127.   **In short, Treis had Grams working round the clock to so they could steal from him.**

## X.    Grams discovers Treis stole WAO2 and sold it to Stronghold.

128.   In January 2022 Grams continued to work remotely on the miners. But in late January, he was confused to learn that his access had been blocked to most of the machines.

129.   Treis's Managing Director, Brian Lambretti, told Grams he would work to "fix" the access issue.

130.   Lambretti told Grams he would return to Pennsylvania on February 6, 2022.

131.   In the meantime, Lambretti directed Grams to work on optimizing the few machines Grams could access.

132.   Grams did so and got the machines to achieve 60PH.

133.   On February 7, 2022, Lambretti called Grams and told him the machines had been sold.

134.   Lambretti falsely assured Grams that WAO2 had been removed from the machines prior to sale.

135.   Over the ensuing months, Grams had no access to the machines.

136.   But he occasionally received odd reports from his Dev Fee account.

137.   The reports suggested the miners were connecting for brief periods and then disconnecting.

138.   In the winter of 2022, Grams reached out directly to Stronghold and learned Treis had sold the machines without removing WAO2.

139.   It was clear Stronghold was using WAO2.

140.   It was also clear Treis had implicly or explicitly led Stronghold to believe it had the right to use the machines with WAO2.

141.   Meanwhile, Grams realized his Dev Fee was being **blocked.**
Grams confronted Treis.

142.   A scurry of conference calls and emails were exchanged between Stronghold, Treis, each entity's legal counsel, and Grams.

143.   Throughout, Treis claimed *they* owned WAO2 and accused Grams of somehow stealing *from them*.

144.   Treis's members disparaged Grams in front of Stronghold, an important industry leader who could have been a potential client for Grams, encouraged Stronghold to continue using WAO2 without paying Grams's development fee, and thoroughly discredited Grams in his field, all to ensure they didn't have to turn over the yield from their misappropriation.

145.   Stronghold continued to use WAO2.

146.   On information and belief, Stronghold mined substantial cryptocurrency using WAO2 even after they learned it had been misappropriated.

147.   On information and belief, Stronghold blocked Grams's Dev Fee owed for the currency mined.

148.   Stronghold refused to reimburse Grams for the Dev Fees they blocked or to otherwise compensate him for their use of his intellectual property.

## XI.   <u>Treis's Owners Conspired to Commit Theft of Trade Secrets</u>

149.   On information and belief, Treis is a closely-held entity both owned and controlled by its four Managing Directors.

150.   On information and belief, Treis continues to use WAO2 on its internal machines yet is blocking Grams's Dev Fee.

151.   There are scant operational costs for Treis's use of WAO2—they simply let the machines run, collect the mined crytocurrency, and pass it through directly to the Managing Directors.

152.   If they are not using WAO2, on information and belief they have reverse engineered it and are using their own pirated version to avoid the Dev Fee.

153.   It is now clear that when Treis's Managing Directors learned Chain did not own WAO2 they resolved to continue as if they did—even cutting Cevon out of their dealings.

154.   The Managers resolved that if they had not bought WAO2 from CEL, they would simply steal it from Grams.

155.   Their decision profited each of them personally as Treis is a closely held entity.

156.   The members of Treis—Managing Directors David Pence, Michael Bolick, Senter Smith, and Lambretti—conspired to bury the truth that Grams was the sole developer of WAO2 and that they had no right to use or sell it.

157.   Throughout winter of 2022 Treis and Pence, in cooperation with the other Managing Directors, then falsely represented to third party buyers that Treis had the right to sell Whatsminer machines optimized by WAO2.

20

158.   All Treis's Managing Directors knew that Grams believed he was optimizing WAO2 for Treis's use only and not one of them stepped forward to caution Grams about the deal with Stronghold.

159.   Every deal the Managing Directors formed and every machine Treis delivered armed by WAO2 was a separate theft of Grams's intellectual property.

**COUNT I**
**WILLFUL AND WANTON MISAPPROPRIATION**
**PURSUANT TO 18 U.S.C. § 1836**
**(Defendants Chain and CEL)**

160.   Plaintiff incorporates and realleges paragraphs 18 through 159 as if the same were set forth fully herein.

161.   Plaintiff brings this claim against Defendants Chain and CEL.

162.   Plaintiff created and owns the WAO2 Source Code.

163.   WAO2 contains numerous trade secrets.

164.   WAO2 is related to a product or service intended to be used in interstate and foreign commerce.

165.   Defendants Chain and CEL purported to deliver, send, or convey WAO2 to Cevon and/or Treis without authorization.

166.   Defendants Chain and CEL stole and/or without authorization appropriated, took, or carried away WAO2.

167.   Defendants Chain and CEL obtained WAO2 by fraud, artifice, and deception.

168.   Defendants Chain and CEL did so with the intent to economically benefit.

169.   Defendants Chain and CEL knew disseminating WAO2 would injure Grams.

170.   Defendants Chain and CEL were unjustly enriched through their misappropriation.

171.   Plaintiff sustained actual losses by the misappropriation of WAO2, including but not limited to the decimation of its value through public dissemination.

WHEREFORE, premises considered, Plaintiff demands judgment against Defendants Chain and CEL for:  (a) damages for his actual loss of caused by Defendants' misappropriation of the trade secrets; (b) damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or (c) alternatively, damages caused by the misappropriation for a reasonable royalty for Defendants' unauthorized disclosure or use of the trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(B).  Additionally, because Defendants Chain and CEL willfully or maliciously misappropriated numerous trade secrets, Plaintiff demands an award of exemplary damages in an amount not more than two times the amount of actual damages pursuant to 18 U.S.C. § 1836(b)(3)(C) and an award of attorney's fees pursuant to 18 U.S.C. § 1836(b)(3)(D), together with interest and costs of this action.

**COUNT II**
**WILLFUL AND WANTON MISAPPROPRIATION**
**PURSUANT TO 18 U.S.C. § 1836**
**(Defendants Treis, Cevon, Pence, Bolick, Smith, and Lambretti)**

172.   Plaintiff incorporates and realleges paragraphs 18 through 159 as if the same were set forth fully herein.

173.   Plaintiff brings this claim against Defendants Treis and Cevon, as well as Defendants Pence, Bolick, Smith, and Lambretti, in their individual capacities.

174.   Defendants Treis, Cevon, Pence, Bolick, Smith, and Lambretti knowingly delivered, sent, or conveyed WAO2 to Stronghold and/or other third parties without authorization.

175.   Plaintiff sustained actual losses by the misappropriation of WAO2 including but not limited to the decimation of its value through public dissemination.

WHEREFORE, premises considered, Plaintiff demands judgment against Defendants Treis, Cevon, Pence, Bolick, Smith, and Lambretti for:  (a) damages for his actual loss of caused by Defendants' misappropriation of the trade secrets; (b) damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or (c) alternatively, damages caused by the misappropriation for a reasonable royalty for Defendants' unauthorized disclosure or use of the trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(B).  Additionally, because Defendants Treis, Cevon, Pence, Bolick, Smith, and Lambretti willfully or maliciously misappropriated numerous trade

secrets, Plaintiff demands an award of exemplary damages in an amount not more than two times the amount of actual damages pursuant to 18 U.S.C. § 1836(b)(3)(C) and an award of attorney's fees pursuant to 18 U.S.C. § 1836(b)(3)(D), together with interest and costs of this action.

### COUNT III
### WILLFUL AND WANTON MISAPPROPRIATION
### PURSUANT TO 18 U.S.C. § 1836
### (Defendant Stronghold)

176.   Plaintiff incorporates and realleges paragraphs 18 through 159 as if the same were set forth fully herein.

177.   Plaintiff brings this claim against Defendants

178.   Plaintiff informed Stronghold that he is the owner of WAO2.

179.   Stronghold did not create WAO2 but used the code optimization to mine cryptocurrency.

180.   Stronghold intentionally blocked Plaintiff's Dev Fee.

181.   Stronghold refused to compensate Plaintiff.

182.   Stronghold was unjustly enriched through their misappropriation of WAO2.

183.   Plaintiff suffered damages in the form of lost income and potential income from his Dev Fee.

WHEREFORE, premises considered, Plaintiff demands judgment against Defendant Stronghold for:  (a) damages for his actual loss of caused by Defendants'

misappropriation of the trade secrets; (b) damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or (c) alternatively, damages caused by the misappropriation for a reasonable royalty for Defendants' unauthorized disclosure or use of the trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(B).   Additionally, because Defendants Treis, Cevon, Pence, Bolick, Smith, and Lambretti willfully or maliciously misappropriated numerous trade secrets, Plaintiff demands an award of exemplary damages in an amount not more than two times the amount of actual damages pursuant to 18 U.S.C. § 1836(b)(3)(C) and an award of attorney's fees pursuant to 18 U.S.C. § 1836(b)(3)(D), together with interest and costs of this action.

### COUNT IV
### WILLFUL AND WANTON MISAPPROPRIATION
### PURSUANT TO 18 U.S.C. § 1836
**(Defendants Treis, Cevon, Pence, Bolick, Smith, and Lambretti)**

184.   Plaintiff incorporates and realleges paragraphs 18 through 159 as if the same were set forth fully herein.

185.   Plaintiff brings this claim against Defendants Treis and Cevon, as well as Defendants Pence, Bolick, Smith, and Lambretti, in their individual capacities.

186.   Defendants knew Plaintiff is the owner of WAO2.

187.   Defendants did not create WAO2 but used the code optimization to mine cryptocurrency.

188.   Defendants intentionally blocked Plaintiff's Dev Fee.

189.    Defendants refused to compensate Plaintiff.

190.    Defendants were unjustly enriched through their misappropriation of WAO2.

191.    Plaintiff suffered damages in the form of lost income and potential income from his Dev Fee.

WHEREFORE, premises considered, Plaintiff demands judgment against Defendant Stronghold for: (a) damages for his actual loss of caused by Defendants' misappropriation of the trade secrets; (b) damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or (c) alternatively, damages caused by the misappropriation for a reasonable royalty for Defendants' unauthorized disclosure or use of the trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(B). Additionally, because Defendants Treis, Cevon, Pence, Bolick, Smith, and Lambretti willfully or maliciously misappropriated numerous trade secrets, Plaintiff demands an award of exemplary damages in an amount not more than two times the amount of actual damages pursuant to 18 U.S.C. § 1836(b)(3)(C) and an award of attorney's fees pursuant to 18 U.S.C. § 1836(b)(3)(D), together with interest and costs of this action.

## COUNT V
## CONSPIRACY TO COMMIT THEFT OF TRADE SECRETS
## IN VIOLATION OF 18 U.S.C. § 1832(A)(5)
**(All Defendants)**

192.   Plaintiff incorporates and realleges paragraphs 18 through 159 as if the same were set forth fully herein.

193.   Plaintiff brings this claim against all Defendants.

194.   Treis and each of its Managing Directors, as owners for their personal benefit, conspired to misappropriate WAO2.

195.   Each Managing Director, Treis, and Stronghold conspired to continue using WAO2 in violation of Plaintiff's ownership rights.

196.   Each Managing Director, Treis, and Stronghold conspired to block Plaintiff's Developer Fee.

197.   Each Managing Director, Treis, and Stronghold performed acts to effect the object of the conspiracy.

198.   Plaintiff sustained actual losses by the misappropriation of WAO2, including but not limited to the decimation of its value through public dissemination and lost income and potential income from his Dev Fee.

WHEREFORE, premises considered, Plaintiff demands judgment against Defendant Stronghold for:  (a) damages for his actual loss of caused by Defendants' misappropriation of the trade secrets; (b) damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing

damages for actual loss; or (c) alternatively, damages caused by the misappropriation for a reasonable royalty for Defendants' unauthorized disclosure or use of the trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(B).   Additionally, because Defendants Treis, Cevon, Pence, Bolick, Smith, and Lambretti willfully or maliciously misappropriated numerous trade secrets, Plaintiff demands an award of exemplary damages in an amount not more than two times the amount of actual damages pursuant to 18 U.S.C. § 1836(b)(3)(C) and an award of attorney's fees pursuant to 18 U.S.C. § 1836(b)(3)(D), together with interest and costs of this action.

## COUNT VI
## VIOLATION OF THE RACKETEERING AND CORRUPT PRACTICES ACT PURSUANT TO 18 U.S.C. 1964 AND 18 U.S.C. 1962(C)
### (All Defendants)

199.   Plaintiff incorporates and realleges paragraphs 18 through 159 as if the same were set forth fully herein.

200.   Plaintiff brings this claim against all Defendants.

201.   Defendants are associated as an enterprise.

202.   Defendants' activities affect interstate and foreign commerce.

204.   Defendants have conducted their affairs through a pattern of racketeering activity.

      a.      Defendants have misappropriated Plaintiff's trade secrets;

      b.      All Defendants have used Plaintiff's trade secrets without the right to such use;

      c.    Defendant Treis and its Managing Directors defrauded Plaintiff.

205.   Plaintiff suffered damages as set forth herein or otherwise.

WHEREFORE, premises considered, Plaintiff demands judgment against all Defendants for threefold of the damages Plaintiff has sustained, a reasonable attorneys' fee, and the cost of this action.

**COUNT VII**
**UNJUST ENRICHMENT**
**(All Defendants)**

206.   Plaintiff incorporates and realleges paragraphs 18 through 159 as if the same were set forth fully herein.

207.   Plaintiff brings this claim against all Defendants.

208.   Defendant Treis received hundreds of hours of Plaintiff's work without compensating him for same.

209.   Defendant Treis sold the machines enhanced by WAO2 for several million dollars.

210.   Without Plaintiff's code and optimization work, Treis would not have been able to sell the machines, as they would not have functioned as the contract required.

211.  Stronghold deployed Plaintiff's code to collect substantial cybercurrency without compensating him.

212.   There are *di minimus* expenses for the mining of the cryptocurrency.

213.   Treis's Managing Directors accordingly passed the substantial profits directly on to themselves.

214.   All Defendants have received benefits, as stated above.

215.   All Defendants have been unjustly enriched at Plaintiff's expense.

216.   The circumstances under which each Defendant received benefits at

217.   Plaintiff's expense make it unjust for any Defendant to retain the benefits without commensurate compensation.

WHEREFORE, premises considered, Plaintiff demands judgment against all Defendants, jointly and severally, for any and all actual and special compensatory damages, in an amount to be determined by the jury, together with interest and the costs of this action.

## COUNT VIII
## BREACH OF CONTRACT
### (Defendants Chain and CEL)

218.   Plaintiff incorporates and realleges paragraphs 18 through 159 as if the same were set forth fully herein.

219.   Plaintiff brings this claim against Chain and CEL.

220.   Plaintiff, Chain, and/or CEL entered into a broker style arrangement in they would equally share all profits from any contract Defendant procured for Plaintitff's WAO2.

221.   Defendants Chain and CEL breached the agreement by retaining more than fifty percent of all such profits.

222.   As a proximate cause of Defendants Chain and CEL's breach, Plaintiff suffered injuries and damages.

WHEREFORE, premises considered, Plaintiff demands judgment against Defendants Chain and CEL, jointly and severally, for any and all actual and special compensatory damages in an amount to be determined by the jury, together with interest and the costs of this action.

**COUNT IX**
**BREACH OF CONTRACT**
**(Defendant Treis)**

223.   Plaintiff incorporates and realleges paragraphs 18 through 159 as if the same were set forth fully herein.

224.   Plaintiff brings this claim against Chain and CEL.

225.   Defendant Treis agreed to pay Plaintiff a Dev Fee for their internal use WAO2.

226.   Defendants agreed to protect the confidentiality of WAO2.

227.   Defendant Treis agreed not to sell any machine containing WAO2.

228.   Defendant Treis breached the agreement by:  proactively blocking and refusing pay to Plaintiff's Dev Fee, not protecting the confidentiality of WAO2, and selling machines containing WAO2.

229    As a proximate cause of Defendant Treis's breaches, Plaintiff suffered injuries and damages.

WHEREFORE, premises considered, Plaintiff demands judgment against Defendant Treis for any and all actual and special compensatory damages in an amount to be determined by the jury, together with interest and the costs of this action.

### COUNT X
### FRAUDULENT MISREPRESENTATION
**(Defendants Treis, Cevon, CEL, Chain, Lambretti, and Pence)**

230.    Plaintiff incorporates and realleges paragraphs 18 through 159 as if the same were set forth fully herein.

231.    Plaintiff brings this claim pursuant to Ala. Code §§ 6-5-100 and 6-5-101 against Defendants Treis, Cevon, CEL, and Chain, as well as against Defendants Lambretti and Pence in their individual capacities.

232.    In February of 2020, Chain misrepresented to Grams that he would share half of the profits of any deal he could strike between Grams and any third party.

233.    Over the course of Chain's interactions with Treis and its directors, Chain continued to mislead Grams.

234.    Chain and CEL also allegedly misled Treis and its directors, claiming that CEL owned WAO2.

235.   Chain and CEL further allegedly misrepresented to Treis that Grams was an employee, when he was not, never had been, and was not being paid anything by Chain or CEL.

236.   When Grams heard vague references to Cevon being formed, its membership falsely assured him that he had a to-be-defined interest in Cevon.

237.   In April of 2021, Treis and its directors misrepresented to Grams that they would pay him his Dev Fee, would not disseminate his code, would protect his code, and they would not sell any machine containing his code.

238.   On or about January 15, 2022, Treis, through Lambretti, misrepresented to Grams:

     a.    That they did not know why Grams's access was blocked;

     b.    That they would "fix" the blockage;

     c.    That Grams should keep customizing WAO2 for Treis;

     d.    Lambretti made these misrepresentations to trick Grams into continuing uncompensated work for Treis when Grams otherwise would not have.

239.   Grams invested a degree of trust and confidence in Treis and its members, based on their close working relationship while he customized his source code for them.

240.   Grams believed he, Treis, and its membership were engaged in a joint effort to ensure they would all collectively profit from Grams's customization of WAO2 for Treis's machines.

241.   Treis's directors knew they should have told Grams they intended to sell machines containing WAO2 to Stronghold.

242.   Treis's directors falsely represented to Grams that they would not sell machines containing WAO2.

243.   Treis's directors falsely represented to Stronghold that they owned all code on the machines they were selling.

245.   When Grams learned of the sale, Treis's directors falsely represented to Grams that WAO2 had been removed from the machines prior to sale.

246.   These representations were all false.

247.   The persons making each statement knew the statements were false when they were made, or knew they did not have enough information to confirm their veracity, and failed to correct the statements when such facts became known.

248.   Defendants' misrepresentations were material.

249.   Defendants made such statements with the intent that the representations be acted upon.

250.   Defendants knew or should have known at the time that Plaintiff did not know their statements were false.

251.   Plaintiff justifiably relied on Defendants' statements, particularly in light of their long-term joint efforts.

252.   Defendants' representations were the proximate and consequential causes of Plaintiff's injury.

253.   Plaintiff claims punitive damages of Defendants due to the reckless, wanton, willful, or intentional nature of their conduct.

WHEREFORE, premises considered, Plaintiff demands judgment against Defendants Treis, Cevon, CEL, Chain, Lambretti, and Pence, jointly and severally, for any and all actual and special compensatory damages and punitive damages, in an amount to be determined by the jury, together with interest and the costs of this action.

## COUNT XI
## SLANDER
### (Treis, Pence, Bolick, Smith, and Lambretti)

254.   Plaintiff incorporates and realleges paragraphs 18 through 159 as if the same were set forth fully herein.

255.   Plaintiff brings this claim against Defendants Treis and against Defendants Bolick, Smith, and Lambretti in their individual capacities.

256.   In conversations with Stronghold throughout winter of 2022, Treis made false claims that Grams had stolen his own code from Treis.

257.   Treis knew and or should have known that these statements were false because Grams created the code, they did not create the code, and they had agreed to pay him for their own use of it.

258.   These representations damaged Grams's reputation with Stronghold and its representatives, agents, members, and employees.

259.   Plaintiff suffered damages thereby.

WHEREFORE, premises considered, Plaintiff demands judgment against Treis, Pence, Bolick, Smith, and Lambretti, jointly and severally, for any and all actual and special compensatory damages and punitive damages, in an amount to be determined by the jury, together with interest and the costs of this action.

**COUNT XII**
**TORTIOUS INTERFERENCE WITH**
**BUSINESS OR CONTRACTUAL RELATIONS**
**(Treis, Pence, Bolick, Smith, and Lambretti)**

260.   Plaintiff incorporates and realleges paragraphs 18 through 159 as if the same were set forth fully herein.

261.   Plaintiff brings this claim against Defendants Treis and against Defendants Bolick, Smith, and Lambretti in their individual capacities.

262.   Plaintiff was involved in and/or a party to various business or contractual relationships.

264.   Plaintiff was fully aware of the existence of these business or contractual relationships.

265.   Through negligent, reckless and/or intentional conduct, Defendants tortiously interfered with Plaintiff's valid and enforceable contractual or business relationships.

266.   The actions of Defendants were without right and/or justifiable cause.

267.   As a proximate consequence of Defendants' unlawful interference, Plaintiff was caused to suffer of the loss of the use and benefit of substantial sums of money, loss of business profits and business opportunities, or other serious and permanent injuries to be proven at trial.

268.   Plaintiff claims punitive damages of Defendants due to their reckless, wanton, willful, or intentional conduct.

WHEREFORE, Plaintiff demands judgment against Defendants Treis and against Defendants Bolick, Smith, and Lambretti, jointly and severally, for all compensatory and consequential damages allowed by law, together with interest and costs, in an amount as determined by a trial jury, together with interest and the costs of this action.

### COUNT XIII
### CONVERSION
**(Treis, Pence, Bolick, Smith, and Lambretti)**

269.   Plaintiff incorporates and realleges paragraphs 18 through 159 as if the same were set forth fully herein.

270.   Plaintiff brings this claim against Defendants Treis and against Defendants Bolick, Smith, and Lambretti in their individual capacities.

271.   Defendants have converted property legally belonging to Counterclaim Plaintiffs.

272.   As a result, Plaintiff has been deprived of his in the property.

273.   Defendants took and converted Plaintiff's property to their own use in knowing violation of Plaintiff's rights and Alabama law, thereby causing Plaintiff to suffer injuries and damages, including but not limited to loss of substantial sums of money and loss of the use of those monies, for which he claims compensatory and consequential damages.

274.   Plaintiff claims punitive damages of Defendants due to the reckless, wanton, willful, or intentional nature of their conduct.

WHEREFORE, Plaintiff demands judgment against all Defendants, jointly and severally, for all compensatory and consequential damages allowed by law, together with interest and costs, in an amount as determined by a trial jury.

Respectfully submitted this the 4th day of May 2023.

*/s/ Jonathan K. Corley*
One of the Attorneys for Plaintiff

**OF COUNSEL:**
Jonathan K. Corley
WHITTELSEY & CORLEY, LLC
Post Office Box 106
Opelika, Alabama 36803-0106
(334) 745-7766
jcorley@wwp-law.com

## JURY DEMAND

**PLAINTIFF DEMANDS A TRIAL BY JURY
AS TO ALL ISSUES SO TRIABLE.**

*/s/ Jonathan K. Corley*
Jonathan K. Corley