IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| MARK GRAMS,<br>an individual Alabama citizen, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Civil Action No.: 3:23-CV-299-RAH |
| TREIS BLOCKCHAIN, LLC,<br>CHAIN ENTERPRISES, LLC,<br>CEVON TECHNOLOGIES, LLC,<br>STRONGHOLD DIGITAL MINING,<br>LLC, DAVID PENCE, MICHAEL<br>BOLICK, SENTER SMITH,<br>BRIAN LAMBERTI, AND<br>JOHN CHAIN, | ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

## AMENDED COMPLAINT

Plaintiff Mark Grams, by and through undersigned counsel, states for his Amended Complaint and Jury Demand as follows:

## INTRODUCTION

1.    In December of 2021 Defendant Treis Blockchain, LLC sold one thousand computers to Defendant Stronghold Digital Mining LLC for several million dollars.

2.    The value of the computers lay not in their hardware but their firmware.

3.   The computers were specialized machines that function to mine cryptocurrency in cyberspace.

4.   As detailed within, the computers operate on firmware that boosts them to run faster than virtually any competitor in the world—critical for machines that race to profit by finding and mining cryptocurrency.

5.   The problem with the sale is that Treis knew it did not own the firmware, had no right to sell it, and was, in fact, responsible for maintaining its secrecy.

## PARTIES

6.   Plaintiff Mark Grams is a resident citizen of the State of Alabama, residing at all times material hereto in Alexander City, Tallapoosa County, Alabama.

7.   Defendant Treis Blockchain, LLC ("Treis") is a limited liability company formed under the laws of the State of South Carolina.  Treis resides at 601 High Tech Court, Greer, South Carolina, 29650.  Treis's membership includes Defendants Bolick, Lamberti, Pence, and Smith.  As set forth below, Treis's members are all foreign citizens; therefore, Treis is also a foreign citizen.

8.   Defendant Chain Enterprises, LLC ("CEL") is a limited liability company formed under the laws of the State of Nevada.  CEL resides at 3900 S. Hualapai, Suite 110, Las Vegas, Nevada 89147.  On information and belief, CEL's

sole member is Defendant Chain.  As set forth below, Chain is a citizen of the South

of Carolina; therefore, CEL is also a foreign citizen.

9.    Defendant Cevon Technologies, LLC ("Cevon") is limited liability

company formed under the laws of the State of Delaware.  Cevon resides at 850 New

Burton Road Suite 201, Dover, Delaware 19904.  On information and belief,

Cevon's sole members are Treis and CEL, both of which, as set forth above, are

foreign citizens; therefore, Cevon is also a foreign citizen.

10.    Defendant Stronghold Digital Mining LLC ("Stronghold") is a limited

liability company formed under the laws of the State of Delaware.  Stronghold

resides at 2151 Lisbon Road, Kennerdell, Pennsylvania 16374.  On information and

belief, Cevon's parent member is Q Power, Inc.  Q Power, Inc. resides in Parainen,

Finland.  Stronghold appears to be a publicly traded entity.

11.    Defendant Michael Bolick is a resident citizen of the State of South

Carolina.  On information and belief, Bolick is a member of Treis and a Treis

Blockchain Manager for Cevon.

12.    Defendant Senter Smith is a resident citizen of the State of South

Carolina. On information and belief, Smith is a member of Treis and a Treis

Blockchain Manager for Cevon.

13.    Defendant John Chain is a resident citizen of the State of South Dakota. On information and belief, Chain is sole member of CEL and a Chain Enterprises Manager for Cevon.

14.    Defendant Brian Lamberti is an individual citizen of the State of South Carolina.  On information and belief, Lamberti is a member of Treis.

15.    Defendant David Pence is an individual who resides in the State of South Carolina. On information and belief, Pence is a member of Treis.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff brings this action under 18 U.S.C. § 1836, 18 U.S.C. § 1964, and 18 U.S.C. § 1962(c).  Subject matter jurisdiction is also predicated on 28 U.S.C. § 1332 because there exists complete diversity between the parties, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.  This Court has subject matter jurisdiction over Plaintiff's state-law claims pursuant to 18 U.S.C. § 1367(a).

17.    Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in Tallapoosa County, Alabama, which is located in the Eastern Division of the Middle District of Alabama, 28 U.S.C. 81(b)(3), or, alternatively,

pursuant to 28 U.S.C. 1391(b)(3) because all Defendants are subject to this Court's personal jurisdiction.

## FACTUAL ALLEGATIONS

### Cryptocurrency and how anyone can "mine" for it[1]

18.    Cryptocurrency is intangible digital currency.

19.    Transactions applying the currency are recorded and verified in a decentralized system using cryptography.

20.    The first digital currency was Bitcoin, which launched in 2009.

21.    Since then, Bitcoin alternatives, referred to as "altcoin," have exploded onto the market, including Ethereum, Tether, USD Coin, Binance Coin, XRP, Binance USD, and Cardano.

22.    There are approximately 18,000 variants of cryptocurrency available.

23.    There are three ways to acquire cryptocurrency:

   a) Purchase cryptocurrency on an exchange market;

———————————

[1] Information for this background section was assembled from internet sources, including: www.simplilearn.com/bitcoin-mining-explained-article,

www.crunchbase.com/organization/whatsminer,

www.investopedia.com/terms/a/asic.asp#:~:text

b) Accept cryptocurrency as compensation in a transaction;

c) "Mine" for it—like gold

24.    This case involves machines that mine for cryptocurrency.

25.    For a mining transaction to be recorded on the ledger it must be validated by solving a complicated mathematical puzzle called a proof of work.

26.    Cryptocurrency "miners" perform this function, manifesting new digital "coins" which can then be used in their exchange market.

27.    Mining is as mentally taxing as goldmining was physically taxing—it requires advanced machines with high computing power applied to solve complicated mathematical equations.

28.    Computers have entered the market whose sole purpose is to mine for cryptocurrency—they are called "miners."

29.    The faster the miners can operate the more lucrative they will be.

30.    The instructions that tell the computer how to mine are called firmware.

31.    Whereas software programs are user-facing and interactive, firmware tells the machine itself how to operate.

32.    Firmware in this context does not interact with a user; it tells a machine how to mine for cryptocurrency.

6

33.    The firmware may be stored on an application-specific integrated circuit (ASIC) chip that is integrated into the machine's hardware.

34.    Each ASIC chip functions to mine a specific digital currency.

35.    Miners that use ASIC chips are referred to as "ASIC miners."

36.    A leading manufacturer of ASIC miners sells them under the brand name Whatsminer.

37.    "Whatsminers" are some of the most cost effective and efficient machines on the market.

38.    Plaintiff Mark Grams figured out how to make them better.

**Plaintiff Grams creates firmware to optimize the industry leading "Whatsminers"—making them faster, more efficient, and more lucrative**

39.    In 2017, Grams learned about cryptocurrency and began pioneering code to optimize miners.

40.    Just two years later he sold his first firmware code optimization ("FCO").[2]

---

[2] Source code can be written to optimize firmware to perform functions beyond those publicly known and available—such code optimizations are proprietary trade secrets.

41.     His 2019 FCO improved the Antminer S17 Series machines.

42.     He sold the 2019 FCO to Immersion Systems, LLC for $30,000.

43.     Brokering the deal between Immersion Systems and Grams was Defendant John Chain.

44.     Grams went on to pioneer code to optimize the industry leading Whatsminers—his MicroBT Whatsminer Asic Miner FCO ("WAO2").

45.     Whereas the firmware sold to Immersion Systems, LLC covered only one model of software, WAO2 covers about one hundred.

46.     WAO2 contains numerous trade secrets, including algorithms and logic, hardware interaction, communication protocols, calibration and configuration data, power management techniques, performance optimization techniques, error handling and recovery processes, integration of third party components, and security measures (together the "Trade Secrets").

47.     In February of 2020, Chain learned that Grams had successfully completed the firmware and asked if he could help Grams monetize it.

48.     Monetizing firmware can take many forms.

_____

49.    Users can pay a fee up-front for a license to use the firmware, or they can agree the developer will retain a percentage of the cryptocurrency as it is mined, referred to as a "developer fee," or "Dev Fee" for short.

50.    Grams recognized that he himself was a tech guy with little business or marketing acumen.

51.    In a discussion, Grams agreed Chain could try to find companies interested in using WAO and that he would pay Chain fifty percent of any new contracts Chain could procure.

52.    Grams also pursued opportunities independently, including with Vnish Mining Software Company.

**Grams begins working with Treis**

53.    In Spring of 2020 Chain began negotiating with Defendant Treis, who wanted to install WAO on their Whatsminers.

54.    On May 27, 2020, in a group chat including Bolick, Chain, Pence, Smith, Chain presented Treis with the "Fee Schedule and Incentive" for WAO users:

Fee Schedule and Incentive for new customers:

——-Fees to the customer / per miner——-
Demonstration Firmware - 5% dev fee
1,000 to 2,999 Machines = 4% dev fee
3,000 to 4,999 Machines = 3% dev fee
5,000 to 9,999 Machines = 2.6% dev fee
10,000 to 14,999 Machines = 2% dev fee

15,000 and above = direct negotiation

——-Proceeds to client Finder——-
1,000 to 4,999 Machines = 30% revenues to partner
5,000 to 9,999 Machines = 40% revenues to partner
10,000 and above = 50% revenues to partner

For the facilities preferring NO dev fee:
- Revenues to partner structure the same
- Per machine fees will be calculated using the 4% dev fee using the previous 6 month average for the price of BTC with a 6 month ROI for the required upfront payment, as the upfront cost is significantly more for the client, but they have NO monetary commitment after the upfront payment

Basic support from ASIC.world and ChainAI will be the same in either model
basic support includes:

Installation assistance
Access to techs during business hours in our online chat
General RMA / Revert to stock assistance in our online chat

24/7 "Enterprise" support will be a separate package with a rate that will be negotiated based on the scope / scale of the deployment and level of assistance required. This will go all the way to "We will fly out a tech to your facility to assist with..........." or assistance with wallets, pools, and custody, etc.
14:08
Gents - this is where we are on pricing at present
14:08
we have intentionally made dev fee more advantageous short term - with the up front cost geared to those who want complete control of what talks to whom / where and the like

10

55.     The list clearly states that while the Firmware is in the demonstration phase, such as Treis was contemplating commencing, the Developer Fee would be 5%.

56.     This is because the demonstration phase is time consuming and involves interactive work for the developer.

57.     Based on group discussions, Grams reasonably believed Treis, Grams, and Chain were cooperating in a joint venture.

58.     Pursuant to that venture, Grams and Chain would initially collect only the Developer Fee.

59.     They understood they needed to prove to Treis that WAO2 functioned as they represented it could, and that Treis's customers would benefit from using WAO2 on their machines.

60.     Meanwhile, Treis needed to provide machines to test out WAO2's functionality and for Grams to continue optimizing it for use on Treis's machines.

61.     And Treis needed to bring customers to the table to ultimately buy the machines optimized by WAO2.

62.     The group agreed that in the beginning, Grams and Chain would simply collect their development fee.

63.    But the group planned that over time as the venture succeeded, there would be future discussions.

64.    Treis represented to Grams and Chain that the venture would solidify into a more formal entity wherein profits and efforts would be shared in an appropriate manner yet to be determined.

65.    On June 2, 2020, Pence asked to start testing out the firmware.

66.    Chain added Grams to their groupchat and Grams introduced himself as the developer of the firmware: "Let me introduce myself, I am the firmware mods developer for the Whatsminers and others."

67.    Grams did not refer to Chain AI, or suggest that he was an employee, member, or officer of Chain AI—because he wasn't.

68.    He was the developer of the firmware that Treis wanted to use.

69.    Grams let Treis know he wanted to test the firmware on m30 machines.

70.    Pence represented to the group that "We have some large orders like 1500 m30s any day.  If we could show them overclocking on m30s with confidence **you could get a large order on ths like in 90 days** because of order delivery but that would look great as a starter."  (emphasis added).

71.    The opportunity to install his firmware on 1500 machines for future customer use was a real incentive for Grams, because the more machines that he

could operate his firmware on the more compensation he would accrue from his share of the Dev Fee.

72.    The referenced 1500 machines never materialized.

73.    It now appears Pence falsely stated Treis had ordered 1500 machines solely to induce Grams to agree to let Treis start using his firmware.

74.    Grams spent significant time preparing their machines to use his firmware effectively and measuring the increase in production.

75.    At noon on June 16, 2020 Bolick confirmed the results: "All, looks like the M30s is running at 99.85 TH and 4000 W and the M30+ is running at ~ 106 TH and 3691 W.  Nice work!"

76.    Initially, Treis had agreed to pay a 5% Developer Fee to install WAO on 400 of their machines to test out WAO's efficacy.

77.    Later, they demanded the Dev Fee be reduced to 3%.

78.    Chain, on behalf of Grams, agreed to the reduced amount.

79.    Chain reinforced to Treis that security and maintaining the confidentiality of the firmware was critical:

       a) "We're happy to facilitate some info sharing, NDAs, or whatever between now and Tuesday."  Chat 5/22/2020, Chain to Bolick.

b) "I've spent a lot of time every week on physical and cyber security consulting…So, I do take security of info, proprietary IP and the like quite stringently." *Id.*

80.    But overall the intimate group relied on trust and oral or informal instructions: "John—Please hold in confidence this pricing matrix new offered to the customer…."  Chat 9/8/2020, Bolick to Chain.

81.    In summer of 2020 Treis's testing phase initiated.

82.    Throughout all times relevant to this Amended Complaint, Grams performed his work from his home laboratory in Alabama.

83.    When Treis needed physical work performed on a machine, Treis sent it to Grams in Alabama.

84.    When it was time for the machines to go back to Treis, Grams sent or hand delivered them back to Treis in South Carolina.

85.    In late September 2021, Lamberti himself drove out to Gram's lab in Alabama with a Treis intern to pick up all of the machines Grams had brought back from Pennsylvania to repair, along with some power supplies Grams had not been able to fix.

86.    Whenever Treis's directors or interns had a question, they directed it to Grams by phone or internet, and Grams answered from Alabama.

87.   It was Treis's job to find customers interested in purchasing machines optimized by Grams's WAO2 firmware.

88.   On information and belief, Treis directors traveled to Alabama to meet with potential customers.

89.   During a phone call in August 2020, Pence and Bolick promised Grams and Chain that Treis would make them $400,000 in Developer Fees by January of 2021.

90.   Grams worked with the group from his home in Alabama.

91.   Treis reached out regularly to Grams, sending machines to Alabama for him to work on, and having its members reach out to Grams with all firmware questions.

92.   For instance, on August 27, 2020, Bolick reported to Grams that "One of the boards you just repaired [in Alabama] and that I just received is for the M31s machine that we tried to unlock."  Chat 8/27/2020, Bolick to Grams

93.   Essentially, Gram's home in Alabama became Treis's physical workshop for broken machines and the site of its tech support for all WAO2 related questions.

94.   Grams even sold ten of Treis's machines, 10 Antminer L3 miners, to an Alabama customer directly, for $14,000.

95.     Treis had sent the Antminers to Grams to work on in his home lab.

96.     When he repaired the Antminers he let Treis know he had a prospective purchaser for the machines.

97.     Instead of having Grams send the machine back to them, Treis confirmed the sale.

98.     Treis sent machines to Alabama and Mark sold them to Alabama residents on behalf of Treis: $14,000

> "Please make checks payable to:
>
> Treis Blockchain Inc
>
> Please send a list of what you sold.
>
> Please mail to:
>
> Treis Blockchain
> Beth Davis
> 3620 Pelham Road
> PMB 84,
> Greenville, SC 29615
>
> *Email, Beth Davis to Mark Grams, September 1, 2021.*
>
> "Received the check."
>
> *Email, Beth Davis to Mark Grams, September 16, 2021.*
>
> Treis's directors directed Grams to deliver machines
> from Alabama to Pennsylvania.

"please unload everything onto the dock."

*Email Bolick to Grams, Pence, Lamberti, et al.*

99.   Treis had Grams send them a check for the proceeds of the sale.

100.   Over the following eighteen months, Grams spent thousands of uncompensated hours customizing WAO2 to suit Treis's goals.

101.   Treis directed Mark to do so:

a)  "We have a big customer coming in tomorrow….we really need all your available attention on ramping this one up[.]" Chat 8/27/2020, Bolick to Grams;

b)  "I got done about 3 am" Chat 8/27/2020 Grams to Bolick;

c)  "Mark has been burning some serious hours" Chat 8/27/2020 Chain to Bolick;

d)  "Any chance you can bump this back up a little bit in the next hour?" Chat 9/20/2020, Bolick to Grams;

e)  "Our next key customer is now confirmed for Wednesday….Mark—it would be ideal if you can push the M30s up to a stable 100 TH….It would also be great if we can bump one or both of the 2 air" Chat 9/23/2020, Bolick to Grams;

f)  "let's discuss the scope and targets…for this extended (final?) test phase…I would love it if we can prove that a FW upgrade of the immersed M20s machines is effective" Chat 10/6/2020, Bolick to Grams.

17

**The Joint Venture Solidifies—But Grams Receives Nothing**

102.   In fall of 2020 Treis, apparently satisfied with Grams's progress, began negotiating with Chain to purchase WAO2 outright.

103.   WAO2, which had optimized the best machine on the market, was valued between seven and eight figures.

104.   Defendant John Chain falsely represented that WAO2 was solely owned by his entity, Chain Enterprises, LLC ("CEL").

105.   Chain also falsely represented that Grams was his business partner with membership in CEL.

106.   Grams never had any membership in CEL.

107.   Throughout the period, Grams was never an employee, officer, or subcontractor for CEL.

108.   Neither Treis, nor any of its directors, who chatted regularly with Grams, verified whether Grams was a member of CEL.

109.   Instead of an outright purchase the deal was funneled through a subsidiary created for the purpose, Cevon Technologies, LLC ("Cevon").

110.   Cevon is owned 50% by Treis and 50% by CEL.

111.   According to Cevon's Limited Liability Company Agreement, Treis's initial capital contribution was $100.

18

112.    And CEL's initial capital contribution was "all intellectual property that it owns or exclusively licenses related to firmware and dual phase immersion cooling systems for crypto-currency and blockchain applications."

113.    The operating agreement contemplated no royalties and no Dev Fee, in violation of the representations Treis had made to Grams.

114.    However, CEL was not the owner or licensor of WAO2.

115.    WAO2 was owned solely by Grams.

116.    Chain had, at best, a nonexclusive-broker relationship to market WAO2 for Grams.

117.    CEL was not required to provide any proof that it owned any intellectual property.

118.    On information and belief, WAO2 was never specifically referenced in any way.

119.    Treis's contribution of $100 is *di minimus.*

120.    Treis, Pense, Smith, Lamberti, Bolick, and Chain all knew the value of WAO2 far exceeded $100.

121.    Equalizing a capital contribution of $100 with the world's fastest cryptocurrency mining firmware, void of royalties or Dev Fees, is unreasonable on its face.

122.   No one asked Grams to sign the deal.

123.   Treis knew or should have known that neither Chain nor CEL owned WAO2.

124.   Treis knew or should have known that Grams would never have agreed to exchange firmware of this value for $100.

125.   While the business guys were in the other room drafting the papers, Grams was working diligently from his lab.

126.   Grams continued to respond to Treis's requests for improvements to the mining project.

127.   He was told that he would be compensated, but that the terms and receipt of his compensation could only be solidified after the Chain litigation.

128.   "Treis has agreed that Mark can continue to work for Cevon in a manner to be fully determined once we figure out all the related legal issues caused by what our suit alleged as a lack of truthfulness on Chain's part." *Email, Bolick to Harley Torrealba, Senter Smith, and David Pence, October 6, 2021.*

129.   In or around March 2021 Treis encountered a physical problem with its miners' use of WAO2—their miners were overheating.

130.   The problem required a mechanical solution.

131.  Grams worked with Treis's machines physically from his lab in Alabama to find a solution.

132.  Grams developed a two-part mechanical solution:

  a)  He designed an insert to divert the airflow on air cooled miners;

  b)  He removed the miner's middle board.

133.  Grams's solution boosted the miners to faster speeds by diverting more power to their remaining boards.

134.  At Treis's request, Grams shared the design for this workaround with Treis's metal sheet fabricator.

135.  Working from Gram's designs Treis then made cosmetic changes and patented it as their own without Grams's knowledge or consent.

136.  But regardless, as set forth below, it is beyond dispute that by April of 2021, Treis knew that Chain had never owned WAO or WAO2 and that Grams was the developer and sole owner.

137.  Throughout 2020, Grams had been focused on customizing WAO2 for Treis.

138.  He worked tirelessly on the customization because the more Treis's machines mined, the more he would collect, through his Dev Fee.

21

139.  At all times, Treis gave Grams the impression they were working jointly toward this common purpose:

a)  "Had a great call with Immersion Systems in Dallas this morning right before the Cargill call….They are comfortable with the 2% dev fee". Chat 10/21/2020, Bolick to Grams;

b)  To support the development, the group installed Grams's firmware on 200 miners;

c)  In November Treis asked to load more miners with the firmware;

d)  "I suggest we discuss options for leveraging our overclocking firmware work to date / collaborating / partnering / cross marketing" Chat 12/28/2020, Bolick to Grams;

e)  To support the effort, Grams's firmware was installed on another 200 of Treis's machines;

f)  And directions continued to flow;

g)  "It would be nice if we could replicate the following Immersion provider…." Chat 1/27/21, Pence to Grams;

h)  "I will play with the 4 more today and see just what can do" Chat 1/27/21, Grams to Pence;

i)  "Being able to do this would add to Cevon's credibility in the market"

*Id.;*

j)  "I will send you a bottle of your favorite liquor if you can help us figure

out how to get…" Chat 1/27/21, Pence to Grams;

k)  "that is brilliant!  Thanks for the image…we are going to try to re-create

that here" Chat 1/27/21, Pence to Grams;

l)  "This is great news!  …. So let's see if we can do this more often.

….Your pictures show how to do a 2 PSU rig.  We need to see if we accomplish

that." Chat 2/2/21, Pence to Grams;

m) "We would like to learn how you tested all four and how you returned

two to service.  Maybe later this week you could do a google meet with Brian

[Lamberti] and me?" Chat 2/2/21, Pence to Grams;

n) The team got excited as Grams's improvements were increasingly

successful:

i)  "tuning the 113 miners we have access to now …28%29% increase

in overall hashrate" Chat 3/4/21, Grams to Treis;

ii) "Hell yeah!  That's what we need."  Chat 3/4/21, Lamberti to

Grams;

iii) "Tuning a little more has up to 31% increase overall"  Chat 3/5/21, Grams to Treis;

iv) "Looking good Mark!"  Chat 3/26/21, Lamberti to Grams;

v) "Can this go to 1800?  Chat 3/30/21, Lamberti to Grams;

vi) "it looks about a 30+% increase on air" Chat 3/30/21, Grams to Treis;

vii)  "That sounds very promising!"  Chat 3/24/21, Bolick to Grams;

viii) "Great work guys.  That just turned Cevon into a million + revenue potential company."  Chat 3/31/21, Pence to Grams;

ix) "Wow.  Just wow.  And Kudos to us all at this turn of events."  Chat 3/31/21, Bolick to Grams;

x) "Do you have a minute to look at 2 Franked miners that I just put into vat 7?"  Chat 3/31/21,  Lamberti to Grams.

**Treis learns it bought nothing—for $100**

140.  Throughout 2020, Grams received only $4,300 in Dev Fees.

141.  Per his agreement with Chain, all of the Dev Fees were being sent to an electronic wallet.

142.  The distributions from the wallet were supposed to be shared equally.

143.    Given the number of Treis's machines operating WAO2, Grams expected significantly greater income.

144.    Grams became concerned the Dev Fee was compromised.

145.    He suspected Chain was taking more than fifty percent of the Dev Fee being deposited into the wallet, and was allocating less than fifty percent to Grams.

146.    Simply put, he suspected Chain was stealing from him.

147.    On information and belief, Chain and Treis were making hundreds of thousands of dollars in cryptocurrency value using WAO2.

148.    Given the value of WAO2's extractions, the Dev Fee should have been much higher.

149.    In April 2021 Grams announced that he was not comfortable with the way things were being handled.

150.    Grams told Treis that he suspected Chain was in breach of the agreement between Grams and Chain and that he would no longer be working with Chain.

151.    The Treis directors expressed shock that Grams was not a member of CEL.

152.    Treis's directors represented that they had no idea that Grams was the owner of WAO2 and had not given or sold it to Chain or CEL.

153.    On April 28, 2021, Bolick wrote to Grams, "Thanks for the call yesterday.  I spoke with David and Senter and we want to figure out a way to work directly with you."

154.    Grams told Chain that he was redirecting the Dev Fees to an account under Grams's sole management.

155.    Grams informed Treis that if they wanted to continue using WAO2 they had three options:

   a)  Maintain the *status quo*: continue using WAO2 on Treis's internal machines only subject to the 3% development fee; or

   b)  Purchase WAO2 outright and own the exclusive right to use it for $1,000,000; or

   c)  Remove WAO2 from all their machines.

156.    Treis chose to stay the course and continue paying the Dev Fee.

157.    In turn, Grams continued customizing WAO2 for Treis.

158.    It is beyond dispute that Treis knew about the Developer Fees.

159.    On May 25, 2021, Grams let Bolick know Chain was blocking his access to the Developer Fee:

a)  "I no longer have access to the chainai slushpool wallet.  John locked me out so I cannot monitor the funds that are still going into it."  Grams to Bolick, 11:17 a.m.

b)  Minutes later Bolick responded, "Ok.  Thank you for letting me know."

160.   In May, Grams let Treis know that Chain had locked him out from collecting the Dev Fee:

a)  "I no longer have access to the chainai slushpool wallet.  John locked me out so I cannot monitor the funds that are still going into it."  Chat, Grams to Bolick, 5/25/21 at 11:17 a.m.

b)  "Ok.  Thanks for letting me know."  Chat, Bolick to Grams, 5/25/21 at 11:21 a.m.

161.   Overall, Treis expressed appreciation that Grams had spoken up, "You did nothing wrong and did the right thing in coming to us with the truth.  [Chain], on the other hand, did not, in my opinion, do right things in his business relationships with either of us."  Chat 6/7/2021, Bolick to Grams.

162.   Grams continued customizing WAO2 for Treis.

163.   On June 10, 2021, Grams asked Bolick, "How much would it cost for 10 gallons of immersion fluid?  I think I will try to build a small tank for 2-4 miners for testing here [in Alabama]."

27

164.   On June 15, 2021 at 9:36 a.m. Bolick responded:

Sorry Mark.  I just saw this.  I am on vacation this week
but I will review what we can do to get you set up with
an immersion vat first thing next week.

Any time you text here and I don't respond, please feel
free to call me directly at ….

165.   On July 7, 2021 at 2:55 Bolick continued to send Grams directions:

What would help us it to get output in the Status/System
Log after cgminer is restarted
….
"If you could get these outputs for us from 5-10 devices
(from M20s and m21s each) it would be of great help"

Is this something you can get together?

166.   Grams agreed to do so and Bolick thanked him.

167.   The same day Grams let Bolick know he was making a tool so that Treis would know when a miner needed attention, and Bolick again expressed his appreciation.

168.   In July of 2021, Treis invited Grams and his wife to travel to South Carolina to meet the Treis team in person.

169.   Treis paid for the trip.

170.   On July 20th, at approximately 13:00 p.m., Grams had a meeting with Bolick in Bolick's office.

171. The two discussed:

a) The situation with John Chain;

b) Treis's use of WAO2;

c) How much Treis appreciated Grams's work and that he was doing a great job

172. Regarding Treis's use of WAO2 Grams told Bolick Treis needed to chose from three options:

a) Purchase WAO2 for $1,000,000;

b) Buy an unlimited license to use WAO2 without a DevFee for $100,000; or

c) The *status quo*—continue using WAO2 on machines owned and held by Treis only subject to Grams's 3% Dev Fee.

173. Bolick suggested that instead of buying WAO2 for $1,000,000 Treis could give Grams shares of its affiliate Bettertherm.

174. However, Bolick had also indicated Bettertherm might be dissolved; so Grams politely declined.

175. Grams said he would consider selling WAO2 for shares of Treis instead.

29

176.    Bolick declined that offer, saying that Treis needed to wait until it knew what was going on with its pending litigation first.

177.    So Grams and Bolick agreed Treis would simply keep the *status quo* and continue paying the Dev Fee to use WAO2 on their machines internally.

178.    That night, Grams and his wife went to dinner with Bolick and Bolick's wife, during which Bolick continued to praise Grams's success with developing the firmware.

179.    During the dinner, Bolick also stated that Treis hoped to continue working with Grams and developing their relationship.

180.    Finally, Bolick again expressed how Grams's decision to alert Treis to the fact that Chain did not own the firmware, and that Grams did, had been the 'right thing' to do.

181.    Treis sent Grams back to Alabama with machines to fix including 75 control boards, 30 miners, and 20 hashboards.

182.    When Grams had finished fixing the machines in Alabama he drove them back to South Carolina.

183.    On July 24, 2021, Grams shared with Bolick a copy of his agreement with VNish.

184.    Grams informs Bolick that per the agreement, "If ever canceled [Vnish] has to basically stop using [WAO2] but it does not give him the ip or anything else." Chat, 8/24/21 at 20:14, Grams to Bolick.

185.    Bolick makes no objection that Grams is letting Vnish use WAO2, does not protest that Treis or Cevon own WAO2, and certainly does not question that Grams is the sole owner of WAO2.

186.    Rather, business continues as usual.

187.    On or about July 29, 2021 Bolick and Grams have a call, and Grams updates Bolick at 14:19:

> Thanks for the call the potential client is looking for an immersion container including miners but doesn't want to spend more than 200k.  capturing the heat is not needed.  It would be placed here in AL and wants whatsminers.

188.    On September 3, 2021, Treis filed suit against Chain in the Court of Chancery of the State of Delaware for misleading them in *Treis Blockchain, LLC v. John Chain and Chain Enterprises, LLC,* Case. No. 2021-0764, removed to federal court in Case No. 1:21-cv-01435—MN.

189.    Treis's allegations included:

    a)  "Chain represented to Treis that Chain Enterprises employed a person by the name of Mark Grams, who had purportedly developed certain intellectual

property related to overclocking firmware and, as an employee of Chain Enterprises, Mr. Grams would further develop the firmware for Cevon's business." Document 1-1, Verified Complaint, ¶ 26.

b) Treis alleged that they had "purchased additional equipment and provided access …to ensure the firmware could be developed more fully…Treis also sent equipment directly to Mr. Grams [in Alabama] to facilitate this work." *Id.* at ¶ 27.

c) "In or around April of 2021, Treis discovered that Mr. Grams was not an employee of Chain Enterprises and that Mr. Grams contended that neither Chain nor Chain Enterprises had any ownership interest or exclusive licensing rights related to firmware." *Id.* at ¶ 32.

190.   The pleading fraudulently mischaracterizes the Developer Fee Treis had known about since the first day they were introduced to Grams as a scheme to steal from them.

191.   Treis alleged that Chain and Chain Enterprises "devised a scheme to conceal revenue from Treis by allowing Mr. Grams to divert royalties generated by Treis's equipment[.]" *Id.* at ¶ 33.

192.   This mischaracterization was an attempt to perpetrate a fraud upon the Court and disparaged Grams, even if indirectly.

193. Grams was not named as a Defendant and no allegations were made that Grams ever misrepresented anything to Treis.

194. Chain and CEL countersued Treis for selling machines containing WAO2 in circumvention of Cevon's purported rights.

195. Nobody named Grams, the actual owner of the code, as a party.

196. Just two days after filing suit against Chain, Treis reached out to ensure Grams would keep developing WAO2 for them.

197. "Mark—please give me a call so we can discuss plans for PA." Chat 9/5/2021, Bolick to Grams.

198. Throughout the times relevant to this Amended Complaint, Grams had been working primarily from his heavily-secured personal site in Alabama.

199. However, Treis's machines, operating on WAO2, were housed in Pennsylvania and South Carolina.

200. Most of the machines were housed in Pennsylvania, and Treis sent Grams to Pennsylvania to work on those machines.

201. When developing and using proprietary software it is critical to protect the integrity of the code.

202.    After firmware is in final version it can be encrypted, but in practice it is never practical to do so during a testing phase in which it is constantly undergoing updates.

203.    Accordingly, Grams insisted and Treis agreed that all devices using WAO2 would be password protected, locked, and otherwise secured.

204.    All Parties knew that protecting the confidentiality of WAO2 was essential as the value of the firmware to both user and developer is drastically reduced by public dissemination.

205.    Grams himself keeps all copies of WAO2 only on password‑protected devices, with a camera system recording all access, on private property.

206.    Grams requested that Treis similarly install cameras at all entry points to record anyone accessing the miners.

207.    In September 2021, Grams traveled to the Scrubgrass Power Plant in Pennsylvania to service machines Treis was storing there.

208.    The trip was set up by and for Treis, who knowingly continued to direct Grams to perform work for Treis for no compensation.

209.    "Working to make travel arrangements today.  Current plan…Michael Grams [Mark's brother] and Mark Grams will travel late Wednesday …Here is the plant address: Scrubgrass Plant—2151 Lisbon Rd, Kennerdell, PA 16374." *Email*

*Bolick to Mark Grams, Michael Grams, Paul Nielsen, Brian Lamberti, Beth Davis, David Pence, and Senter Smith. September 6, 2021.*

210. Meanwhile, Treis paid Mark's brother, who Mark brought in to help the team, $6,700 just for the Pennsylvania trip.

211. "I told Mark that Treis has agreed to pay you USD $6700 for 14 x 10-hour days at our site in Kennerdale, PA to address issues with our miners there." *Email Bolick to Mark Grams and Michael Grams, September 7, 2021.*

212. It was clear to all that Treis had caused Grams to believe he was going to be compensated for his work as well.

213. Grams worked tirelessly—fourteen hours a day, starting at 9:00 a.m. and not leaving until 7:00 or 8:00 p.m.

214. Grams was shocked to learn there was no security whatsoever safeguarding the firmware.

215. WAO2 was installed on computers that had no passwords.

216. There were no cameras recording access to the machines.

217. The computers were stored in containers that had no locks on them.

218. The containers were located on a publicly accessible site.

219. In sum, anyone could simply walk up to one of the containers, open Treis's computers, and steal Grams's WAO2.

220.   Grams immediately alerted Lamberti.

221.   He told Lamberti that the security surrounding access to Treis's machines and his firmware was unacceptable.

222.   Lamberti responded that he would take immediate action to secure the site.

223.   Throughout that day, Lamberti had Treis's workers go through every machine and install passwords.

224.   Grams insisted this was not enough and asked Lamberti to install cameras to monitor access to the computers and locks on the containers.

225.   Lamberti assured Grams that he would take the security issue up with his team and they would provide ample security.

226.   Grams trusted Lamberti's reassurances because he knew Treis would not want anyone to be able to steal hundreds of their valuable machines.

227.   Grams had no idea that Treis would not want to install cameras because then Grams would potentially be able to see if third parties, such as their anticipated buyer Stronghold, were accessing the machines.

228.   At the end of the trip, Treis gave Grams thirty miners to take back to Alabama to repair.

229.   In the fall of 2021 Grams offered to sell Treis a license to include WAO2 on machines they would sell to third parties.

230.   Treis declined the offer.

231.   But they continued directing Grams to optimize the Whatsminers, and letting him believe it was so he could collect his Dev Fee.

232.   On September 29, 2021, at 17:10 p.m. Bolick continued to direct Grams:

> Do you think you can do the tuning on the 5 M30s
> machines tonight?  Also, can we talk tomorrow afternoon
> to get caught up?

233.   Mark responds that he will do so that night and updates Bolick that with his work, "We are looking at 10% increase with all 3 boards in them."

234.   Bolick was pleased.

235.   It is beyond dispute that in 2021 Treis's managing directors knew that Grams was the sole author of WAO2.

236.   "The companies I was told I would receive shares of in return for bringing the software into the mix are all being dissolved, Michael wants to take part or all the dev fee back or away.  …we need to come to an agreement on the dev fee or Treis buying the firmware outright for $1.2 million."  *Email Grams to Smith*, October 15, 2021.

237.   "At NO time was there any agreement made to make the firmware a part of any other company, John knew I was not going to give up the IP rights to the firmware unless there was a payment of at least a million dollars to me." *Email Attachment, Grams to Bolick, November 15, 2021.*

238.   "Mark Grams DOES own the intellectual property rights to the MicroBT/Whatsminer Unlocking and Overclocking Software and its associated software or tools."    NON-COLLUSION/NON-DISCLOSURE AFFIDAVIT, forwarded to Senter Smith by Email, Grams to Smith, October 15, 2021.

239.   Similarly, Treis's managing directors knew that it would be wildly inappropriate to install Grams's firmware on third party IT.

240.   "Importantly [Treis's] lawsuit claims that Chain never had any rights to the firmware that Mark developed and if this is true it is disturbing that Chain used this same firmware [on your IT]." *Email, Bolick to Harley Torrealba, Senter Smith, and David Pence, October 6, 2021.*

241.   It is also beyond dispute that Treis's directors knew that Grams's firmware collected the Dev Fee for Grams.

242.   "We agreed to move our [program] to help address [his] expressed concern that Chain might be collecting hidden dev fees through the application of

Mark's firmware." *Email, Bolick to Harley Torrealba, Senter Smith, and David Pence, October 6, 2021.*

243.  "I told John I don't want any part of what was going on other than to collect a dev fee on my firmware." *Email Grams to Hartley Torrealba and Bolick*, October 15, 2021.

244.  But Grams reminded Treis that they had agreed to continue to pay his Dev Fee:

245.  "The options were remove the firmware, continue using it at the current developer rate or purchase the firmware.  Treis chose to continue using it at the current development rate and all funds collected from the developer fee continue to be paid to me[.]" *Email Attachment Grams to Bolick, November 15, 2021.*

### Treis fraudulently mislead Grams into customizing WAO2 to meet Treis's undisclosed buyer's demands

246.  Throughout Grams's time working with Chain and Treis, WAO2 was completely unique:

    a)  It was the world's only firmware product for air-cooled miners;

    b)  It was the world's best firmware for immersion-cooled miners.

247.  However, Treis kept pushing for WAO2 to be faster and more efficient.

248.   To keep up with Treis's demands, Grams was coding improvements to WAO2 and the machines ten to fourteen hours a day, seven days a week, for no direct compensation.

249.   In January 2022, Lamberti insisted that at least 1000 of its Whatsminers, through WAO2, needed to reach sixty trillion hashes per second (60,000,000,000,000 hashes per second or "60PH")—a rate unprecedented in the industry.

250.   Grams believed Treis wanted WAO2 optimized to better mine for cryptocurrency, that he would receive his development fee for what was mined, and thereby his efforts would ultimately benefit him.

251.   In reality, Treis was in undisclosed negotiations with Defendant Stronghold, to sell Whatsminers with WAO2 installed, even though Treis had no ownership or licensing rights to do so.

252.   Pence, Smith, Lamberti, and Bolick believed they could circumvent the Dev Fee, and avoid the ownership issue associated with WAO2, by selling the machines to Stronghold.

253.   In no version of these multiple layers of fraud did Treis ever believe it owned WAO2:

   a)  Treis did not develop or write WAO2;

40

b) Treis did not employ or otherwise retain or compensate anyone to develop or write WAO2;

c) Treis had agreed to pay a 3% Dev fee in exchange for a nonexclusive license to use WAO2 internally;

d) Cevon (not Treis) had purportedly acquired WAO2 from Chain during Cevon's formation.

e) *Months before the Stronghold deal Bolick reaffirmed to Grams in their meeting Treis's contract for a nonexclusive license to use WAO2 internally subject to the Dev Fee*.

254.  The speeds which could be achieved only through WAO2's optimization were a **material condition** of Stronghold's offer—without WAO2 Stronghold could have simply bought machines directly from Whatsminer.

255.  In order to seal the deal with Stronghold, Treis (through Grams) had to achieve 60PH.

256.  On information and belief Treis also had to fraudulently warrant it owned WAO2, or at least a license for Stronghold to use it.

257.  **In short, Treis had Grams working round the clock to so they could steal from him.**

**Grams discovers Treis stole WAO2 and sold it to Stronghold.**

258.   In January 2022 Grams continued to work remotely on the miners in Pennsylvania and South Carolina.

259.   But in late January, he was confused to learn that his access had been blocked to most of the machines.

260.   Treis's Managing Director, Brian Lamberti, told Grams he would work to "fix" the access issue.

261.   Lamberti told Grams that Treis needed Grams to return to Pennsylvania on February 6, 2022.

262.   In the meantime, Lamberti directed Grams to work on optimizing the few machines Grams could access.

263.   Grams did so and got the machines to achieve 60PH.

264.   On February 7, 2022, Lamberti called Grams and told him the machines had been sold.

265.   Lamberti falsely assured Grams that WAO2 had been removed from the machines prior to sale.

266.   Over the ensuing months, Grams had no access to the machines.

267.   But he occasionally received odd reports from his Dev Fee account.

268.   The reports suggested the miners were connecting for brief periods and then disconnecting.

269.   This accumulated activity suggested that the firmware was being used but the Dev Fee was somehow being blocked.

270.   In November of 2022, Grams reached out directly to Stronghold's leadership and counsel and learned Treis had sold the machines without removing WAO2.

271.   Grams informed Stronghold's leadership and counsel clearly and absolutely that he owned WAO2 and its trade secrets.

272.   Grams informed Stronghold's leadership and counsel that Treis had no right to sell the machines with his firmware.

273.   Grams told Stronghold's leadership and counsel they needed to either remove the firmware or pay him the Dev Fee.

274.   Treis did not, and could not, any longer convincingly represent to Stronghold that Treis owned the firmware because Treis had already filed a suit in federal court claiming Chain had *not* been the legal owner of the firmware.

275.   Treis at best claimed Cevon owned the firmware, and Cevon was not a signator on Treis's sales agreement with Stronghold.

276.   It was clear Stronghold was using WAO2.

277. It was also clear Treis had implicitly or explicitly led Stronghold to believe it had the right to use the machines with WAO2.

278. Meanwhile, Grams realized his Dev Fee was being blocked.

279. Grams confronted Treis, including Bolick, Lamberti, and Treis's legal counsel Douglas Kim.

280. Grams demanded information about the sale and voiced his concern that his firmware was being used but the Dev Fee was being blocked.

281. Grams reminded Treis that the machines could not operate his firmware and that Treis had no right to sell any machine without first removing the firmware.

282. At first the group simply ignored Grams's complaints, until he threated to take legal action.

283. Then, a scurry of conference calls and emails were exchanged between Stronghold, Treis, each entity's legal counsel, and Grams.

284. In a call between Stronghold, Pense, and Treis's legal counsel Doug Kim, the group agreed they needed to work together against Grams.

285. Treis's directors Bolick and Pense accused Grams of lying and stealing.

286. They claimed that Grams's firmware had *di minimus* value and that they owned it.

287.   Yet Stronghold represented that it was almost finished removing the firmware from their machines.

288.   Why Stronghold was removing the firmware if everyone agreed it was rightfully sold to them is questionable.

289.   Based on his conversations with its members, Grams earnestly believed Treis was supporting him.

290.   Even as late as November of 2022, Grams was reaching out to Bolick, seeking help because his fees were being blocked by Stronghold:

a) "I don't want to drag you guys into this but it could come to be…somebody's going to be held accountable for them blocking it all out in the money that's being lost now for about four months I really appreciate it thank you". Text Grams to Bolick, 11/15/22 at 6:42 p.m.

b) "Mark—I just saw this text and listened to my voicemail.  I am not avoiding you.  I am super confused because I thought you said you thought John Chain sold the exploits to MircoBT.  Happy to get on the phone with you as long as Doug joins as he did last time."

c) "I mainly need to know if [Stronghold] knew there was a dev fee.  They are still using firmware but blocked the dev connection to the dev server in their

45

switches.  If they knew it was dev firmware and still blocked it then it is criminal to do so" Text Grams to Bolick, 11/15/22 at 8: 49 p.m.

291.   Grams later followed up:

> I'd like to get this resolved and worked out amongst the three of us [Treis, Stronghold, and Grams] if possible they're stating they had no knowledge of the machines being split or the firm, or even being on the machines You guys were offered to buy the software on an unlimited license for $100,000.  David said it wasn't worth it but yet in order to make the sale go through the software had to be on there to get you guys for 60 Petta hash therefore either you guys sold them the software as part of the deal and I would be owed a commission off of that sale or the software should've been removed nobody contacted me letting me know the software is even being transferred until the last couple of days when we were supposed to do some changes and make removals and lock is up that software was specifically for treis it was not a public release version so I would really like to resolve this with you guys.

292.   On December 8, 2022, a conference call was conducted between Grams Bolick, Pence, Kim, Matt Usdin (legal counsel for Stronghold), and various employees of Stronghold.

293.   During the call, Kim, Bolick, and Pence threatened Grams that if he did not back down they would add him as a Defendant in the litigation they had filed against Chain and Chain Enterprises.

294.    Ironically, that suit was brought by Treis precisely because Chain had purportedly tricked them into believing they owned WAO2 in defiance of Grams's actual ownership.

295.    Throughout, Treis claimed they owned WAO2 and accused Grams of somehow stealing from them.

296.    Treis's members disparaged Grams in front of Stronghold, an important industry leader who could have been a potential client for Grams, encouraged Stronghold to continue using WAO2 without paying Grams's development fee, and thoroughly discredited Grams in his field, all to ensure they didn't have to turn over the yield from their misappropriation.

297.    Stronghold continued to use WAO2.

298.    On information and belief, Stronghold mined substantial cryptocurrency using WAO2 even after they learned it had been misappropriated.

299.    On information and belief, Stronghold blocked Grams's Dev Fee owed for the currency mined.

300.    Stronghold refused to reimburse Grams for the Dev Fees they blocked or to otherwise compensate him for their use of his intellectual property.

**Treis's Owners Conspired to Commit Theft of Trade Secrets**

301.   On information and belief, Treis is a closely-held entity both owned and controlled by its four Managing Directors.

302.   On information and belief, Treis continues to use WAO2 on its internal machines yet is blocking Grams's Dev Fee.

303.   There are scant operational costs for Treis's use of WAO2—they simply let the machines run, collect the mined crytocurrency, and pass it through directly to the Managing Directors.

304.   If they are not using WAO2, on information and belief they have reverse engineered it and are using their own pirated version to avoid the Dev Fee.

305.   It is now clear that when Treis's Managing Directors learned Chain did not own WAO2 they resolved to continue as if they did—even cutting Cevon out of their dealings.

306.   The Managers resolved that if they had not bought WAO2 from CEL, they would simply steal it from Grams.

307.   Their decision profited each of them personally as Treis is a closely held entity.

308.   The members of Treis—Managing Directors David Pence, Michael Bolick, Senter Smith, and Lamberti—conspired to bury the truth that Grams was the sole developer of WAO2 and that they had no right to use or sell it.

309.   Throughout winter of 2022 Treis and Pence, in cooperation with the other Managing Directors, then falsely represented to third party buyers that Treis had the right to sell Whatsminer machines optimized by WAO2.

310.   All Treis's Managing Directors knew that Grams believed he was optimizing WAO2 for Treis's use only and not one of them stepped forward to caution Grams about the deal with Stronghold.

311.   Every deal the Managing Directors formed and every machine Treis delivered armed by WAO2 was a separate theft of Grams's intellectual property.

312.   Grams continues to receive reports that his firmware is being used but his Developer Fee is being blocked.

### COUNT I WILLFUL AND WANTON MISAPPROPRIATION PURSUANT TO 18 U.S.C. § 1836
### (Defendants Chain and CEL)

313.   Plaintiff incorporates and realleges the previous paragraphs as if the same were set forth fully herein.

314.   Plaintiff brings this claim against Defendants Chain and CEL.

315.   Plaintiff created and owns the WAO2 Source Code.

316.   WAO2 contains numerous trade secrets, including algorithms and logic, hardware interaction, communication protocols, calibration and configuration data, power management techniques, performance optimization techniques, and error handling and recovery processes.

317.   Defendants use WAO2 in interstate and foreign commerce.

318.   Defendants Chain and CEL purported to deliver, send, or convey WAO2 and its Trade Secrets to Cevon for Treis's benefit without authorization.

319.   Defendants Chain and CEL stole and/or without authorization appropriated, took, or carried away WAO2 and its Trade Secrets.

320.    Chain and CEL's actions in stealing WAO2 and its Trade Secrets were willful and malicious.

321.   Defendants Chain and CEL obtained the Trade Secrets by fraud, artifice, and deception.

322.   Defendants Chain and CEL did so with the intent to economically benefit.

323.   Defendants Chain and CEL knew disseminating WAO2 or revealing its Trade Secrets would injure Grams.

324.   Defendants Chain and CEL were unjustly enriched through their misappropriation.

50

325. Plaintiff sustained actual losses by the misappropriation of the Trade Secrets, including but not limited to the decimation of the value of WAO2 through public dissemination of its Trade Secrets.

WHEREFORE, premises considered, Plaintiff demands judgment against Defendants Chain and CEL for: (a) damages for his actual loss of caused by Defendants' misappropriation of the trade secrets; (b) damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or (c) alternatively, damages caused by the misappropriation for a reasonable royalty for Defendants' unauthorized disclosure or use of the trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(B). Additionally, because Defendants Chain and CEL willfully or maliciously misappropriated numerous trade secrets, Plaintiff demands an award of exemplary damages in an amount not more than two times the amount of actual damages pursuant to 18 U.S.C. § 1836(b)(3)(C) and an award of attorney's fees pursuant to 18 U.S.C. § 1836(b)(3)(D), together with interest and costs of this action.

## COUNT II WILLFUL AND WANTON MISAPPROPRIATION PURSUANT TO 18 U.S.C. § 1836
### (Defendants Treis, Cevon, Pence, Bolick, Smith, and Lamberti)

326. Plaintiff incorporates and realleges the previous paragraphs as if the same were set forth fully herein.

327.   Plaintiff brings this claim against Defendants Treis and Cevon, as well as Defendants Pence, Bolick, Smith, and Lamberti, in their individual capacities.

328.   Plaintiff is the sole owner and developer of WAO2 and its Trade Secrets.

329.   WAO2 contains numerous trade secrets, including algorithms and logic, hardware interaction, communication protocols, calibration and configuration data, power management techniques, performance optimization techniques, and error handling and recovery processes.

330.   Defendants use WAO2 in interstate and foreign commerce.

331.   By April of 2021, Defendants Treis and Cevon, as well as Defendants Pence, Bolick, Smith, and Lamberti all knew that Plaintiff is the sole owner and developer of WAO2 and its Trade Secrets.

332.   Defendants agreed with Plaintiff that Plaintiff would be paid a Dev Fee for his development of WAO2.

333.   Defendants intentionally blocked Plaintiff's Dev Fee.

334.   Defendants Treis, Cevon, Pence, Bolick, Smith, and Lamberti willfully and maliciously misrepresented to Plaintiff that WAO2 had been removed from all of their machines.

335.    Defendants Treis, Cevon, Pence, Bolick, Smith, and Lamberti knowingly delivered, sent, or conveyed WAO2 and its Trade Secrets to Stronghold and/or other third parties without authorization.

336.    Defendants Treis, Pence, Bolick, Smith, and Lamberti, sold machines with Plaintiff's unencrypted firmware Stronghold and/or other third parties without authorization from Plaintiff.

337.    It is unclear whether Cevon was informed about or consented to the sale.

338.    Defendants Treis, Cevon, Pence, Bolick, Smith, and Lamberti were willful and malicious and acted with an intent to economically benefit themselves while depriving Grams of compensation for his intellectual property.

339.    Defendants refused to compensate Plaintiff for his intellectual property and the thousands of hours Plaintiff spent developing WAO2.

340.    Defendants were unjustly enriched through their misappropriation of WAO2.

341.    Plaintiff suffered damages in the form of lost income and potential income from his Dev Fee.

342.    Plaintiff sustained actual losses by the misappropriation of WAO2 including but not limited to the decimation of its value through public dissemination.

343.    Defendant's actions were at all times willful and malicious.

WHEREFORE, premises considered, Plaintiff demands judgment against Defendants Treis, Cevon, Pence, Bolick, Smith, and Lamberti for:  (a) damages for his actual loss of caused by Defendants' misappropriation of the trade secrets; (b) damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or (c) alternatively, damages caused by the misappropriation for a reasonable royalty for Defendants' unauthorized disclosure or use of the trade secrets pursuant to 18 U.S.C. §1836(b)(3)(B).  Additionally, because Defendants Treis, Cevon, Pence, Bolick, Smith, and Lamberti willfully or maliciously misappropriated numerous trade secrets, Plaintiff demands an award of exemplary damages in an amount not more than two times the amount of actual damages pursuant to 18 U.S.C. § 1836(b)(3)(C) and an award of attorney's fees pursuant to 18 U.S.C. § 1836(b)(3)(D), together with interest and costs of this action.

## COUNT III WILLFUL AND WANTON MISAPPROPRIATION PURSUANT TO 18 U.S.C. § 1836
### (Defendant Stronghold)

344.    Plaintiff incorporates and realleges the previous paragraphs as if the same were set forth fully herein.

345.    Plaintiff brings this claim against Defendant Stronghold.

346. Plaintiff informed Stronghold that he is the owner of WAO2 in 2022.

347. Stronghold did not create WAO2 but used the code optimization to mine cryptocurrency.

348. Stronghold did not have a valid license or authorization to use WAO2, which was Plaintiff's intellectual property.

349. WAO2 contains numerous trade secrets, including algorithms and logic, hardware interaction, communication protocols, calibration and configuration data, power management techniques, performance optimization techniques, and error handling and recovery processes.

350. Defendants use WAO2 in interstate and foreign commerce.

351. Stronghold had no right, license, or authorization to use WAO2.

352. Stronghold intentionally blocked Plaintiff's Dev Fee.

353. Stronghold refused to compensate Plaintiff for WAO2 or its Trade Secrets.

354. Even after learning that Plaintiff is the rightful owner of WAO2, Defendant Stronghold willfully and maliciously continued to use WAO2 without compensating Plaintiff.

355. Even after learning that Plaintiff is the rightful owner of WAO2, Defendant Stronghold willfully and maliciously blocked Plaintiff's Dev Fee.

55

356. Even after learning that Plaintiff is the rightful owner of WAO2, Defendant Stronghold willfully and maliciously misrepresented to Plaintiff that WAO had been removed from all of its machines.

357. Stronghold was unjustly enriched through their misappropriation of WAO2 because the machines they purchased were able to mine cryptocurrency far faster and more efficiently than machines without WAO2.

358. Plaintiff suffered damages in the form of lost income and potential income from his Dev Fee.

WHEREFORE, premises considered, Plaintiff demands judgment against Defendant Stronghold for: (a) damages for his actual loss of caused by Stronghold's misappropriation of the trade secrets; (b) damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or (c) alternatively, damages caused by the misappropriation for a reasonable royalty for Stronghold's unauthorized disclosure or use of the trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(B). Additionally, because Defendant Stronghold willfully or maliciously misappropriated numerous trade secrets, Plaintiff demands an award of exemplary damages in an amount not more than two times the amount of actual damages pursuant to 18 U.S.C. §

1836(b)(3)(C) and an award of attorney's fees pursuant to 18 U.S.C. § 1836(b)(3)(D), together with interest and costs of this action.

**COUNT IV CONSPIRACY TO COMMIT THEFT OF TRADE SECRETS  IN VIOLATION OF 18 U.S.C. § 1832(A)(5), *et seq.***
**(Defendants Treis, Pence, Bolick, Lamberti, Smith)**

359.   Plaintiff incorporates and realleges the previous paragraphs as if the same were set forth fully herein.

360.   Plaintiff brings this claim against all Defendants.

361.   Treis and each of its Managing Directors (Pence, Bolick, Smith, and Lamberti), as owners for their personal benefit, conspired on various separate occasions to misappropriate WAO2:

a)  Treis and its Directors conspired not to return WAO2 and its Trade Secrets from Grams even while suing Chain and CEL for pretending to convey them to Cevon;

b)  Treis and its Directors used WAO2 and its Trade Secrets even after they were aware they did not own them;

c)  Treis and its Directors sold machines optimized by WAO2 and its Trade Secrets even after they knew neither Treis nor Cevon owned them;

d)  Treis and its Directors misappropriated Grams's Franken work and patented it as their own.

57

362.    WAO2 contains numerous trade secrets, including algorithms and logic, hardware interaction, communication protocols, calibration and configuration data, power management techniques, performance optimization techniques, and error handling and recovery processes.

363.    Defendants use WAO2 in interstate and foreign commerce.

364.    Each Managing Director (Pence, Bolick, Smith, and Lamberti) and Treis conspired to continue using WAO2 in violation of Plaintiff's ownership rights.

365.    Each Managing Director (Pence, Bolick, Smith, and Lamberti) and Treis conspired to block Plaintiff's Developer Fee.

366.    Each Managing Director (Pence, Bolick, Smith, and Lamberti) and Treis, and Stronghold performed acts to effect the object of the conspiracy.

367.    Plaintiff sustained actual losses by the misappropriation of WAO2, including but not limited to the decimation of its value through public dissemination and lost income and potential income from his Dev Fee.

WHEREFORE, premises considered, Plaintiff demands judgment against Defendants Treis, Pence, Smith, Bolick, and Lamberti, for:  (a) damages for his actual loss of caused by Defendants' misappropriation of his designs and trade secrets; (b) damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or (c)

58

alternatively, damages caused by the misappropriation for a reasonable royalty for Defendants' unauthorized disclosure or use of the trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(B).  Additionally, because Defendants Treis, Pence, Bolick, Smith, and Lamberti willfully or maliciously misappropriated numerous trade secrets, Plaintiff demands an award of exemplary damages in an amount not more than two times the amount of actual damages pursuant to 18 U.S.C. § 1836(b)(3)(C) and an award of attorney's fees pursuant to 18 U.S.C. § 1836(b)(3)(D), together with interest and costs of this action.

## COUNT V VIOLATION OF THE RACKETEERING AND CORRUPT PRACTICES ACT PURSUANT TO 18 U.S.C. 1964 AND 18 U.S.C. 1962(C)
### (All Defendants)

368.   Plaintiff incorporates and realleges the previous paragraphs as if the same were set forth fully herein.

369.   Plaintiff brings this claim against all Defendants.

370.   Defendants are associated as an enterprise.

371.   Defendants' activities affect interstate and foreign commerce.

372.   Defendants have conducted their affairs through a pattern of racketeering activity, including repetitive and continuous fraud, misrepresentation, and theft designed to take the economic benefit associated with WAO2 and its trade secrets for themselves, without compensating the developer, Plaintiff.

373.   CEL and Chain initiated the enterprise forming Cevon to steal WAO2 and its Trade Secrets from Grams.

374.   CEL and Chain concocted a scheme to create Cevon to obscure ownership of the WAO2 intellectual property, and to hold WAO2 out as their own property.

375.   CEL and Chain misrepresented to Treis that CEL owned WAO2 and its Trade Secrets.

376.   CEL and Chain misrepresented to Treis that Grams was part of its memberships and approved of transferring WAO2 to Cevon.

377.   Cevon conspired by covering up the fact that Grams was the true owner of WAO2 even in the Delaware federal suit.

378.   CEL, Chain, Cevon, Treis, and its Managing Directors (Pence, Bolick, Smith, and Lamberti) all conspired to convince Grams to continue working on WAO2.

379.   CEL, Chain, Cevon, Treis, and its Managing Directors (Pence, Bolick, Smith, and Lamberti) all withheld material information from Grams regarding Cevon's formation, membership structure, and purported acquisition of WAO2.

380.   CEL and Chain conspired to steal Gram's earnings in the developer wallet.

381.   Even after Grams informed Treis, and its Managing Directors (Pence, Bolick, Smith, and Lamberti) that he owned WAO2 and that he did not have any membership interests in CEL, Treis, its Managing Directors (Pence, Bolick, Smith, and Lamberti) and Cevon continued the enterprise.

382.   Treis, and its Managing Directors (Pence, Bolick, Smith, and Lamberti) could have restructured Cevon, entering into an agreement to purchase WAO2, entering into an agreement for the right to sell machines optimized by WAO2, entering into an agreement for an exclusive license for WAO2 or removed WAO2 from its books and ledgers.

383.   Instead, they conspired to steal the loot (WAO2) from the thief (Chain/CEL).

384.   At times, Treis maintained the ruse that Cevon owned WAO2.

385.   At other times, Treis represented that it owns WAO2 itself.

386.   Treis, and its Managing Directors (Pence, Bolick, Smith, and Lamberti) continued to use WAO2.

387.   Treis, and its Managing Directors (Pence, Bolick, Smith, and Lamberti) continued to profit from WAO2.

388.   Treis, and its Managing Directors (Pence, Bolick, Smith, and Lamberti) continued to make false representations and failed to disclose material information

to Grams to make him continue working for them believing he would be compensated.

389.    Treis, and its Managing Directors (Pence, Bolick, Smith, and Lamberti) did so because they knew only Grams could get their machines ready for sale to Stronghold.

390.    Defendants Treis, its Managing Directors (Pence, Bolick, Smith, and Lamberti) conspired with each other, and then wrongfully asserted ownership interest in WAO2 and wrongfully used WAO2 without compensation to its developer, Plaintiff.

391.    Defendant Treis and each of its Managing Directors (Pence, Bolick, Smith, and Lamberti) learned that Plaintiff was the true owner of WAO2 and then conspired to deprive Plaintiff of the economic benefits of his intellectual property in a string of repeated frauds by 1) purporting to transfer the intellectual property to Cevon, 2) selling machines with unencrypted WAO2 without authorization, and 3) continuing to demand work from Plaintiff without intent to compensate.

392.    Defendant Treis and each of its Managing Directors (Pence, Bolick, Smith, and Lamberti) repeatedly defrauded Plaintiff to convince him to continue working without compensation.  Each Defendant in this paragraph assured Plaintiff he would be getting a Dev Fee in exchange for his labor.  Plaintiff relied on this

misrepresentation to continue working on WOA2.  Plaintiff would not have worked on WAO2 without assurance of compensation for his thousands of hours of work. However, each Defendant was actively involved in actions intent on depriving Plaintiff of his Dev Fee such as setting up Cevon to attempt to take ownership of WAO2, selling unencrypted versions of WAO2 while blocking the Dev Fee, selling the machines without authorization to do so, reverse engineering WAO2 so Defendants could continue to take advantage of the technology without compensating Plaintiff.  Such events took place throughout 2020 through 2022 as detailed in line 1-303 of this Complaint.

393.   On information and belief, Defendants Treis and its Managing Directors (Pence, Bolick, Smith, and Lamberti), wrongfully reverse engineered WAO2 in order to take advantage of the technology without compensating its developer, Plaintiff.

394.   Defendants Treis, and each of its Managing Directors (Pence, Bolick, Smith, and Lamberti), CEL, Cevon, and Chain repeatedly engaged in a pattern of fraud and theft designed to deprive Plaintiff of economic benefit and shift that benefit to themselves.  These facts are detailed extensively and specifically in lines 1 through 303.

395.   Throughout the time period associated with this Complaint, Defendants Treis, its Managing Directors (Pence, Bolick, Smith, and Lamberti), CEL, and Chain repeatedly requested additional work from Plaintiff, all while knowing they were intending to convert ownership and economic benefit associated with WAO from Plaintiff to themselves, without compensating Plaintiff.

396.   Defendants Treis and each of its Managing Directors (Pence, Bolick, Smith, and Lamberti) engaged in further frauds and theft when they sold machines containing the stolen firmware to Stronghold.  Defendants Treis and its Managing Directors (Pence, Bolick, Smith, and Lamberti) falsely told Defendant Stronghold that they owned the right to sell the machines with WAO Installed.

397.   Defendants Treis and each of its Managing Directors (Pence, Bolick, Smith, and Lamberti) fraudulently induced Plaintiff to perform further work to achieve speeds demanded by Stronghold, all while intending to sell Plaintiff's work without compensating him.  Defendant Treis and each of its Managing Directors (Pence, Bolick, Smith, and Lamberti), assured Plaintiff repeatedly that the work Plaintiff was doing would be compensated by the Dev Fee.  Plaintiff was not aware that Defendants Treis and its Managing Directors (Pence, Bolick, Smith, and Lamberti) were planning on illegally selling WAO2, and circumventing the Dev Fee.

398.    Defendants Treis and each of its Managing Directors (Pence, Bolick, Smith, and Lamberti) continued to perpetrate frauds on both Stronghold and Plaintiff by misappropriating the firmware and misrepresenting its true ownership. This fraud was designed explicitly to avoid compensating Plaintiff and block the existing Dev Fee, as detailed above in lines 1 through 303.

399.    On information and belief, Defendant Treis and its Managing Directors (Pence, Bolick, Smith, and Lamberti) reverse engineered WAO2 to continue to use and or sell it to third parties without compensating plaintiff.

400.    However, Defendant Stronghold ultimately joined the enterprise.

401.    When Defendant Stronghold learned that Grams was the true owner of WAO2, they conspired with Treis and its Managing Directors (Pence, Bolick, Smith, and Lamberti) to keep using WAO2.

402.    When Defendant Stronghold learned that Grams was the true owner of WAO2, they conspired with Treis and its Managing Directors (Pence, Bolick, Smith, and Lamberti) to deprive Plaintiff of his Dev Fee.

403.    When Defendant Stronghold learned that Grams was the true owner of WAO2, they did not cooperate with Plaintiff to recoup the funds they had overpaid to Treis for Grams's work.

404. When Defendant Stronghold learned that Grams was the true owner of WAO2, they conspired with with Treis and its Managing Directors (Pence, Bolick, Smith, and Lamberti) to sully Grams's industry reputation so that they could continue to deprive him of the benefit of his inventions and work.

405. All Defendants have misappropriated Plaintiff's intellectual property, firmware, and its Trade Secrets;

406. All Defendants have used Plaintiff's intellectual property, firmware, and Trade Secrets without the right to such use;

407.  Plaintiff suffered damages as set forth herein or otherwise.

 WHEREFORE, premises considered, Plaintiff demands judgment against all Defendants for threefold of the damages Plaintiff has sustained, a reasonable attorneys' fee, and the cost of this action.

## COUNT VI UNJUST ENRICHMENT
### (All Defendants)

408. Plaintiff incorporates and realleges the previous paragraphs as if the same were set forth fully herein.

409. Plaintiff brings this claim against all Defendants.

410. Defendants Chain, CEL, Cevon, Treis, Stronghold, Pence, Smith, Bolick, and Lamberti received hundreds of hours of Plaintiff's work without compensating him for same.

411.  Defendant Treis sold the machines enhanced by WAO2 for several million dollars.

412.  Without Plaintiff's code and optimization work, Treis would not have been able to sell the machines, as they would not have functioned as the contract required.

413.  Without Plaintiff's firmware and optimization work, Stronghold would not have purchased the machines, and would have mined less cryptocurrency.

414.  Stronghold deployed Plaintiff's code to collect substantial cybercurrency without compensating him.

415.  There are di minimus expenses for the mining of the cryptocurrency.

416.  Treis's Managing Directors (Pence, Bolick, Smith, and Lamberti) accordingly passed the substantial profits directly on to themselves.

417.  All Defendants have received benefits, as stated above.

418.  All Defendants have been unjustly enriched at Plaintiff's expense.

419.  The circumstances under which each Defendant received benefits at

420.  Plaintiff's expense make it unjust for any Defendant to retain the benefits without commensurate compensation.

WHEREFORE, premises considered, Plaintiff demands judgment against all Defendants, jointly and severally, for any and all actual and special compensatory

damages, in an amount to be determined by the jury, together with interest and the costs of this action.

## COUNT VII BREACH OF CONTRACT
### (Defendants Chain and CEL)

421.   Plaintiff incorporates and realleges the previous paragraphs as if the same were set forth fully herein.

422.   Plaintiff brings this claim against Chain and CEL.

423.   Plaintiff, Chain, and/or CEL entered into a broker style arrangement in they would equally share all profits from any contract Defendant procured for Plaintitff's WAO2.

424.   Defendants Chain and CEL breached the agreement by distributing more than fifty percent of the Dev Fees stored in the developer wallet for their exclusive use.

425.   As a proximate cause of Defendants Chain and CEL's breach, Plaintiff suffered injuries and damages.

WHEREFORE, premises considered, Plaintiff demands judgment against Defendants Chain and CEL, jointly and severally, for any and all actual and special compensatory damages in an amount to be determined by the jury, together with interest and the costs of this action.

## COUNT VIII BREACH OF CONTRACT
**(Defendant Treis)**

426.  Plaintiff incorporates and realleges the previous paragraphs as if the same were set forth fully herein.

427.  Plaintiff brings this claim against Treis.

428.  Defendant Treis agreed to pay Plaintiff a Dev Fee of 3% for their internal use of WAO2.

429.  Defendant Treis agreed to protect the confidentiality of WAO2.

430.  Defendant Treis declined to purchase a license to sell machines to third parties that utilized WAO2.

431.  Defendant Treis agreed not to sell any machine containing WAO2

432.  Defendant Treis breached the agreement by:  proactively blocking and refusing pay to Plaintiff's Dev Fee, not protecting the confidentiality of WAO2, and selling machines containing WAO2.

433.  As a proximate cause of Defendant Treis's breaches, Plaintiff suffered injuries and damages.

WHEREFORE, premises considered, Plaintiff demands judgment against Defendant Treis for any and all actual and special compensatory damages in an amount to be determined by the jury, together with interest and the costs of this action.

## COUNT IX FRAUDULENT MISREPRESENTATION
### (Defendants Treis, Cevon, CEL, Chain, Lamberti, and Pence)

434.   Plaintiff incorporates and realleges the previous paragraphs as if the same were set forth fully herein.

435.   Plaintiff brings this claim pursuant to Ala. Code §§ 6-5-100 and 6-5101 against Defendants Treis, Cevon, CEL, and Chain, as well as against Defendants Lamberti and Pence in their individual capacities.

436.   In February of 2020, Chain misrepresented to Grams that he would share half of the profits of any deal he could strike between Grams and any third party for the sale or use of WAO2.

437.   Over the course of Chain's interactions with Treis and its directors, Chain continued to mislead Grams.

438.   Chain and CEL also allegedly misled Treis and its directors, claiming that CEL owned WAO2.

439.   Chain and CEL further allegedly misrepresented to Treis that Grams was an employee, when he was not, never had been, and was not being paid anything by Chain or CEL.

440.   When Grams heard vague references to Cevon being formed, its

441.   membership falsely assured him that he had a to-be-defined interest in Cevon.

442.   In April of 2021, Treis and its directors misrepresented to Grams that they would pay him his Dev Fee, would not disseminate his code, would protect his code, and they would not sell any machine containing his code.

443.   On or about January 15, 2022, Treis, through Lamberti, misrepresented to Grams:

444.   That they did not know why Grams's access was blocked;

445.   That they would "fix" the blockage;

446.   That Grams should keep customizing WAO2 for Treis;

447.   Lamberti made these misrepresentations to mislead Grams into continuing uncompensated work for Treis when Grams otherwise would not have.

448.   Grams invested a degree of trust and confidence in Treis and its members, based on their close working relationship while he customized his source code for them.

449.   Grams believed he, Treis, and its membership were engaged in a joint effort to ensure they would all collectively profit from Grams's customization of WAO2 for Treis's machines. Treis would profit by increased revenue derived from mining Cryptocurrency using WAO2 enhanced machines and Grams's Franken modifications, while Grams would benefit through receipt of his Dev Fee.

450.    Treis's directors knew they should have told Grams they intended to sell machines containing WAO2 to Stronghold.

451.    Treis's directors falsely represented to Grams that they would not sell machines containing WAO2.

452.    Treis's directors falsely represented to Stronghold that they owned all code on the machines they were selling.

453.    When Grams learned of the sale, Treis's directors falsely represented to Grams that WAO2 had been removed from the machines prior to sale.

454.    These representations were all false.

455.    The persons making each statement knew the statements were false when they were made, or knew they did not have enough information to confirm their veracity, and failed to correct the statements when such facts became known.

456.    Defendants' misrepresentations were material.

457.    Defendants made such statements with the intent that the representations be acted upon.

458.    Defendants knew or should have known at the time that Plaintiff did not know their statements were false.

459.    Plaintiff justifiably relied on Defendants' statements, particularly in light of their long-term joint efforts.

460.    Defendants' representations were the proximate and consequential causes of Plaintiff's injury.

461.    Plaintiff claims punitive damages of Defendants due to the reckless, wanton, willful, or intentional nature of their conduct.

WHEREFORE, premises considered, Plaintiff demands judgment against Defendants Treis, Cevon, CEL, Chain, Lamberti, and Pence, jointly and severally, for any and all actual and special compensatory damages and punitive damages, in an amount to be determined by the jury, together with interest and the costs of this action.

## COUNT X SLANDER
### (Treis, Pence, Bolick, Smith, and Lamberti)

462.    Plaintiff incorporates and realleges the previous paragraphs as if the same were set forth fully herein.

463.    Plaintiff brings this claim against Defendants Treis and against Defendants Bolick, Smith, and Lamberti in their individual capacities.

464.    Treis's directors Bolick and Pence accused Grams of lying and stealing.

465.    On information and belief, Smith and Lamberti repeated and/or supported those false claims to third parties.

466.    They claimed that Grams's firmware had *di minimus* value and that they owned it.

73

467.   Treis knew and or should have known that these statements were false because Grams created the code, they did not create the code, and they had agreed to pay him for their own use of it.

468.   These representations damaged Grams's reputation with Stronghold and its representatives, agents, members, and employees.

469.   Plaintiff suffered damages thereby.

WHEREFORE, premises considered, Plaintiff demands judgment against Treis, Pence, Bolick, Smith, and Lamberti, jointly and severally, for any and all actual and special compensatory damages and punitive damages, in an amount to be determined by the jury, together with interest and the costs of this action.

## COUNT XI TORTIOUS INTERFERENCE WITH  BUSINESS OR CONTRACTUAL RELATIONS
### (Treis, Pence, Bolick, Smith, and Lamberti)

470.   Plaintiff incorporates and realleges the previous paragraphs as if the same were set forth fully herein.

471.   Plaintiff brings this claim against Defendants Treis and against Defendants Bolick, Smith, and Lamberti in their individual capacities.

472.   Plaintiff was involved in and/or a party to various business or contractual relationships.

473.   Plaintiff was fully aware of the existence of these business or contractual relationships.

474.   Through negligent, reckless and/or intentional conduct, Defendants tortiously interfered with Plaintiff's valid and enforceable contractual or business relationships.

475.   The actions of Defendants were without right and/or justifiable cause.

476.   As a proximate consequence of Defendants' unlawful interference, Plaintiff was caused to suffer of the loss of the use and benefit of substantial sums of money, loss of business profits and business opportunities, or other serious and permanent injuries to be proven at trial.

477.   Plaintiff claims punitive damages of Defendants due to their reckless, wanton, willful, or intentional conduct.

 WHEREFORE, Plaintiff demands judgment against Defendants Treis and against Defendants Bolick, Smith, and Lamberti, jointly and severally, for all compensatory and consequential damages allowed by law, together with interest and costs, in an amount as determined by a trial jury, together with interest and the costs of this action.

## COUNT XII CONVERSION
### (Treis, Pence, Bolick, Smith, and Lamberti)

478.   Plaintiff incorporates and realleges the previous paragraphs as if the same were set forth fully herein.

479.   Plaintiff brings this claim against Defendants Treis and against

480.   Defendants Bolick, Smith, and Lamberti in their individual capacities.

481.   Defendants have converted property legally belonging to Plaintiffs.

482.   As a result, Plaintiff has been deprived of his interest in the property.

483.   Defendants took and converted Plaintiff's property to their own use in knowing violation of Plaintiff's rights and Alabama law, thereby causing Plaintiff to suffer injuries and damages, including but not limited to loss of substantial sums of money and loss of the use of those monies, for which he claims compensatory and consequential damages.

484.   Plaintiff claims punitive damages of Defendants due to the reckless, wanton, willful, or intentional nature of their conduct.

WHEREFORE, Plaintiff demands judgment against all Defendants, jointly and severally, for all compensatory and consequential damages allowed by law, together with interest and costs, in an amount as determined by a trial jury.

## COUNT XIII MISAPPROPRIATION
## (ALABAMA TRADE SECRETS ACT)
### (Defendants Chain and CEL)

485.   Plaintiff incorporates and realleges the previous paragraphs as if the same were set forth fully herein.

486.   Plaintiff brings this claim against Defendants Chain and CEL.

487.   Plaintiff created and owns the WAO2 Source Code.

488.   WAO2 contains numerous trade secrets, including algorithms and logic, hardware interaction, communication protocols, calibration and configuration data, power management techniques, performance optimization techniques, and error handling and recovery processes.

489.   WAO2 was intended for use in a trade or business, is included or embodied within the firmware.

490.   WAO2 was not publicly known and was not known in the Crypto mining industry.

491.   WAO2 cannot be readily ascertained or derived from publicly available information.

492.   WAO2 was subject to significant security measures while in Plaintiff's possession including password protecting and locking computers with it installed, and security cameras monitoring all access to machines containing WAO2.

493. WAO2 had significant monetary value.

494. Defendants Chain and CEL purported to deliver, send, or convey the WAO2 trade secrets to Cevon and/or Treis without authorization.

495. Defendants Chain and CEL's delivery of the trade secret constituted a breach of confidence between Chain and CEL and Plaintiff.

496. Defendants Chain and CEL stole and/or without authorization

497. appropriated, took, or carried away WAO2.

498. Chain and CEL's actions in stealing trade secrets associated with WAO2 were willful and malicious.

499. Defendants Chain and CEL obtained WAO2 by fraud, artifice, and

500. Deception, including misrepresentation and outright theft.

501. Defendants Chain and CEL did so with the intent to economically benefit.

502. Defendants Chain and CEL knew disseminating WAO2 would injure Grams.

503. Defendants Chain and CEL were unjustly enriched through their misappropriation.

504. Plaintiff sustained actual losses by the misappropriation of WAO2, including but not limited to the decimation of its value through public dissemination.

WHEREFORE, premises considered, Plaintiff demands judgment against Defendants Chain and CEL for: (a) damages for his actual loss of caused by Defendants' misappropriation of the trade secrets; (b) damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or (c) alternatively, damages caused by the misappropriation for a reasonable royalty for Defendants' unauthorized disclosure or use of the trade secrets pursuant to the Alabama Trade Secret Act. Additionally, because Defendants Chain and CEL willfully or maliciously misappropriated numerous trade secrets, Plaintiff demands an award of exemplary damages in an amount not less than $10,000 pursuant to Alabama Code 8-27-4(3) and an award of attorney's fees pursuant to Alabama Code 8-27-4(2)(c), together with interest and costs of this action.

### COUNT XIV WILLFUL AND WANTON MISAPPROPRIATION PURSUANT TO ALABAMA TRADE SECRETS ACT
**(Defendants Treis, Cevon, Pence, Bolick, Smith, and Lamberti)**

505.   Plaintiff incorporates and realleges the previous paragraphs as if the same were set forth fully herein.

506.   Plaintiff brings this claim against Defendants Treis and Cevon, as well as Defendants Pence, Bolick, Smith, and Lamberti, in their individual capacities.

507.   Plaintiff created and owns the WAO2 Source Code.

79

508.   WAO2 contains numerous trade secrets, including algorithms and logic, hardware interaction, communication protocols, calibration and configuration data, power management techniques, performance optimization techniques, and error handling and recovery processes.

509.   WAO2 was intended for use in a trade or business, is included or embodied within the firmware.

510.   WAO2 was not publicly known and was not known in the Crypto mining industry.

511.   WAO2 cannot be readily ascertained or derived from publicly available information.

512.   WAO2 was subject to significant security measures while in Plaintiff's possession including password protecting and locking computers with it installed, and security cameras monitoring all access to machines containing WAO2. Defendants Treis, and its Managing Directors (Pence, Bolick, Smith, and Lamberti) failed to properly secure the trade secrets while they were in their possession.

513.   WAO2 had significant monetary value.

514.   All Defendants did not create WAO2 but used the code optimization to mine cryptocurrency.

515.   All Defendants agreed with Plaintiff that Plaintiff would be paid a Dev Fee for his development of WAO2.

516.   All Defendants intentionally blocked Plaintiff's Dev Fee.

517.   Defendants Treis, Cevon, Pence, Bolick, Smith, and Lamberti knowingly delivered, sent, or conveyed WAO2 to Stronghold and/or other third parties without authorization. This constituted a breach of confidence between Plaintiff and Defendants.

518.   Defendants Treis, Pence, Smith, Bolick, and Lamberti, then sold machines with Plaintiff's unencrypted firmware to third parties without authorization from Plaintiff.

519.   Defendants refused to compensate Plaintiff for his intellectual property and the thousands of hours Plaintiff spent developing WAO2.

520.   Defendants Treis, Cevon, Pence, Bolick, Smith, and Lamberti's were willful and malicious and done with an intent to economically benefit themselves while depriving Grams of compensation for his intellectual property.

521.   Plaintiff sustained actual losses by the misappropriation of WAO2 including but not limited to the decimation of its value through public dissemination.

522.   Defendants were unjustly enriched through their misappropriation of WAO2.

523.   Plaintiff suffered damages in the form of lost income and potential income from his Dev Fee.

524.   Defendant's actions were at all times willful and malicious.

WHEREFORE, premises considered, Plaintiff demands judgment against Defendants Treis, Cevon, Pence, Bolick, Smith, and Lamberti for:  (a) damages for his actual loss of caused by Defendants' misappropriation of the trade secrets; (b) damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or (c) alternatively, damages caused by the misappropriation for a reasonable royalty for Defendants' unauthorized disclosure or use of the trade secrets pursuant to the Alabama Trade Secret Act.  Additionally, because Defendants Treis, Cevon, Pence, Bolick, Smith, and Lamberti willfully or maliciously misappropriated numerous trade secrets, Plaintiff demands an award of exemplary damages in an amount not less than $10,000 pursuant to Alabama Code 8-27-4(3) and an award of attorney's fees pursuant to Alabama Code 8-27-4(2)(c), together with interest and costs of this action.

## COUNT XV WILLFUL AND WANTON MISAPPROPRIATION PURSUANT TO ALABAMA TRADE SECRETS ACT
### (Defendant Stronghold)

525.   Plaintiff incorporates and realleges the previous paragraphs as if the same were set forth fully herein.

526.   Plaintiff brings this claim against Defendant Stronghold.

527.   Plaintiff informed Stronghold that he is the owner of WAO2.

528.   WAO2 contains numerous trade secrets, including algorithms and logic, hardware interaction, communication protocols, calibration and configuration data, power management techniques, performance optimization techniques, and error handling and recovery processes.

529.   WAO2 was intended for use in a trade or business, is included or embodied within the firmware.

530.   WAO2 was not publicly known and was not known in the Crypto mining industry.

531.   WAO2 cannot be readily ascertained or derived from publicly available information.

532.   WAO2 was subject to significant security measures while in Plaintiff's possession including password protecting and locking computers with it installed, and security cameras monitoring all access to machines containing WAO2.

Defendants Treis, and its Managing Directors (Pence, Bolick, Smith, and Lamberti) failed to properly secure the trade secrets while they were in their possession.

533.  WAO2 had significant monetary value.

534.  Stronghold learned about the WAO2 Trade secrets from Defendant Treis.  However, Stronghold knew or should have known that WAO2 was a trade secret.  As of the date Plaintiff informed Stronghold that he was the true owner of WAO2, Stronghold knew that the trade secret had been appropriated through Treis's breach of confidence.

535.  Stronghold did not create WAO2 but used the code optimization to mine cryptocurrency.

536.  Stronghold did not have a valid license or authorization to use WAO2, which was Plaintiff's intellectual property.

537.  Stronghold intentionally blocked Plaintiff's Dev Fee.

538.  Stronghold refused to compensate Plaintiff.

539.  Stronghold was unjustly enriched through their misappropriation of WAO2 because the machines they purchased were able to mine cryptocurrency far faster and more efficiently than machines without WAO2.

540.  Plaintiff suffered damages in the form of lost income and potential income from his Dev Fee.

WHEREFORE, premises considered, Plaintiff demands judgment against Defendant Stronghold for: (a) damages for his actual loss of caused by Defendants' misappropriation of the trade secrets; (b) damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or (c) alternatively, damages caused by the misappropriation for a reasonable royalty for Defendants' unauthorized disclosure or use of the trade secrets pursuant to the Alabama Trade Secret Act. Additionally, because Defendant Stronghold willfully or maliciously misappropriated numerous trade secrets, Plaintiff demands an award of exemplary damages in an amount not less than $10,000 pursuant to Alabama Code 8-27-4(3) and an award of attorney's fees pursuant to Alabama Code 8-27-4(2)(c), together with interest and costs of this action.

## COUNT XVI CONSPIRACY TO COMMIT THEFT OF TRADE SECRETS IN VIOLATION OF THE ALABAMA TRADE SECRETS ACT
### (All Defendants)

541.  Plaintiff incorporates and realleges the previous paragraphs as if the same were set forth fully herein.

542.  Plaintiff brings this claim against all Defendants.

543.  Plaintiff is the owner and creator of WAO2.

544.   WAO2 contains numerous trade secrets, including algorithms and logic, hardware interaction, communication protocols, calibration and configuration data, power management techniques, performance optimization techniques, and error handling and recovery processes.

545.   WAO2 was intended for use in a trade or business, is included or embodied within the firmware.

546.   WAO2 was not publicly known and was not known in the Crypto mining industry.

547.   WAO2 cannot be readily ascertained or derived from publicly available information.

548.   WAO2 was subject to significant security measures while in Plaintiff's possession including password protecting and locking computers with it installed, and security cameras monitoring all access to machines containing WAO2. Defendants Treis, and its Managing Directors (Pence, Bolick, Smith, and Lamberti) failed to properly secure the trade secrets while they were in their possession.

549.   WAO2 had significant monetary value.

550.   Chain, CEL, Cevon, Stronghold, Treis and each of its Managing Directors (Pence, Bolick, Smith, and Lamberti), for their personal benefit, conspired to misappropriate WAO2.

551.   Each Managing Director, Treis, and Stronghold conspired to continue using WAO2 in violation of Plaintiff's ownership rights.

552.   Chain, CEL, Cevon, Treis and each of its Managing Directors (Pence, Bolick, Smith, and Lamberti) conspired to block Plaintiff's Developer Fee.

553.   Chain, CEL, Cevon, Treis and each of its Managing Directors (Pence, Bolick, Smith, and Lamberti) performed acts to effect the object of the conspiracy.

554.   Plaintiff sustained actual losses by the misappropriation of WAO2, including but not limited to the decimation of its value through public dissemination and lost income and potential income from his Dev Fee.

WHEREFORE, premises considered, Plaintiff demands judgment against each Defendant for (a) damages for his actual loss of caused by Defendants' misappropriation of the trade secrets; (b) damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or (c) alternatively, damages caused by the misappropriation for a reasonable royalty for Defendants' unauthorized disclosure or use of the trade secrets pursuant to the Alabama Trade Secret Act.   Additionally, because each Defendant willfully or maliciously misappropriated numerous trade secrets, Plaintiff demands an award of exemplary damages in an amount not less than $10,000

pursuant to Alabama Code 8-27-4(3) and an award of attorney's fees pursuant to Alabama Code 8-27-4(2)(c), together with interest and costs of this action.

### COUNT XVII WORK AND LABOR DONE
**(All Defendants)**

555.   Plaintiff incorporates and realleges the previous paragraphs as if the same were set forth fully herein.

556.   In the alternative, if the court finds there was no valid contract, Plaintiff performed thousands of hours of work and labor at the direct request of Defendants Treis, Chain, CEL, Cevon, Pence, Bolick, Smith, and Lamberti.

557.   Plaintiff performed this work with the expectation of compensation.

558.   Plaintiff is a highly skilled firmware developer who did not donate thousands of hours of labor for someone else's commercial enterprise.

559.   The vast majority of this work took place in Alabama.

560.   The work was performed due to direct requests from Defendants Treis, Chain, CEL, Cevon, Pence, Bolick, Smith, and Lamberti.

561.   Defendants Treis, Chain, CEL, Cevon, Pence, Bolick, Smith, and Lamberti continually requested improvements to WAO2 and required that Plaintiff work additional hours to meet their needs.

562.   Defendants Treis, Pence, Bolick, Smith, and Lamberti requested such improvements so they could obtain a premium for the sale of at least 1000 machines to Defendant Stronghold.

563.   Defendant Stronghold demanded that additional work be performed to enhance WAO to 60 PH.   Defendant Stronghold requested this speed level to Defendant Treis and/or its Managing Directors (Pence, Bolick, Smith and Lamberti), who in turn requested that Plaintiff work additional hours.

564.   All Defendants are the recipients of the economic benefit of Plaintiff's labor.

565.   All Defendants knowingly accepted serves rende4red by Plaintiff, and the benefit and the result thereof.

WHEREFORE, premises considered, Plaintiff demands judgment against each Defendant for (a) damages to compensate Plaintiff for the fair value of his work and labor done, in an amount not less than $1,000,000.

## COUNT XVIII QUANTUM MERUIT
### (All Defendants)

566.   Plaintiff incorporates and realleges the previous paragraphs as if the same were set forth fully herein.

567.   In the alternative, if the court finds there was no valid contract, Plaintiff performed thousands of hours of work and labor at the direct request of Defendants

Treis, Chain, CEL, Cevon, Pence, Bolick, Smith, and Lamberti, and the indirect request of Defendant Stronghold.

568.   Plaintiff performed this work with the expectation of compensation as his services are extremely valuable.

569.   Plaintiff is a high skilled firmware developer who did not donate thousands of hours of labor for someone else's commercial enterprise.

570.   The vast majority of this work took place in Alabama.

571.   Defendants Treis, Chain, CEL, Cevon, Pence, Bolick, Smith, and Lamberti continually requested improvements to WAO2 and required that Plaintiff work additional hours to meet their needs.

572.   Defendants Treis, Pence, Bolick, Smith, and Lamberti requested such improvements so they could obtain a premium for the sale of at least 1000 machines to Defendant Stronghold.

573.   Defendant Stronghold demanded that additional work be performed to enhance WAO to 60 PH.   Defendant Stronghold requested this speed level to Defendant Treis and/or its Managing Directors (Pence, Bolick, Smith and Lamberti), who in turn requested that Plaintiff work additional hours.

574.   All Defendants are the recipients of the work and the economic benefit of Plaintiff's labor.

575.   All Defendants knowingly accepted serves rendered by Plaintiff, and the benefit and the result thereof.

576.   No reasonable person would expect a highly skilled programmer to work thousands of hours without compensation.  The very nature of the work and time involved reasonably notified Defendants that the Plaintiff expected to be paid.

577.   WHEREFORE, premises considered, Plaintiff demands judgment against each Defendant for (a) damages to compensate Plaintiff for the fair value of his work and labor done, in an amount not less than $1,000,000.

Respectfully submitted this 5th day of September, 2023.

/s/ Jonathan K. Corley
Jonathan K. Corley
One of the Attorneys for Plaintiff

/s/ Carissa V. Sears
Carissa V. Sears
One of the Attorneys for Plaintiff

OF COUNSEL:
Jonathan K. Corley
WHITTELSEY & CORLEY, LLC
Post Office Box 106
Opelika, Alabama 36803-0106
(334) 745-7766
jcorley@wwp-law.com

Carissa V. Sears
The Sears Law Office, LLC
7887 E. Belleview Ave. Suite 1100
Greenwood Village, Colorado 80111
720.412.1172
carissa@searslaw.org

## **JURY DEMAND**

**PLAINTIFF DEMANDS A TRIAL BY JURY AS TO ALL ISSUES SO TRIABLE.**

/s/ Jonathan K. Corley
Jonathan K. Corley

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 6th day of October, 2023, I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification to the following counsel of record via e-mail:

Joshua J. Jackson
SAMFORD & DENSON, LLP
Post Office Box 2345
Opelika, Alabama 36803-2345
jackson@samfordlaw.com

*/s/ Jonathan K. Corley*
Jonathan K. Corley
