# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **MARK GRAMS,**<br>an individual Alabama citizen,<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**TREIS BLOCKCHAIN, LLC,**<br>**CHAIN ENTERPRISES, LLC,**<br>**CEVON TECHNOLOGIES, LLC,**<br>**STRONGHOLD DIGITAL MINING,**<br>**LLC, DAVID PENCE, MICHAEL**<br>**BOLICK, SENTER SMITH,**<br>**BRIAN LAMBERTI, AND**<br>**JOHN CHAIN,**<br><br>    **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Civil Action No.: 3:23-CV-299-RAH** |

## RESPONSE TO DEFENDANTS' MOTION TO TRANSFER OR ALTERNATIVELY TO DISMISS PURSUANT TO RULE 12(b)(2)

## INTRODUCTION

If you hire a thief to go steal a car from someone in Alabama, it should come

as no surprise if the police charge you with a crime in Alabama, no matter where

you live. Similarly, when you steal a computer program from someone in Alabama,

you may "reasonably be expected to be haled into court []here to answer" for it. "An

individual injured in California need not go to Florida to seek redress from persons

who, though remaining in Florida, knowingly caused the injury in California." *Calder v. Jones*, 104 S.Ct. 1482, 1487 (1984) (Rehnquist, J).

This Court has personal jurisdiction over Treis Blockchain, LLC and Chain Enterprises, LLC, because of their commercial collaboration, over a period of years, with an Alabama resident. This Court has personal jurisdiction over the remaining Defendants because they each engaged in misconduct calculated to steal intellectual property from an Alabama resident and then made misrepresentations to him while he was in Alabama to extend the duration of their misuse and profits. Meanwhile, this Court has jurisdiction over everyone who participated in a scheme to misappropriate WAO2 as RICO confers nationwide personal jurisdiction.

Defendants argue that even if this Court has personal jurisdiction, the Court should transfer the matter to Treis's home state. The Court cannot do this because Alabama is the only state that had personal jurisdiction over all the Defendants at the time the Complaint was filed. A group of conspirators do not get to transfer a case to wherever they vote to consent to jurisdiction after the filing—jurisdiction needed to exist by operation of law at the time of the filing of the Complaint.

## BACKGROUND

The focus of this matter is WAO2, a proprietary firmware program created by Plaintiff Mark Grams. (Compl. ¶ 44). When WAO2 is installed on a cryptocurrency

mining machine it "overclocks" the machine's initial abilities, so that the machine runs faster, and therefore more profitably, than it ever could at factory settings. (Compl. ¶ 4). WAO2 achieves faster speeds than any other firmware on the market—and is therefore worth millions. (Compl. ¶103).

Throughout the underlying events, Grams resided in Alabama. (Compl. ¶ 198). In February of 2020 John Chain, then a resident of Colorado, reached out to Grams in Alabama and asked him for permission to market his firmware. (Compl. ¶ 47). Grams and Chain entered an informal, nonexclusive broker arrangement, agreeing they would split all profits equally. (Compl. ¶ 51).

That summer Chain introduced Grams, still in Alabama, to Treis Blockchain, LLC, a South Carolina entity. (Compl. ¶ 66). Treis is a closely held entity that had four members: Defendants David Pence, Michael Bolick, Senter Smith, and Brian Lamberti. (Compl. ¶¶ 301, 307). Chain, from Colorado, brokered a deal in which Grams agreed to install WAO2 on Treis's machines in exchange for a percentage of the cryptocurrency mined, referred to in the industry as a "Dev(eloper) Fee". *Id.* The agreement granted Treis a personal nonexclusive license to use WAO2 on its machines but not to sell the program or share its license with anyone else. (Compl. ¶ 54).

The Dev Fee was the only compensation Grams or Chain would collect. (Compl. ¶ 62). But installing the firmware on Treis's machines and customizing the program so that it would run optimally on the machines was labor intensive. Treis would collect 97% of the cryptocurrency farmed because it owned the machines and supplied the power; Grams and Chain would split the remaining 3% Dev Fee. (Compl. ¶ 77). Grams conducted all of his installations remotely from Alabama; Treis supplied him the remote access.

On October 7, 2020, Treis and Chain Enterprises entered a "Limited Liability Company Agreement," that neither disclosed to Grams, wherein Chain Enterprises sold all its intellectual property to Chain for $100. (Compl. ¶¶ 102-125). Signing for Treis was Defendant Michael Bolick and signing for Chain Enterprises was Defendant John Chain. Defendants Bolick and Senter Smith, in their roles as Managers for Treis, executed the agreement on behalf of Cevon Technologies, LLC, simultaneously formed for the exclusive purpose of carrying out the agreement.

Treis and its Individual members maintain that they believed Cevon had acquired WAO2 in this transaction. Treis and its Individual members insist that they did not learn Chain Enterprises did not own or have the right to sell WAO2 until April of 2021. (Compl. ¶¶ 140-153). When Treis learned it did not own WAO2 it sued Chain Enterprises, who in turn countersued, in *Treis Blockchain, LLC v. John*

*Chain and Chain Enterprises, LLC and Chain Enterprises, LLC v. Bolick*, No. 1:21-cv-01435—MN.  (Compl. ¶¶ 188-95).  But Treis's Individual Members also entered into a conspiracy to act as if they owned WAO2 regardless.  (Compl. ¶¶ 305--12).

Member Pence reached out to Grams, in Alabama to broker a new deal to use WAO2.  (Compl. ¶¶ 128, 168, 196-97).  Treis and Grams then continued to collaborate to optimize WAO2's performance.  Grams always operated from his lab in Alabama. (Compl. ¶¶ 82, 198).  When the machines required physical work, Treis shipped the machines to Gram's lab for him to work on.  (Compl. ¶ 83).  The rest of the time, Pence, Bolick, and Lamberti issued their directives to Gram in Alabama, and Grams performed in Alabama.  (Compl. ¶¶ 86, 92-93, 101(a)-(f), 131, 139(e), 139(m), 139(n), 213, 232, 248-49, 257).

In fall of 2021, Bolick, Pence, and Lamberti began exerting tremendous pressure on Grams to improve WAO2 to achieve certain performance criteria.  (Compl. ¶¶ 232, 248-49, 255, 257).  They demanded that Grams find a way to get the machines obtain their designated speeds.  *Id.*  To meet their demands, Grams had to work in his lab ten to fourteen hours a day, seven days a week.  *Id.* Treis paid him nothing for his labor.  (Compl. ¶ 58).  Nor did Treis share that the only reason Treis needed its machines to reach the designated speeds was because it was in undisclosed

negotiations with Stronghold Digital Mining, LLC to sell the machines, and those speeds were a material condition of the sale. (Compl. ¶¶ 248-257).

On or about December of 2021, without informing Grams, Treis sold its machines to Stronghold for $7,000,000—*double* the market value of the machines at factory settings. But Treis never had the right to sell its machines without first removing WAO2. (Compl. ¶¶ 235-37, 245, 253(e)). Grams had offered to sell this right to Treis and Treis refused to purchase it. Instead, Treis chose to simply steal WAO2 from Grams to collect its profits on this one deal, while publishing WAO2 to the world and destroying its market value for all other potential purchasers.

Meanwhile, almost incredibly, it appears **Treis's Members continued issuing directives for Grams to continue work on the machines they had already sold to Stronghold,** knowing Grams would receive nothing for his work. (The Treis/Stronghold deal was effective December 14, 2021 but Treis continued to impose demands on Grams through February of 2022). (Compl. ¶¶ 249, 258-264).

In late January, 2022, long after Treis had already sold the machines to Stronghold, Grams reached out, concerned that his access to some of the machines in Pennsylvania appeared to be blocked. (Compl. ¶259). He had no idea about the sale. Member Lamberti directed Grams to **continue working** on any machines he did have access to, knowing Grams would receive no compensation for the work.

(Compl. ¶¶ 260-62).  On February 7, 2022, Lamberti informed Grams that the machines had been sold, but falsely told Grams that WAO2 had been removed from all of the machines prior to the sale.  (Compl. ¶¶ 264-65).

Over the following months, Grams received odd reports from his Dev Fee account indicating that the miners were connecting for a brief period then disconnecting.  (Compl. ¶¶ 267-68).  This indicated WAO2 was being used but that his Dev Fee was being blocked.  (Compl. ¶¶ 269, 276-78).  Grams initially tried to resolve the issue directly with Treis.  (Compl. ¶¶ 279-81, 290-91).  When Treis refused to address Grams's concerns, Grams reached out directly to Stronghold. (Compl. ¶¶ 270-73).

At this point, Stronghold knew, or should have known, that it had acquired misappropriated firmware.  (Compl. ¶¶ 274-76).  The Delaware matter had been publicly available for a year, in which Treis sued Chain Enterprises stating that Cevon (not even Treis) had tried to purchase WAO2 from Chain Enterprises, only to learn Chain Enterprises did not own it.  Accordingly, either Treis had sold Stronghold firmware it had misappropriated from Cevon, or that it had misappropriated from Grams.  *Id.*

But instead of abandoning their use of pirated firmware, Stronghold decided to rely on Treis's demonstrably false contractual representation that it owned

everything it was selling. (Compl. ¶ 277). This defense carries no weight. Stronghold's only legal remedy was to sue Treis and/or pay Grams—and they chose not to do either. (Compl. ¶ 283).

Instead, Stronghold doubled down on their ill-gotten gains. They cooperated with Treis, representing to Grams that all firmware was removed from the machines. (Compl. ¶ 284, 287-88, 293). They participated in group calls threatening, disparaging, and intimidating him out of asserting his rights. (Compl. ¶¶ 292-297). And they continued using the firmware while simultaneously blocking Grams's Dev Fee. (Compl. ¶¶ 297-300). And they continued to use and profit from WAO2 for another year.

## ARGUMENT

This Court has personal jurisdiction over Treis because Treis entered into a commercial collaboration with an Alabama resident, directing thousands of hours of his work over a two-year period for their sole benefit. (Count VIII; Count XVII Work and Labor Done). *Empirian Health, LLC v. Specialty RX, Inc.*, No. 2:22cv639-MHT, 2023 WL 7553555, (M.D. Ala. Nov. 14, 2023) (as a nonresident "can be constitutionally held to answer in Alabama for failing to fulfill its contractual duties, even if its alleged misconduct occurred outside the State.").

This Court has personal jurisdiction over all the Defendants because each committed intentional tortious acts knowing their misconduct would harm Grams in Alabama. (Counts II, III, IV, XIV, XV, XVI State and Federal Misappropriation/Conspiracy; Count IX Fraudulent Misrepresentation).

| Claim | Treis | Individual Members | Stronghold | Chain |
|---|---|---|---|---|
| Breach of Contract | X | | | X |
| Work and Labor Done | X | X | | |
| DTSA/ATSA/ | X | X | X | X |
| Conspiracy DTSA/ATSA | X | X | X | X |
| Misrepresentation | X | X | X | X |
| RICO | X | X | X | X |

Defendants John Chain and Chain Enterprises, LLC reached out to Grams in Alabama to establish a business relationship, to broker sales of WAO2 on behalf of Grams and share any profits gained. They then breached their agreement, misappropriated the Dev Fee they agreed to divide evenly, and misrepresented to Stronghold that CE owned WAO2.

Defendants Treis and its Individual Directors, once informed of Chain's malfeasance, decided to act as if their acquisition of WAO2 had been valid, while simultaneously suing Chain on the basis that it was not. Treis reached out to Grams in Alabama, entered into new agreements to continue to use WAO2 on their

machines, and then engaged in a series of misrepresentations calculated to misappropriate WAO2, **issuing repeated directives to Grams over a period of months to unwittingly help them steal from himself**, all from Alabama.

Defendant Stronghold became aware that it was using Grams's misappropriated firmware. They misrepresented to Grams (in Alabama) that they had taken WAO2 off of their machines, but continued to use it, and even blocked his Dev Fee to further steal from him.

And finally, the Court has jurisdiction over all Defendants who Grams has plausibly alleged participated in a conspiracy to misappropriate WAO2 pursuant to 18 U.S.C. 1962 (Count V: RICO), which Defendants concede confers nationwide personal jurisdiction.

Defendants seek to transfer the case to South Carolina based on 28 USC § 1404 or § 1406. Transfer is not proper under § 1406 because Alabama was never an improper forum for this matter—it was the *only* possible forum. Neither is transfer available under § 1404. It is Defendants' burden to meet the threshold showing that this matter could have originally been filed in South Carolina. But Stronghold resides in Pennsylvania, Chain Enterprises resides in Delaware, and Chain resides in North Dakota now and resided in Colorado during the underlying events. Defendants offer no evidence that any of these Defendants established

minimum contacts with South Carolina. Alabama is the only hub on the spoke of the Defendants' concerted misconduct, because all their conduct was directed at Grams, here in Alabama.

## STANDARD OF REVIEW

A pleading survives a motion to dismiss when it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible if the factual content allows the Court to draw a reasonable inference that the defendant is liable. *Id.*

When jurisdiction is challenged at the pleading stage, prior to discovery, a plaintiff is only required to make a *prima facie* showing of jurisdiction. *Diamond Crystal Brands, Inc. v. Food Movers Intern., Inc.,* 593 F.3d 1249, 1257 (11th Cir. 2010); *In re Bal Harbour Quarzo, LLC*, 634 B.R. 827, 833 (S.D. Fla. 2021). A *prima facie* showing is made when the Plaintiff includes "an averment of facts, which, if credited, would suffice to establish jurisdiction over the defendant." *Bal Harbour*, at 833. at 832. A heavy burden then switches to the defendant to present "direct, highly specific testimonial evidence regarding a fact essential to jurisdiction." *Id.* Then, if the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in

favor of the plaintiff." *Diamond Crystals*, at 1257; (quoting *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.,* 288 F.3d 1264, 1269 (11th Cir.2002)).

Meanwhile, to transfer venue, Defendants must "make a clear and convincing showing that venue should be changed." *Lisseveld v. Marcus*, 173. F.R.D. 689, 701 (M.D. Fla. 1997).

I.    **It will not violate the Due Process Clause for this Court to assert personal jurisdiction over any of the Defendants because each has established minimum contact with this forum and exercise of jurisdiction comports with fair play and substantial justice.**

*Plaintiff agrees with Defendant that:*

*1) Alabama's long-arm jurisdiction is coextensive with constitutional due process. Accordingly, jurisdiction exists to the extent that its exercise does not violate the Due Process Clause of the Fourteenth Amendment;*

*2) the traditional purposeful availment test is applicable to Plaintiff's Breach of contract claims (along with Work and Labor done, which Defendants do not address);*

*3) the Court may apply the less demanding Calder "effects test" for purposeful availment when evaluating jurisdiction related to Plaintiff's intentional tort claims*

The Due Process Clause requires that an individual (or entity) have "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign

sovereign. *Shaffer v. Heitner*, 433 U.S. 186, 218 (1977) (Stevens, J. concurring).

"Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this 'fair warning' requirement is satisfied if 1) the defendant has 'purposefully directed' his activities at residents of the forum." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984) and 2) the injuries complained of in the litigation "arise out of or relate to" those activities. *Helicopteros Nacionales de Coloumbia, S.A. v. Hall*, 466 U.S. 408, 414 (1984).

   A.    Claims Treis established minimum contact with Alabama by purposefully directing its activities at Grams and causing injury that arose out of that conduct (the "traditional" purposeful availment test."

"Parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King v. Rudzewicz*, 471 U.S. 462, 473 (1985), citing *Travelers Health Assn. v. Virgina*, 339 U.S. 643, 647 (1950); *McGee v. International Life Ins. Co.*, 355 U.S. 220, 222-223 (1957). In turn, each state has a "'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Burger King*, at 473; citing *McGee*, at 223. It would be unfair to permit an out of state actor to escape having to answer for their behavior in the state where the injury occurs;

"the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed." *Burger King*, at 474.

This district's decision, entered just days ago in *Empirian Health, LLC v. Specialty RX, Inc.*, is on point. No. 2:22cv639-MHT, 2023 WL 7553555 (M.D. Ala. Nov. 14, 2023). *Empirian* involved an agreement between an Alabama company, Empirian Health, LLC, and a New Jersey company, Specialty RX, Inc. Pursuant to their agreement, Specialty Rx sent Empirian rebate claims monthly for Empirian to process, over a period of about two years. No further contact with Alabama was alleged. Specialty RX unilaterally terminated the contract prematurely, and Empirian brought suit in Alabama. This district found it had specific jurisdiction over Specialty Rx, as a nonresident "can be constitutionally held to answer in Alabama for failing to fulfill its contractual duties, even if its alleged misconduct occurred outside the State." *Id.* at *2. This Court rejected Specialty Rx's defense that the conduct violating the agreements occurred in another state. Rather, the Court found compelling that Specialty Rx had entered into a long-term relationship with an Alabama resident "profiting millions from the exchange."

The cases could hardly be more similar. Herein, Grams alleges that Treis formed a long-term commercial relationship with him. To serve the relationship, Treis sent its machines to Alabama for Grams to optimize his firmware to suit Treis's

directives. Treis profited from the relationship in three ways 1) Grams performed hundreds of thousands of dollars' worth of labor without any compensation, 2) Treis blocked Grams's Dev Fee in breach of their agreement, profiting thereby, and 3) Treis sold the same machines Grams had optimized as Treis directed to Stronghold in a seven million dollar transaction—profiting millions. Treis would not have been able to sell its machines to Stronghold without forging a relationship with an Alabama resident, convincing him to install his firmware on Treis's machines, and tricking him into working countless hours optimizing his firmware for free.

Grams has averred sufficient facts to establish jurisdiction over Treis based on its decision to enter into agreements with Grams to perform thousands of hours of tasks over a period spanning almost two years. (C. ¶ 100-01, 248-49). Grams at all times resided in Alabama. In Spring of 2020, in a series of talks, Treis agreed Grams could collect his Dev Fee and directed him to install WAO2 on their machines. (C. ¶ 62, 65, 76, 77). In Summer of 2020 Treis directed Grams to begin a testing phase from his site in Alabama. (C. ¶¶ 65, 81-82). Whenever Grams needed to do physical work on a machine, Treis sent its machines to Alabama for Grams to work on there. (C. ¶¶ 83-84, 131, 139). Over the period, virtually all the time Treis asked Grams to perform work, or Grams was performing work for Treis, it was from Grams's site in Alabama. (C. ¶ 86, 90-93, 100). Treis even directed

Grams to sell machines he had invested time in fixing to an Alabama resident and collected the profits. (C. ¶¶ 95-99). Treis did not pay Grams for any of this labor.

Treis argues that it is not Grams's location but their location that mattered during all these events. This is not accurate—nonresident defendants do not ever need to set foot in a state to purposefully direct activity there. *Burger King*, at 476. It is Treis's *contacts* with Alabama that matter, not whether its members entered the state or itself engaged in activites here. *Dodson v. Barclays Bank Delaware*, No. 1:19-cv-1004-TFM-B, 2020 WL 5414352, at *1 (S.D. Ala. Sept. 9, 2020) ("The Court has personal jurisdiction over [Barclay's] because Plaintiff alleges she is a resident of Alabama and Barclays solicited her to open a credit card account, the act which underpins the claims in this action[.]"); *Turner v. Regions Bank*, 770 F.Supp.2d 1244, 1249-50 (M.D. Ala. 2011) ("By contacting [claimants] in Alabama to collect a debt that was discharged by a bankruptcy court in this State, [movant] 'purposefully directed [its] activities at residents of the forum.'"; *University of South Alabama v. Southern Farm Bureau Cas. Ins. Co.*, No. CA 05-00275-C, 2005 WL 1840238, at *8 (S.D. Ala. Jul. 27, 2005). Treis issued instructions to Grams to conduct activity in Alabama "ten to fourteen hours a day, seven days a week, for no direct compensation"—this is purposeful direction. Compl. ¶ 248).

Treis further argues that all of Grams's actions were unilateral—as if he was giving himself directions to optimize their machines for Stronghold. Grams has averred sufficient facts to demonstrate Treis took an active role in directing activities outside of its home state. In any relationship among diverse citizens, one acts from one state and one acts from another. It is the choice to form a continuous relationship, knowing the other resides outside of your state, and will be performing services for you outside of your state, and reaching out to him frequently to monitor, assess, encourage, and assist in performance that forges the minimum connection, whereby you should not be surprised to be summoned to answer for injuring him in his home forum. *Altec Capital Services, LLC v. Premier Equip. Rental & Sales, LLC*, No. 2:13-cv-1540-VEH, 2014 WL 99072, at *4 (N.D. Ala, Jan. 9, 2014) (jurisdiction found when parties formed a contractual relationship suggestive of an on-going relationship as opposed to a one-time transaction), *see also Molex Co., LLC v. Andress*, 887 F.Supp.2d 1189, 1203 (N.D. Ala. 2012).

Finally, Defendants try to minimize the effect of Lamberti's trip to Alabama, accompanied by another Treis employee, to pick up their machines from Grams, as "unrelated" to their ongoing collaboration. Grams maintains that traveling to Alabama to pick up the machines Treis directed him to fix, choosing to travel into Alabama instead of following the established course of sending them by mail, then

17

breaching the agreement to pay him for the profits created by Treis's possession, use, and sale of those very same machines is "related."

B.  <u>The remaining defendants each established minimum contact with Alabama by committing intentional torts aimed at Alabama that caused harm in Alabama they should have anticipated.</u>

Generally, minimum contacts are established when a defendants' intentional conduct in their home state was "calculated to cause injury to" the plaintiff in his home state. *Calder v. Jones*, 465 U.S. 783, 789 (1984). Much as the journalists in Calder knew their defamation would injure an actress in California, the Defendants knew stealing WAO2 would injure its creator here in Alabama where he resides and conducts his business.

This Circuit published a matter earlier this year that is directly on point. In *SkyHop Tech., Inc. v. Narra*, 58 F.4th 1211, 1230 (11th Cir. 2023) this Circuit held that when a developer hijacked an owner's use of its software, his ransom emails into Florida were sufficient to establish jurisdiction. Referencing *Licciardello v. Lovelady*, 544 P.3d 1280, 1285 (11th Cir. 2008) (see within), the Circuit found specific personal jurisdiction:

> We have no difficulty reaching the same conclusion here. Indyzen undoubtedly sent its emails into Florida intentionally. And viewed in the light most favorable to SkyHop, Indyzen sent those emails to force SkyHop to pay additional funds so that SkyHop could regain control of its own property. It was certainly foreseeable to Indyzen

that SkyHop would feel the harm from its alleged threats in Florida, where SkyHop is based. And that is especially true here since Indyzen knew, from the outset, that it was in a partnership with a Florida-based company. Indeed, Narra made three separate trips to Florida to meet with Scotto. So Indyzen had reason to know that its decision and the ensuing *1231 emails could force it to defend against a lawsuit in Florida.

*SkyHop Techs., Inc. v. Narra*, 58 F.4th at 1230–31.

This Circuit has confirmed that the commission of intentional torts "support the exercise of jurisdiction over the nonresident defendant who has no other contacts with the forum." *Licciardello v. Lovelady*, 544 P.3d 1280, 1285 (11th Cir. 2008). In this matter, the Defendants "obviously knew that the effect of any injury to plaintiff[] would be primarily focused in Alabama, the plaintiff['s] state of residence." *Army Times Pub. Co. v. Watts*, 730 F.S2d. 1398, 1400 (11th Cir. 1984).

Because the effects test operates in a realm in which the defendant has engaged in *wrongful* conduct, cognizant that his actions will affect someone outside of his home state, the test "is based on a plaintiff's ties to the forum state and the harm suffered by the plaintiff." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1357 (11th Cir. 2013). "[A] nonresident defendant's single tortious act can establish purposeful availment, without regard to whether the defendant had any other contacts with the forum state." *Louis Vuitton* 736 F.3d at 1356; citing *Lovelady*, F.3d at 1285.

As courts in this district have observed, "the Supreme Court has specifically distinguished between negligent and intentional actions, holding that the latter indicate that 'the defendant may be held to have expected its conduct to have an effect in that state, and further to have expected that the victim will bring suit for redress there.'" *Alfa Corp. v. Alfagres, S.A.,* 385 F. Supp. 2d 1230, 1235 (M.D. Ala. 2005) (knowing trademark violation sufficient); *Coblentz v. General Motors Corp.,* 724 F.Supp. 1364 (M.D.Ala.1989) (Thompson, J.), aff'd sub nom. *Coblentz GMC v. GMC Truck Operation*, 932 F.2d 977 (11th Cir. 1991), and aff'd sub nom. *Coblentz GMC v. GMC Truck Operation*, 932 F.2d 978 (11th Cir. 1991) (finding out of state interference with Alabama business sufficient.

As the *Coblentz* court observed:

> "However, when a defendant intentionally takes some action with the knowledge that the result will be harm to a specific victim in another state, the picture involves more than mere foreseeability or the likelihood that fortuitous and undirected conduct will have an effect in that state. When the conduct is intentional and is directed at a victim in another state, the defendant may be held to have expected its conduct to have an effect in that state, and further to have expected that the victim will bring suit for redress there.

724 F. Supp. at 1368.

Plaintiff appreciates that such contacts may not be "random, fortuitous or attenuated." The Supreme Court bookended the scope of *Calden* in *Walden v. Fiore*,

571 U.S. 277, 286 (2014).  In *Walden*, the Court held that a Georgia police officer who had a random one-off encounter with a plaintiff who was visiting Georgia but who happened to live in Nevada, could not be haled into a Nevada court.  Treis's conduct was not random, fortuitous, or attenuated, it was calculated, ongoing, and extensive.

Defendants cite no case in which a defendant who engaged in a conspiracy to steal software over a period of months, involving numerous acts of misrepresentation solely to meet the conspiracies' goals, was held not to purposefully directed his activities at the plaintiff's home forum.  In fact, the only other case Defendants cite involves a Washington respondent who wrote a single letter to an Alabama resident reporting acts that occurred solely in Washington years earlier.  Treis did not write one letter, it campaigned over a two-year period to injure an Alabama resident in repeated acts designed to accomplish the injury. Grams did not relocate to Alabama after the acts occurred, he lived here the entire time, a fact of which they were well aware.

Plaintiff has alleged intentional torts were committed by each Defendant. Both Stronghold and Treis misappropriated WAO2.  Both Stronghold and Treis misrepresented to Grams that they had removed WAO2 from their machines.  And the individual Defendants each engaged in acts of misrepresentation and profited

from the misappropriation. The individual Defendants are each liable for their actions independently of Treis, as "primary participants in an alleged wrongdoing intentionally directed at an [Alabama] resident." *Calder v. Jones*, 465 U.S. 783, 789 (1984). These same intentional torts form the basis of Plaintiff's RICO claim and are developed within that section, *infra*. If the Court does not find any Defendant participated in Plaintiff's alleged RICO scheme, their conduct should yet be evaluated under the *Calder* effects test.

## II.    The Court's exercise of jurisdiction will comport with traditional notions of fair play and substantial justice.

As the United States Supreme Court has repeatedly emphasized, "A state has an especial interest in exercising judicial jurisdiction over those who commit torts within its territory." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776 (1984) (quotations omitted). 'Within' a territory is not read narrowly but expansively, such that an injury occurs in the territory where its injury is felt, not from where the tortfeasors act. *Id.* Alabama "has a very strong interest in affording its residents a forum to obtain relief from intentional misconduct of nonresidents causing injury in" Alabama." *Licciardello v. Lovelady*, 544 F.3d 1280, 1288 (11th Cir. 2008).

Misappropriation is felt acutely within the home state, which has a special interest in protecting the intellectual property rights of its citizens. *See, e.g., DocRX, Inc. v. Dox Consulting, LLC*, 738 F.Supp.2d 1234, 1251 (S.D. Ala. 2010) (defendant

had taken aim at plaintiff in Alabama when they misappropriated its software, processes, and ideas and made defamatory statements to steal from plaintiff). Indeed, even the continued use of a *trademark* in violation of the rights of an Alabama resident has been held to be sufficient to establish jurisdiction. *Alfa Corp. v. Alfagres, S.A.*, 385 F.Supp.2d 1230, (M.D. Ala. 2005); citing *Indianapolis Colts, Inc. v. Metro. Baltimore Football Club*, 34 F.3d 410, 412 (7th Cir. 1994) ("use of a trademark with knowledge of the infringement constitutes intentional tortious wrongdoing such that the alleged infringer could reasonably anticipate being haled into court"); *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1391 (8th Cir. 1991) (intentional trademark infringement sufficient to establish minimum contacts), *see also*, *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d q1082, 1087 (9th Cir. 2000); *Borschow Hosp. & Med. Spup., Inc. v. Budick-Siemans Corp.*, 143 F.R.D. 472, 486 (D. Puerto Rico 1992) (tortious interference with contract sufficient).

### III.    18 U.S.C. § 1864 (RICO) confers personal jurisdiction over the Defendants.

"Any person injured in his business or property by reason of a violation of [18 U.S.C. § 1962] may sue therefore in any appropriate United States district court." 18 U.S.C. § 1964.

Section 1962(c) states that it is "unlawful for any person … associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity."  Acts of racketeering activity are defined in Section 1961 to include theft of trade secrets pursuant to 18 U.S.C. § 1832, which states:

> **(a)** Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly--
>
> **(1)** steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information;
>
> **(2)** without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information;
>
> **(3)** receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;
>
> **(4)** attempts to commit any offense described in paragraphs (1) through (3); or
>
> **(5)** conspires with one or more other persons to commit any offense described in paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy,

shall, except as provided in subsection (b), be fined under
this title or imprisoned not more than 10 years, or both.

In this Circuit, to plead civil RICO under 18 U.S.C. 1962(c) a plaintiff must plausibly allege 1) conduct, 2) of an enterprise, 3) through a pattern, 4) of racketeering activity. *Williams v. Mohawk Indus., Inc.*, 411 F.3d 1252, 1256 (11th Cir. 2005). The terms in the RICO statute are to be "liberally construed to effectuate its remedial purposes.: *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1349 (11th Cir. 2016) quoting *Boyle v. United States*, 556 U.S. 938, 944 (2009).

    A.    <u>Plaintiff has plausibly alleged that Defendants colluded to commit repeated acts of misappropriation—thereby establishing the enterprise element of a civil RICO claim.</u>

Defendants do not attempt to argue, and therefore abandon at this stage, that Grams has plausibly alleged conduct, pattern, and racketeering activity. Instead, they challenge Plaintiff's support of only one element—whether Grams has established the existence of an enterprise.

An enterprise does not require any formal or legal association. *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1284 (11th Cir. 2006) ("This Court has never required anything other than a "loose or informal" association of distinct entities."). Similar to antitrust matters, "The critical determination in evaluating whether 'an association or individual entities,' constitutes a RICO enterprise' is whether "the association of individual entities, however, loose or informal, … furnishe[d] a

vehicle for the commission of two or more predicate crimes." *United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000). As detailed within, Plaintiff has plausibly stated that Treis and Stronghold conspired to continue using WAO2 in violation of Grams's rights, took group calls with him to exert group pressure to intimidate away from asserting his rights, and simultaneously blocked his Dev Fee while continuing to use WAO2 to make profits. This is sufficient association-in-fact to constitute an enterprise.

   B.   <u>Stage One: The Individual Members conspire to use Treis to misappropriate WAO2 from Grams.</u>

1) This is not true as to Treis and the individual directors at any time. 2) Stronghold began working with Treis when it resolved not to return WAO2 to Grams but to profit from Treis's intimidation tactics to stifle Grams's claim of right.

   D rely on turkette addressed in lockheed

   In this Circuit, to find an enterprise it is sufficient that the Defendants had a common purpose of making money, particularly when the money is made through unlawful activity. *Id.* citing *United States v. Church,* 955 F.2d 688, 698 (11th Cir.1992).

   No rogue Individual Member singlehandedly misappropriated WAO2. Rather, Grams has asserted that this enterprise began when the Individual Members (Lambretti, Pence, Smith, and Bolick) of Treis, a small closely held entity, conspired

to use the entity to misappropriate WAO2 from Grams. (C. ¶¶ 301, 305-11). In the Spring of 2021, the Individual Members knew they did not own WAO2—in fact they filed a lawsuit against Chain complaining about it. [CITE DELAWARE CASE AND COMPLAINT]. But later that year, when they wanted to sell their machines to Stronghold, they couldn't do so without the overclocking firmware, because the speeds Stronghold demanded could only be achieved with WAO2. Instead of buying WAO2 from Grams, buying a license for Stronghold's use, or informing Stronghold about the Dev Fee, the Individual Members decided to just steal it. The four Individual Members conspiring to commit repeated acts of misappropriation for their mutual profit to Grams's injury is an agreement to form an enterprise.

All the members knew Treis didn't own WAO2. It is indisputable each knew Treis didn't develop it—because Treis agreed to pay a Dev Fee for its use. (C. ¶ 54). Then Treis attempted to purchase WAO2 from Chain Enterprises, LLC and sued the entity when they learned it didn't own WAO2. (C. ¶¶ 188-189).

Based on Treis's own emails and the lawsuit Treis filed in Delaware, Grams alleges that Treis's managing directors "knew it would be wildly inappropriate to install Grams's firmware on third party IT." (C. ¶ 239). Three of the members admit as much in an email to third party Harley Torrealba: "Importantly, [Treis's Delaware] lawsuit claims that Chain never had any rights to the firmware that Mark

developed and if this is true it is disturbing that Chain used this same firmware [on your IT]." *Email, Bolick to Torrealba, Senter Smith, and David Pence, October 6, 2021* quoted in C. at 240; *see also* ¶242 quoting email among the same parties referring to the firmware as "Mark's firmware." Two months later they used WAO2 to sell their machines to Stronghold. It is reasonable to consider they may have been in negotiations to sell the firmware even while they were telling Torrealba it shouldn't be used.

As detailed further below, each Individual Member played his role in misappropriating WAO2 from Grams. *U.S. v. Starrett*, 55 F.3d 1525, 1542 (11th Cir. 1995) (it is not necessary "to establish that each conspirator explicitly agreed with every other conspirator to commit the substantive RICO crime … or knew his fellow conspirators, or was aware of all the details of the conspiracy. That each conspirator may have contemplated participating in different and unrelated crimes is irrelevant."); *Reves v. Ernest & Young*, 507 U.S. 170, 179 (1993).

It is plausible that each Individual Member profited when Treis sold machines for seven million dollars—(double their value or Treis's investment) in the form of wrongful distributions (wrongful because they knew the deal sold firmware Treis did not own).

**Pence** made misrepresentations to Grams to get WAO2 onto Treis's machines. (C. ¶¶ 70-73). When Grams complained to Stronghold about the misappropriation, Pence misrepresented to Stronghold that WAO2 was not the cause of the machine's overclocking performance and that anyway, Treis had the right to sell WAO2. (C. ¶¶ 279-286, 295). And Pence threated to sue Grams for asserting his rights. (C. ¶¶ 292-93).

**Bolick** monitored the transition and encouraged Grams to optimize the machines for Treis (C. ¶¶ 75, 79, 80, 89, 101 (a)-(f), 128, 139, 165, 170-177, 196, 232-234).

**Smith** confirmed Treis would compensate Grams for Treis's use of WAO2 and Grams's optimization work and knew Grams claimed Treis had no right to sell WAO2. (C. ¶ 153, 236-238, 240).

**Lamberti** leaned on Grams to get the overclocking up to meet Stronghold's requirements, then misrepresented to Grams that WAO2 was removed from all machines prior to the Stronghold sale. (C. ¶ 249, 261-265).

No rogue member of Treis entered into a seven-million-dollar contract to sell firmware it did not own (and had *sued* Chain over) without the knowledge and consent of the others. Rather it is plausible that each of the four members of Treis,

who are its *only* members, all chose to use WAO2 in violation of Grams's rights in order to meet Stronghold's criteria for the deal—overclocking.

Through a series of misrepresentations, the Individual Members tricked Grams into letting them use WAO2 on their machines without telling him they intended to sell the machines to an undisclosed third party (Stronghold). The fact that they used a legal entity (Treis) to shield their wrongful activity does not shield them from individual liability. *Kirwin v. Price Commc'ns Corp.*, 391 F.3d 1323, 1327 (11th Cir. 2004) ("corporate "agents may be held liable for their own conspiratorial actions") citing *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 163, (2001) ("The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status.").

     **i.**     **Stage Two: When given a choice, Stronghold chose to join the enterprise and conspire with Treis for their mutual benefit.**

It is in the nature of conspiracies that they must frequently be alleged on the basis of circumstantial evidence, as the evidence typically lies solely in the hands of the defendants. "Conspiracies are rarely evidenced by explicit agreements, and must almost always be proven by inferences that may be fairly drawn from the behavior of the alleged conspirators." *DeLong Equip. Co. v. Washington Mills Abrasive Co.*,

887 F.2d 1499, 1515 (11th Cir. 1989) quoted in *In re: Disposable Contact Lens Antitrust*, 215 F.Supp.3d 1272 (M.D. Fla 2016).

When defendants act in lockstep to disadvantage the plaintiff, their coordination itself nudges a plaintiff's claims over the boundary from conceivable to plausible. *Id.* Defendants are not entitled to a presumption that they are acting in their lawful economic self-interest. *Id.*

That Stronghold decided to join in Treis's misappropriation may be proved by circumstantial evidence that Stronghold and Treis came to a meeting of the minds to use WAO2 in violation of Grams's rights. Grams need not demonstrate the existence of a formal agreement, but may instead demonstrate by circumstantial evidence a meeting of the minds to commit an unlawful act." *United States v. Sosa*, 777 F.3d 1279, 1290 (11th Cir. 2015) (quotation omitted).

In 2022, Grams confronted both Treis and Stronghold with the fact that he owned WAO2. Instead of cooperating with Grams to reveal and undo Treis's misappropriation, Stronghold did a quick calculation and realized it benefited most from ignoring Grams's assertion of right and continuing to profit from WAO2. Ignoring the publicly available Delaware filing and on notice that it was profiting from stolen firmware, Stronghold nonetheless aligned with Treis. Stronghold did not secure an affidavit from Treis that it owned the firmware, and did not submit the

issue for a declaratory action in its home forum of Pennsylvania. Instead it chose to conducting its communications with Grams through Treis as it continues to do today through its joint counsel and filing of joint motions. Both entities chose to continue using WAO2. Both entities chose to lie to Grams that they had removed WAO2 from their devices. Both entities found a way to use WAO2 without paying Grams's Dev Fee by blocking it. This Court cannot and should not assume that these decisions are mere coincidence. Rather, the Court should take these facts in the light most favorable to Plaintiff, finding that Plaintiff has plausibly alleged the members of these entities made these decisions together, continue to collaborate, and continue to profit from their illegal misappropriation of his firmware.

WAO2 is so profitable that the enterprise evolved to include Stronghold. When confronted with the truth, Stronghold should have distanced itself from Treis, stopped using WAO2, and pursued its contractual remedies against Treis. Instead, Stronghold aligned itself with Treis, apparently deciding it was more profitable to continue using WAO2 than to sue Treis for misrepresentation (if Stronghold indeed didn't have reason to know that Treis has misappropriated the firmware, an issue that will be explored fully in discovery). The entities aligned themselves in knowing violation of Grams's rights and **continued** both misappropriating and profiting from

WAO2. Their forged alliance continues—they have elected to use the same attorney and advance the same brief.

C.   Plaintiff has stated its RICO violations with Fed. R. Civ. P. Rule 9(b) particularity.

Defendants' particularity argument is inscrutable—it seemingly faults Plaintiff for failing to set forth misrepresentations, but a RICO violation cannot be not based on misrepresentation, which is not a predicate act. Plaintiff's RICO claim it is based on misappropriation. Plaintiff has set forth the 9(b) who, what, when, where why of **Defendants' misappropriation and no affidavit provides any evidence to refute Plaintiff's claims. [CONFIRM],**

Grams has plausibly alleged that Treis and its Individual Members (who), misappropriated WAO2 (what), when they entered into a contract (the document), to sell the firmware to Stronghold (how), on or about December 2021, knowing that they did not own the firmware and had no right to sell it. They continued the misappropriation by transporting the machines to Stronghold without removing WAO2. Stronghold joined in the scheme, electing to continue using WAO2 instead of returning it to Plaintiff, stopping its use, removing WAO2 from its machines, or seeking declaratory relief from the Court as merited in a seven-million dollar transaction in stolen property. Stronghold advanced the scheme by coordinating

with Treis to block the Dev Fee, participated in group calls to intimidate Grams, and continued using WAO2.

> **II.     The Court should deny Defendants' motion to transfer jurisdiction pursuant to 28 U.S.C. 1406 because Plaintiff's complaint was not filed in the wrong division.**

Historically, if a plaintiff filed his action in the wrong forum, his case could only be dismissed—a draconian result.  Accordingly, Congress enacted 1406—to permit a court to transfer a matter to a correct jurisdiction instead of dismissing the matter outright.  Yet transfer under 1406 still imposes harsh penalties.  Unlike a transfer under 1404 for inconvenient forum, transfer under 1406 requires the receiving court to apply its own laws.  The underlying reason is that if the original court was the wrong court, a Plaintiff should not be able to apply the laws of an incorrect court.

Plaintiff brought this matter with the understanding that the Defendants were acting in concert.  If they were, the Court has jurisdiction over all of them pursuant to RICO.  If they were not, the matter does not need to be brought against them all as a group.  Plaintiff has the right to assert his Alabama claims against Treis as the claims were filed appropriately in Alabama.  Treis should not advantage from wrongfully selling Grams's firmware to an out of state actor to destroy an otherwise rightful filing.

**Stronghold:** If the Court finds that it does not have jurisdiction over Stronghold, Plaintiff respectfully requests that Stronghold be dismissed, without prejudice and with leave for Plaintiff to refile in their home forum. Plaintiff does not have a statute of limitations issue preventing later filing in Pennsylvania and does not wish to be forced to carry on two simultaneous suits.

**Chain and Chain Enterprises, LLC**: If the Court finds that it does not have personal jurisdiction against Chain and Chain Enterprises, LLC, Plaintiff respectfully requests that claims made against these Defendants either 1) be transferred to Nevada or 2) dismissed without prejudice except as to this forum.

**Cevon Technologies, LLC:** Cevon is a Delaware entity. During the operative events, Cevon had two members, Chain Enterprises and Treis. If the Court finds that it does not have personal jurisdiction over Cevon, Plaintiff respectfully requests that claims made against Cevon be 1) transferred to Delaware, which has institutional knowledge of this matter through *Treis Blockchain, LLC v. John Chain and Chain Enterprises, LLC and Chain Enterprises, LLC v. Bolick*, No. 1:21-cv-01435—MN or 2) dismissed.

**Treis:** The Court has jurisdiction over Treis, which has made no showing sufficient to justify transfer. However, if the Court transfers this matter in its

entirety, Plaintiff respectfully requests that it transfer either to Delaware, for judicial economy, or Pennsylvania, to maintain claims against Stronghold.

**III.**  **The Court should deny Defendants' motion to transfer jurisdiction pursuant to 28 U.S.C. 1404 because Defendants fail to meet their burden of demonstrating that South Carolina was a forum in which suit could have initially been brought or that South Carolina would be a more convenient forum for anyone except Treis and its Members.**

Whether a forum is appropriate does not depend on a group vote among conspiring Defendants. Rather, a plaintiff's choice of forum "should not be disturbed unless it is clearly outweighed by other considerations." *Robinson v. Giarmarco & Biull, P.C.*, 74. F.3d 253, 260 (11th Cir. 1996). It is not appropriate to simply shift the inconvenience of litigating outside a home state from the defendants to the plaintiff. *Id.* To transfer venue, Defendants must "make a **clear and convincing** showing that venue should be changed." *Lisseveld v. Marcus*, 173. F.R.D. 689, 701 (M.D. Fla. 1997) (emphasis added). Defendants set forth only a few vague, conclusory statements regarding the venue; a grossly insufficient showing that does not come close to overcoming the strong presumption in favor of plaintiff's chosen venue. (Mot. at p. 33).

Defendants seek to invoke 28 U.S.C. § 1404(a) to transfer jurisdiction to South Carolina. To grant Defendants' request, the Court must first enter findings 1) that Alabama was an appropriate forum and 2) either that South Carolina is a forum

in which the action 'could originally have been brought' or that *all* parties consent to the transfer. 28 U.S.C. § 1404(a). Grams does not consent to the transfer. Accordingly, the Court must find South Carolina was an appropriate forum when the Complaint was filed. It is Defendants' burden to make this showing.

If the Court finds in Defendants' favor on these threshold issues, the Court then considers whether Defendants have provided sufficient evidence to demonstrate that South Carolina is so much more convenient than Alabama that it overwhelms the presumption in favor of a plaintiff's choice of forum. The Court need not reach this analysis because Defendants have not even attempted to allege a basis upon which the Court could find South Carolina was a forum in which the Complaint could have been brought. Rather, they essentially admit that South Carolina was not an appropriate venue and then seek to cure it now, after the filing, with a group vote consenting to jurisdiction. This is not the standard and has already been rejected in this circuit. But if the Court finds that South Carolina had jurisdiction over all the Defendants when Grams filed suit, the Court should then consider the second prong in the analysis regarding the convenience of the forum. Treis has not identified a single witness, document, or piece of evidence in South Carolina, or advanced any other basis for transfer and therefore fails to meet its burden here as well.

A. <u>South Carolina is not a forum in which this matter could have originally been brought.</u>

"The threshold question in deciding a motion to transfer pursuant to § 1404(a) is whether the action could originally have been brought in the proposed transferee court." *D3D Techs., Inc. v. Microsoft Corp.*, No. 6:20-CV-1699-ORL-31DCI, 2021 WL 2194598, at *1 (M.D. Fla. Feb. 4, 2021). "Transfer is inappropriate if the case could not have been filed in the proposed transferee district." *Kelling v. Hartford Life & Accident Ins.*, 961 F.Supp.2d 1216, 1219 (M.D. Fla. 2013). It is the movant's "*prima facie* burden to prove that both personal jurisdiction and venue are appropriate for *all* defendants in the transferee court." *Kearney v. Home Depot USA, Inc.,* No. 17-5806, 2018 WL 11488411, at *4 (E.D. La. Jul. 31, 2018) (emphasis added); *Weintraub v. Advanced Correctional Healthcare, Inc.*, 161 F.Supp.3d 1272, 1279 (N.D. Ga. 2015) ("[T]he first step under § 1404(a) is to determine whether the present action could have been brought in the [alternative forum].").

Defendants ignore their burden, instead insisting that if they all vote to consent to jurisdiction, jurisdiction never posed a burden. But a movant cannot cure jurisdiction with events occurring (or agreements made) after the filing of a complaint. In fact, the *Kearney* court rejected exactly this type of manipulation. *Kearney*, at *5 ("although Defendant states that it is waiving any potential challenge

to personal jurisdiction, such a waiver is not sufficient to show that venue is one where the suit originally could have been brought.").

Defendants have not even attempted to argue that South Carolina ever had personal jurisdiction over Stronghold, Chain, or Chain Enterprises. Defendants could not do so without conceding that this Court has always had personal jurisdiction over all the Defendants. Nor have Defendants presented any evidence that South Carolina would be a convenient forum for Stronghold, Chain, or Chain Enterprises. There is no evidence that Stronghold ever set foot in South Carolina, that any non-party witnesses reside there, or that Stronghold stores any documents or equipment in South Carolina. Rather, even Defendants concede Stronghold stored all its machines in Pennsylvania.

> a) <u>Defendants have not met their burden of proving that Alabama is an inconvenient forum to overcome the presumption that Plaintiff's choice of forum is appropriate; transfer would merely shift the inconvenience from Plaintiff to Defendants, not serve the interests of justice.</u>

"Once a court confirms that Plaintiff could have brought the action in the transferee venue, it next looks to nine factors to determine the propriety of transfer:

> (1) the convenience of the witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with

the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances.

*Manuel v. Convergys Corp.,* 430 F.3d 1132, 1135 n. 1 (11th Cir.2005).

### ii.     the convenience of the witnesses;

Defendants have not met their burden to show that this factor weighs in favor of transfer.   The *D3D* decision set forth the standard for analysis, when refusing Microsoft's request for transfer to its home in Washington in a patent infringement matter:

> In addition to the plaintiff's choice of forum, an "important factor under § 1404(a) is the convenience of witnesses, and the moving party must make a specific showing of inconvenience to witnesses." *Elec. Transaction Network v. Katz, 734 F. Supp. 492, 501–02 (N.D. Ga. 1989)* (citing *J.I. Kislak Mortg. Corp. v. Conn. Bank & Tr. Co., 604 F. Supp. 346, 347 (S.D. Fla. 1985)*). "[A] general allegation that witnesses will be necessary, without identifying those necessary witnesses and indicating what their testimony at trial will be," does not warrant transfer under § 1404(a). *J.I. Kislak, 604 F. Supp. at 347.* In this respect, "a party seeking a transfer of venue must demonstrate that the witnesses identified are key witnesses." *Homes v. Freightliner, LLC, 237 F. Supp. 2d 690, 694 (M.D. Ala. 2002)* (citing *Mason, 146 F. Supp. 2d at 1362*). Further, because the main concern here is "the possibility of having [witnesses'] testimony at the trial ... transfer may be denied when the witnesses, although in another district, are employees of a party and their presence can be obtained by that party." *Mason, 146 F. Supp. 2d at 1361* (citations omitted).

*D3D Techs., Inc. v. Microsoft Corp.*, No. 6:20-CV-1699-ORL-31DCI, 2021 WL 2194598, at *2 (M.D. Fla. Feb. 4, 2021).

In their seven affidavits, Treis does not identify a single non-party witness who resides in the State of South Carolina. *Holmes v. Freightliner, LLC.,* 237 F. Supp. 2d 690, 696 (M.D. Ala. 2002) ("as the court has not been presented with any argument or evidence that either forum would be more efficient, the court finds that this factor does not weigh either in favor of or against a transfer"). Defendants' reference to vague "all known witnesses" appears to interchange witnesses with parties, as they do not name a single witness, explain why the witness is necessary, indicate what their testimony will be, or identify whether they are employees, as they must. *D3D*, at * 2, *Kearney v. Home Depot USA, Inc*., No. CV 17-5806, 2018 WL 11488411, at *2 (E.D. La. July 31, 2018) (Plaintiff contends that Defendant has not specifically identified the 'supposed key witnesses' who would be inconvenienced by the location of [the initial forum]."). (Mot. at 33).

### iii. the location of relevant documents and the relative ease of access to sources of proof;

Defendants have not met their burden to show that this factor weighs in favor of transfer. "Since the predominance of electronic discovery in the modern, era, most courts have recognized that the physical location of documents is no longer a significant factor in the transfer inquiry." *Weintraub v. Advanced Correctional*

*Healthcare, Inc.*, 161 F.Supp.3d 1272, 1283 (N.D. Ga. 2015).  Every document cited in the Amended Complaint is electronic, and therefore exists both on Treis's devices in South Carolina and the recipient's devices in Alabama, Pennsylvania, and North Dakota.

The only offering Defendants make is that machines "which housed" WAO2 are stored in South Carolina and Pennsylvania.  They do not attest that the machines "still house" WAO2, indeed Stronghold insists they do not.  Treis does not set forth any reason why a machine that *previously* used a firmware program is a current source of proof or would need to be used as evidence in this matter.

Meanwhile, Grams used his laboratory in Alabama as the site of operations.  His lab is still active and could be used for the jury to review the mechanical processes at issue in the matter.  His evidence and equipment are there, rendering this factor neutral at best.  *Kearney*, at * 5 ("Considering that both districts likely hold certain records, this factor is neutral.").

### iv.    the convenience of the parties;

This factor is at best neutral.  Alabama is centrally located among the Parties in this dispute—Chain to the west, Stronghold to the north, and Treis to the east.  Regardless of their choice to align, neither Stronghold nor Chain have identified a single reason it would be more convenient to travel to South Carolina than to

Alabama.  The reality is, they will have to travel either way.  *Kitzel v. Tunnell Gov't Servs. Inc.,* No. 8:22-CV-2733-VMC-AAS, 2023 WL 2330669, at *6 (M.D. Fla. Mar. 2, 2023) ("Because both parties reside in the respective districts, this factor is neutral."); *Weintraub,* 161 F. Supp. 3d at 1282 ("Accordingly, the Court finds that because there are advantages and disadvantages to either party depending on the venue, this factor does not weigh for or against transfer.").

### v.     the locus of operative facts;

This factor is at best neutral.  Each party spent the vast majority of their time operating from their home forum*. Kitzel v. Tunnell Gov't Servs. Inc.,* No. 8:22-CV-2733-VMC-AAS, 2023 WL 2330669, at *6 (M.D. Fla. Mar. 2, 2023) "When there are multiple loci of operative facts and no single locus is primary in this respect, courts treat this factor as neutral in the Section 1404(a) analysis." *quoting Clinton v. Sec. Benefit Life Ins. Co.,* No. 19-24803-CIV, 2020 WL 6120565, at *6 (S.D. Fla. June 29, 2020) (citation omitted).  Grams authored WAO2 in Alabama, dealt with Treis from Alabama, and spent thousands of hours following Treis's directions to improve the speed of Treis's machines in Alabama.  Alabama is the site of at least half of the operative facts.

### vi.    the availability of process to compel the attendance of unwilling witnesses;

This factor is at best neutral. Treis has not identified a single nonparty witness, willing or unwilling. *Am. Navigation Sys., Inc. v. Samsung Elecs. Co.*, No. 8:14-cv-1131-T-36-MAP, 2014 WL 12701068, at *5 (M.D. Fla. Dec. 1, 2014) ("Under Federal Rule of Civil Procedure 45, which governs the issuance of subpoenas in civil cases, a subpoena may command attendance 'within 100 miles of where the person resides, is employed, or regularly transacts business in person' or 'within the state where the person resides, is employed, or regularly transacts business in person, if the person ... is a party or a party's officer ... or ... is commanded to attend trial and would not incur substantial expense." Fed. R. Civ. P. 45(c)(1).). Further, a transfer in the interests of justice may not be made simply because a party is willing to bring its witnesses to one forum but not the other. *Lykes Bros Steamship Co. v. Sugarman*, 272 F.2d 679 (2d. Cir. 1959).

### vii.    the relative means of the parties;

This favor weighs heavily against transfer. Treis and Stronghold are entities engaged in multimillion dollar transactions. Plaintiff is a lone individual forced to retain counsel to pursue claims against the Goliaths who stole from him. *Weintraub*, 161 F. Supp. 3d at 1284 ("In light of the apparent disparity in the financial means of

the parties, the Court finds that this factor weighs in favor of keeping the case in this district."

### viii.    a forum's familiarity with the governing law;

This factor weighs against transfer.  In diversity cases, the filer has an interest in conducting the case in a forum familiar with the law.  Alabama law will apply in this matter regardless of where it is heard, including Grams's state law claims for work and labor done, and ATSA.  Alabama courts are in the best position to efficiently address legal issues as to Alabama law and an Alabama jury will be more familiar and comfortable with the spirit of the laws that govern the environment in which they live.

### ix.    the weight accorded a plaintiff's choice of forum.

Plaintiff's choice of forum weighs heavily in favor of Alabama.  *D3D*, at * 2 ("D3D chose to litigate this case in the Middle District of Florida. Therefore, this factor weighs heavily against transfer.").  When deciding a motion to transfer under Section 1404, the Court employs a "strong presumption against disturbing plaintiff's initial forum choice." SME *Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*, 382 F.3d 1097, 1100 (11th Cir. 2004) (quoting *La Seguridad v. Transytur Line*, 707 F.2d 1304, 1307 (11th Cir. 1983)).[1] "The plaintiff's choice of forum should not be disturbed unless it is clearly outweighed by other considerations." *Robinson v.*

*Giarmarco & Bill, P.C.*, 74 F.3d 253, 260 (11th Cir. 1996) (quoting *Howell v. Tanner*, 650 F.2d 610, 616 (5th Cir. 1981) (internal quotation marks omitted)

### x.     trial efficiency;

This factor weighs against transfer. "To satisfy its burden, [Defendants] must show that any purported gains in judicial efficiency will clearly outweigh [Grams's] choice." *Intell. Ventures I, LLC v. Motorola Mobility, LLC*, No. 13-61358-CIV, 2014 WL 129279, at *3 (S.D. Fla. Jan. 14, 2014) quoted in *Kitzel,* at * 8 (holding that this factor weighed against transfer when the movant didn't even attempt to satisfy its burden). Treis has made no showing that the dockets in South Carolina are less crowded than the dockets in this district, such that trial in South Carolina would be the "most easy, expeditious and inexpensive." *Kitzel*, at * 8.

In sum, it is Defendants burden to demonstrate

### IV.     The Court should deny as moot, Defendants motion to dismiss for insufficient service of process.

All Defendants have been served.

In summation, Plaintiff respectfully requests that this Court DENY Defendants' motion to dismiss in its entirety.

**RESPECTFULLY SUBMITTED THIS 20TH DAY OF NOVEMBER, 2023.**

/s/ Carissa V. Sears
Carissa V. Sears
One of the Attorneys for Plaintiff

/s/ Jonathan K. Corley
Jonathan K. Corley
One of the Attorneys for Plaintiff

OF COUNSEL:
Jonathan K. Corley
WHITTELSEY & CORLEY, LLC
Post Office Box 106
Opelika, Alabama 36803-0106
(334) 745-7766
jcorley@wwp-law.com

Carissa V. Sears
The Sears Law Office, LLC
7887 E. Belleview Ave. Suite 1100
Greenwood Village, Colorado 80111
720.412.1172
carissa@searslaw.org

## CERTIFICATE OF SERVICE

I hereby certify that on this the 20th day of November, 2023, I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification to the following counsel of record via e-mail:

Joshua J. Jackson
SAMFORD & DENSON, LLP
Post Office Box 2345
Opelika, Alabama 36803-2345
jackson@samfordlaw.com

/s/ Jonathan K. Corley
Jonathan K. Corley