# IN THE MIDDLE DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# EASTERN DIVISION

| | |
|---|---|
| MARK GRAMS, ) <br> An individual Alabama citizen, ) <br> ) <br> Plaintiff, ) <br> ) <br> ) <br> ) <br> v. ) <br> ) <br> TREIS BLOCKCHAIN, LLC, ) <br> CHAIN ENTERPRISES, LLC, ) <br> CEVON TECHNOLOGIES, LLC, ) <br> STRONGHOLD DIGITAL MINING, ) <br> LLC, DAVID PENCE, MICHAEL ) <br> BOLICK, SENTER SMITH, ) <br> BRIAN LAMBRETTI, AND ) <br> JOHN CHAIN, ) <br> ) <br> Defendants. | **Civil Action No.:** <br> **3:23-CV-00299-SMD** <br><br> **DECLARATION OF TREIS BLOCKCHAIN, LLC FOR REPLY IN SUPPORT OF MOTION TO TRANSFER** |

I, Michael Bolick, swear and affirm as follows:

1. My name is Michael Bolick and I am a Co-Founder and Managing Director of Defendant Treis Blockchain, LLC ("Treis") in the above-captioned case.

2. I am over the age of eighteen and have personal knowledge of and am competent to testify about the matters addressed in this declaration.

3. I submit this declaration in support of Treis Blockchain, LLC's Reply to Plaintiff Mark Grams' Response to Treis' Motion to Transfer or Alternatively Dismiss Plaintiff's Amended Complaint.

1

4. Speed matters in cryptocurrency mining. The profitability of cryptocurrency mining machines is largely dictated by the speed at which the machines can solve complicated math equations (this speed is called the "hashrate"). The faster the machines can solve the equations in a specific time period, the more cryptocurrency can be "mined."

5. But speed is expensive: the faster the machines run (the higher the "hashrate"), the more energy they consume. This results in an increased cost of the mining operations.

6. Profitability hinges on a balance between power consumption and what's mined. To be profitable, the machines' power consumption must be in line with the cryptocurrency mined and the cryptocurrency that is anticipated to be mined. So, it is common in the industry to "overclock" miners to make them run faster. But the math needs to make sense, e.g., the power costs and operational expense must be less than value of the cryptocurrency mined.

7. The manufacturers of miners (such as the miners at issue in this case) offer their own "overclocking firmware" to advanced users like Treis, as do other vendors, to make the machines run faster ("increase the hashrate").

8. But speed through overclocking creates heat, which in turn creates additional costs. Overclocked miners run hotter, so they need to be cooled to prevent damage to the miner.

9. "Immersion cooling" is a technology that immerses the miners in a vat of dielectric fluid, circulates the fluid in and out of the vat, and cools the miners.

10. Prior to ever meeting Grams and/or Chain Enterprises, LLC ("CEL"), Treis was one of the first industrial scale enterprises with expertise in single phase immersion as well as vast experience with many mining machine vendors, including an emerging vendor, MicroBT, and many of Treis' mining machines were utilizing immersion technology.

11. In the spring of 2020, Grams through CEL— a company located in Nevada— reached out to Treis—a company located in South Carolina— regarding firmware CEL was developing and claimed could greatly increase the manufacturer's default hashrates by modifying immersed machines with customized overclocking firmware (the "Firmware").

12. But the Firmware was only partially developed, had never been demonstrated on immersed machines and had limited exposure to MicroBT mining machines, so it needed additional testing and development to achieve these hashrates on in an immersion environment and on various brands such as MicroBT.

13. In other words, Grams needed Treis' (very expensive) immersed machines located in South Carolina, and Treis' money to power them, to develop the Firmware for an immersion environment.

14. During these initial discussions with CEL and Grams, Treis believed Grams was an employee or agent of CEL. Grams did not indicate that he was otherwise at this time, and while Treis much later discovered that Grams was not CEL's employee or agent, Grams continued to mislead Treis by omission, that he was.

15. So, misleading Treis that he was an employee or agent for CEL, Grams asked whether Treis would serve as a "beta tester" for the Firmware, wherein Treis would allow Grams to use its immersed machines located in South Carolina to further test and develop the Firmware for an immersion environment, and Grams would allow Treis to use the Firmware free of charge and royalty free.

16. Treis' immersion system vats, miners, dielectric fluid, circulators and cooling systems were in South Carolina. Grams installed the Firmware on these miners in South Carolina.

17. Between the spring and summer of 2020, Treis and CEL (who was acting through its agents Grams and Chain) discussed the formation of a joint venture where Treis would provide the immersed machines, the power to operate them, advice and input on the Firmware development, and where CEL, through Grams would lead the Firmware development effort.

18. Over time and in stages beginning in the summer of 2020, Treis gave Grams access to approximately 600 of its immersed miners in South Carolina so

Grams could demonstrate he had the ability to lead the development of the Firmware and to achieve his promised hashrates in an immersion environment.

19. During the initial discussions between Chain, Grams, and Treis regarding the joint venture, Chain and Grams proposed that the joint venture could charge a 3% Development Fee to its customers. But Treis explained that the machines had to be running not only faster but also more efficiently, such that the cost to power and cool the machines would be less than (a) the value of the cryptocurrency mined and (b) a development fee to be charged to *the customer,* which should not exceed 2%.

20. It appeared to Treis that the initial prototype of the Firmware showed potential for reaching CEL's / Grams' promised hashrates at an efficiency that might "make the math work". So, in October 2020, still believing Grams to be an employee or agent of CEL because Grams never disputed same, Treis and CEL formed Cevon Technologies, LLC, a Delaware limited liability company headquartered in South Carolina to finalize and commercialize the Firmware.

21. Grams participated with CEL in its negotiations with Treis leading to the formation of Cevon. The only reason that Grams was allowed to participate in such negotiations was due to Treis' understanding that Grams was doing so as an agent of CEL.

22. On February 11, 2021, Cevon, with CEL and Treis as members, filed an "Application for a Certificate of Authority to Transact Business" with the South Carolina Secretary of State.

23. The joint venture agreement with Treis and CEL (of which Grams was aware) provided in relevant part, that:

  a. Cevon "will not sell miners. Treis Blockchain will handle all sales of miners outside of the Company, provided that nothing herein will prevent Treis Blockchain from having joint customers with the JV [Cevon] who purchase all miners from Treis Blockchain and firmware and/or cooling systems from the JV (which may be installed by Treis Blockchain)"; and

  b. Cevon "hereby grants to each of Treis Blockchain and Chain Enterprises a nonexclusive, perpetual, worldwide, royalty-free license to use and download all of the Company's firmware for use in miners used by Treis Blockchain or Chain Enterprises."

  c. All revenues collected by Cevon and relating to the Firmware were to be split equally between Treis and CEL. It was Treis' understanding that Grams would be compensated by CEL.

24. Treis understood this agreement to provide Treis with "nonexclusive, perpetual, worldwide, royalty-free license" to the Firmware.

25. Following the formation of Cevon, Grams participated in Cevon's weekly meetings to coordinate with Treis and CEL regarding the development of the Firmware in the immersed application, wherein the Firmware was discussed as being developed for *Cevon*. Grams never disputed that the Firmware was being developed on behalf of Cevon.

26. At all relevant times, Grams, as a CEL representative, directed the development of the Firmware based upon feedback received from Treis. Grams did so knowing that any compensation that he would receive would be through CEL's portion of the Development Fee that Cevon would collect from its customers of the finalized version of the Firmware. Grams also understood that further development by him was necessary to produce a final version of the Firmware that would be ready for Cevon to market to its customers. Treis never "directed" Grams regarding the Firmware.

27. At no point in time during the parties' initial negotiations or after the formation of Cevon did Grams inform Treis that the Firmware was a "trade secret." In fact, Grams developed this firmware with Treis' assistance without confidentiality restrictions placed on Treis, or any restrictions for Treis' use or possession of the Firmware.

28. Several months after Cevon's formation, Treis believed Cevon was getting close to a commercially viable product. As such, on January 15, 2021, CEL,

Treis and Grams—all purporting to represent Cevon—participated in a call with a Russian firmware developer named VNish regarding Cevon potentially selling a finalized version of the Firmware to VNish.

29. At no time during this call did Grams state that Cevon did not have the authority to sell the Firmware to VNish, that it was a trade secret, or otherwise. Instead, Grams participated in the call as a representative of Cevon.

30. Despite remaining silent on the call with VNish as to (a) his purported ownership of the Firmware, or (b) his apparent belief that Cevon did not have the authority to engage in the sale of the Firmware to VNish, Grams later admitted to Treis that he had—almost immediately after the call—gone behind Treis' back and entered into a contract with VNish for use of the Firmware outside of Treis, CEL, or Cevon. Grams' contract with VNish resulted in an initial up-front payment of $25,000 plus on-going development fees to be paid to Grams, all of which should have been paid to Cevon, not Grams.

31. Subsequently, despite months of development and the destruction of several of Treis' miners in the process, Treis learned that the Firmware increased the machines' energy consumption and operational costs to a point where the miners made less money when running the Firmware (with the increased energy costs) than they could when they were *not* running the Firmware (thus, operating at a significantly lower energy cost). To make matters worse, payment of a Development

Fee ensured that use of the Firmware would cause Treis (or any subsequent user) to lose money when compared to the amount that could be made without use of the Firmware.

32. It was not until a Cevon weekly conference call in March 2021 that CEL revealed, after agreeing not to take a Development Fee, that Grams and CEL *had* been taking, without Treis' knowledge or consent, a Development Fee equal to what is believed to be 3% of the value of the cryptocurrency mined by Treis' machines. (This Development Fee was even higher than the commercially reasonable 2% fee Treis had, in earlier talks with CEL and Grams, stated might make sense to be applied to the *customer.*)

33. Treis repeatedly asked Grams and CEL why a Development Fee was being taken, but never received a satisfactory response. Treis informed Grams and CEL that they should hold such monies in escrow. Neither Grams nor CEL would reveal the amount taken, or whether the money was being held in escrow.

34. Instead, Grams remained silent on this subject until May 2021 when he reached out to Treis via Telegram chat requesting a private conversation. In the ensuing phone calls, Grams stated that he was separating from CEL, and later admitted that:

    a. He had implemented a Development Fee in the Firmware near the end of 2020; and

    b. Grams had surreptitiously moved the Development Fee to a digital wallet controlled by himself, away from CEL—without CEL's knowledge—around May 2021.

35. At all times, Treis believed it had the rights to the Firmware. This belief stems from, at least, its agreement with CEL, its membership in the Cevon joint venture, and the numerous misrepresentations made by Grams so that he could develop the Firmware with Treis' assistance.

36. Grams mislead Treis in at least the following ways:

    a. He misrepresented by omission that he was an employee and/or agent of CEL—only after Grams separated from CEL in May 2021 did he inform Treis that he was not affiliated with CEL in any way;

    b. As an purported agent of CEL, Grams was present for the Cevon negotiations leading up to the formation of Cevon, participated on weekly Cevon joint venture phone calls, knew about the Cevon joint venture agreement as early as the formation of Cevon (summer of 2020), but continued to accept Treis' miners, money and assistance to develop the Firmware while knowingly misleading Treis into believing that it would be (1) developed under the Cevon joint venture, and (2) royalty free;

    c. He not only stayed silent on any supposed ownership of the Firmware while on the January 15, 2021 Cevon sale call with VNish, Treis, and Grams, but also then went behind Treis' back to seal the deal with VNish himself, which resulted in an initial up-front payment of $25,000 to Grams and may have resulted in additional payments being made to Grams, all of which should have been paid to Cevon not Grams; and

    d. Grams agreed to not take a Development Fee, then took the Development Fee, and later covertly transferred the Development Fee away from CEL to himself into a digital wallet controlled by him and refused to disclose the total amount of the Development Fee taken, stating that "…it is my best interest not to disclose any developer fees collected…" Grams knew that Treis always intended to recover any portion of a Development Fee that was improperly taken and/or not owed to CEL as part of the Cevon joint development agreement.

37. Further, in the Amended Complaint Grams states that in 2021 it was "beyond dispute" that Treis knew "Grams was the sole author of the Firmware." (Am. Comp., ¶ 235.) This is misleading as Grams misled Treis into believing that he was affiliated with CEL, had participated in Cevon's weekly meetings in 2020 and 2021, and was fully aware of and at no point in time did he object to the agreement that the Cevon joint venture would own the Firmware.

38. The purchase agreement that Treis entered into with Stronghold was not simply for the sale of the machines. Stronghold also purchased the following items, all of which have significant value:

   a. the assignment to Stronghold of four contracts to which Treis was a party, including a attractive, fixed price, power purchase agreement ("PPA") that Treis valued at well over a million dollars;

   b. three (3) forty-foot containers with three 600-amp panels and Raritan PX2-5956XV power distribution units that is capable of powering 240 Machines;

   c. one (1) forty-foot container with two 600-amp panels and Raritan PX2-5956XV power distribution units that is capable of powering 144 Machines;

   d. one (1) Digital Shovel container with five data pods and one power pod that is capable of powering 405 Machines (items (a)-(c) are collectively the "Containers"); and

   e. all fixtures, equipment, machinery, supplies, parts, and other inventories located in the Containers.

39. During much of the term of the PPA, Treis' machines were running the firmware in question.

40. Throughout the term of the PPA, Treis would replace the machines in Pennsylvania that ceased functioning properly with functional machines delivered from South Carolina. Additionally, Treis routinely delivered and installed additional machines from South Carolina to increase the size of its fleet of machines in Pennsylvania.

41. In January 2022, Stronghold closed the sales transaction in which it purchased and took possession from Treis all the machines located in Pennsylvania. Stronghold knew or should have known that many of those machines were delivered from South Carolina.

42. I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 8 day of December 2023.

_____
Michael Bolick, Officer of Treis Blockchain, LLC