# IN THE MIDDLE DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# EASTERN DIVISION

| | |
|---|---|
| MARK GRAMS, An individual Alabama citizen, ) ) ) Plaintiff, ) ) ) ) ) v. ) ) TREIS BLOCKCHAIN, LLC, ) CHAIN ENTERPRISES, LLC, ) CEVON TECHNOLOGIES, LLC, ) STRONGHOLD DIGITAL MINING, ) LLC, DAVID PENCE, MICHAEL ) BOLICK, SENTER SMITH, ) BRIAN LAMBRETTI, AND ) JOHN CHAIN, ) ) Defendants. | Civil Action No.: 3:23-CV-00299-SMD **DECLARATION OF MATT USDI IN SUPPORT OF MOTION TO TRANSFER** |

I, Matt Usdin, swear and affirm as follows:

1. I am an Authorized Person of Stronghold Digital Mining LLC ("Stronghold") and General Counsel of its affiliate, Stronghold Digital Mining, Inc. in the above-captioned matter.

2. I am over the age of eighteen and have personal knowledge of and am competent to testify about the matters in this declaration.

3. On December 24, 2021, Stronghold executed a purchase agreement (the "Purchase Agreement") with Treis Blockchain, LLC, a South Carolina limited liability company ("Treis"), wherein Stronghold purchased:

   a. at least 1,000 MicroBT Whatsminers M20S with hash rate of 60PH/s and average efficiency of 60 J/TH located at Stronghold's Scrubgrass Power Plant (the "Machines"). The exact number of Machines is unknown due to recycling of certain parts and components between Machines;

   b. three (3) forty-foot containers with three 600-amp panels and Raritan PX2-5956XV power distribution units that is capable of powering 240 Machines;

   c. one (1) forty-foot container with two 600-amp panels and Raritan PX2-5956XV power distribution units that is capable of powering 144 Machines;

   d. one (1) Digital Shovel container with five data pods and one power pod that is capable of powering 405 Machines (collectively the "Containers");

   e. all fixtures, equipment, machinery, supplies, parts, and other inventories located in the Containers; and

    f. the assignment of four contracts regarding the use, purchase and transfer of the Machines to which Treis was a party and which, pursuant to the assignment, would inure to the benefit of Stronghold.

4. A significant portion of the purchase price paid by Stronghold was attributed to the value of the items listed in Paragraph 1(b)-(f).

5. The Purchase Agreement included a representation made to Stronghold that "[Treis] has good and valid title to all of the Purchased Assets, free and clear of Encumbrances." The "Purchased Assets" included "all of Seller's right, title, and interest in, to, and under the tangible and intangible assets, properties, and rights of every kind and nature located at the Scrubgrass Generating Plant."

6. When Stronghold purchased the Machines, it was unaware that there was any customized firmware installed on the Machines. Neither the Purchase Agreement nor any of the assigned contracts mentioned Mr. Grams or any customized firmware. Prior to the purchase of the Machines, Stronghold was unaware that he alleged to be the developer firmware that was installed on the Machines or that the firmware constituted a trade secret belonging to him. Prior to the purchase of the Machines, it is my belief that senior employees at Stronghold did not know who Mark Grams was and had never interacted with him.

7. Stronghold has never at any point in time had any contractual relationship with or privity to Mr. Grams.

8. On or about November 15, 2022, Bozhidar Dragozov contacted me regarding an allegation that Mark Grams had made to Mr. Dragozov regarding Mr. Grams' ownership of the firmware on the Machines. Shortly after being informed of Mr. Grams' allegations, I had a conversation with him in which he stated that his development fee account was showing activity of his firmware. Mr. Grams further stated that he had an agreement with Treis whereby Treis would pay him a 3% development fee for the use of the firmware and that Treis did not have the authority to transfer the firmware to any third party. Mr. Grams did not indicate that he considered the firmware to be a protectable trade secret. Mr. Grams simply stated that it was improper for Stronghold to use the firmware while failing to pay the 3% development fee.

9. Shortly after the call with Mr. Grams, I asked Mr. Dragozov in writing about the process for removing from the Machines the firmware referenced by Mr. Grams. In writing, Mr. Dragozov indicated that removal would need to be accomplished on a machine-by-machine basis.

10. On or about November 16, 2022, in writing, I instructed Mr. Dragozov and Mr. Radwanski to begin removing from the Machines the firmware

    referenced by Mr. Grams. Mr. Dragozov stated to me in an email that he would work with the team to remove the firmware on November 16, 2022.

11. On December 5, 2022, following the receipt of a statement of fact from Mr. Grams on November 23, 2022, I reached out to the management team at Treis to ask about the allegations made by Mr. Grams. On December 8, 2022, I participated in a call with the management team at Treis and their attorney. The management team at Treis adamantly denied any agreement with Treis whereby Treis would pay Mr. Grams a 3% development fee for the use of the firmware. It is my understanding that the Treis management team continues to deny agreement with Grams regarding firmware on the Machines.

12. On or about December 13, 2022, I directed an email to Mr. Dragozov and Mr. Radwanski, asking them to let me know when the firmware in question was completely removed from all the Machines. I received a reply email stating that the process would be completed by the end of the week. I notified Mr. Grams of this timeline for removal. I have been informed that Grams has confirmed that the firmware was removed from all functioning machines subsequently sold by Stronghold. I also have a good faith belief that all non-functioning machines from which the firmware may not have been removed were sold to a company owned and/or operated by Mr.

Dragozov and may now be in the possession, custody and/or control of Mr. Grams.

13. Through its business dealings with Treis, which ultimately resulted in the purchase of the Machines, Stronghold has several contacts with the State of South Carolina. Those contacts include the following.

    a. Stronghold entered a power purchase contract with Treis whereby Stronghold would supply power to Treis for the purpose of running some of Treis' Machines that were in Pennsylvania. During at least a portion of that agreement, it is my belief that the Machines were running the firmware in question.

    b. It is my belief that pursuant to the power purchase contract, Stronghold received payment from Treis' South Carolina bank account.

    c. It is my belief that from time to time during the power purchase contract, Treis would replace Machines that ceased functioning with functional Machines that were in South Carolina.

    d. In December 2021, Stronghold purchased all of Treis' Machines that were in Pennsylvania, including the replacement Machines that were previously in South Carolina.

    e. The money paid to purchase the Machines was paid into Treis' South Carolina bank account.

    f. Stronghold has had many emails and phone calls with Treis' representatives who were in South Carolina, which related, at least in part, to the operation and/or purchase of the Machines in question.

14. I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 7 day of December 2023.

By: /s/ Matt Usdin
Matt Usdin
Authorized Person