IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| MARK GRAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:23-cv-299-RAH-SMD |
| | ) | [WO] |
| TREIS BLOCKCHAIN, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

### I.     INTRODUCTION

Pending before the Court are the Defendants' motions to dismiss the Amended Complaint for lack of personal jurisdiction, improper venue, and improper service of process, as well as a motion to transfer.  (Doc. 60; Doc. 63.)[1]  The motions are due to be DENIED.[2]

### II.     STANDARDS OF REVIEW

*Personal Jurisdiction.*  A Rule 12(b)(2) motion challenges the court's exercise of personal jurisdiction over a defendant.  *See* Fed. R. Civ. P. 12(b)(2).  Where, as here, the court does not conduct a discretionary evidentiary hearing on a Rule 12(b)(2) motion, the plaintiff bears the burden of establishing a *prima facie* case of personal jurisdiction over the nonresident defendant.  *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 855 (11th Cir. 1990).  "Once the plaintiff pleads sufficient material facts to form a basis for *in personam* jurisdiction, the

---

[1] For the sake of clarity, documents will be referenced by their CM/ECF document page numbers.

[2] On the service of process issue, Grams states that all defendants have now been properly served. (Doc. 79 at 46.)  The Defendants do not respond to this statement.  Accordingly, the Court considers the issue abandoned.

burden shifts to the defendant to challenge plaintiff's allegations by affidavits or other pleadings." *Carmouche v. Carnival Corp.*, 36 F. Supp. 3d 1335, 1388 (S.D. Fla. 2014), *aff'd sub nom. Carmouche v. Tamborlee Mgmt., Inc.*, 789 F.3d 1201 (11th Cir. 2015).  A defendant challenging personal jurisdiction must present evidence to counter the plaintiff's allegations. *Internet Sols. Corp. v. Marshall*, 557 F.3d 1293, 1295 (11th Cir. 2009).

"Where . . . the Defendant submits affidavit(s) to the contrary, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction." *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002).  *See also Internet Sols. Corp.*, 557 F.3d at 1295; *Cable/Home Commc'n Corp.*, 902 F.2d at 855.  Here, "the plaintiff is required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof, and not merely reiterate the factual allegations in the complaint." *Polskie Linie Oceaniczne v. Seasafe Transp. A/S*, 795 F.2d 968, 972 (11th Cir. 1986).  Conclusory statements, "although presented in the form of factual declarations, are in substance legal conclusions that do not trigger a duty for Plaintiffs to respond with evidence of their own supporting jurisdiction." *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1215 (11th Cir. 1999).

In addressing whether personal jurisdiction over a nonresident defendant exists, "[t]he district court must accept the facts alleged in the complaint as true, to the extent they are uncontroverted by the defendant's affidavits." *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990) (citing *Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir. 1988)).  Moreover, "where the plaintiff's complaint and the defendant's affidavits conflict, the district court must construe all reasonable inferences in favor of the plaintiff." *Id.*

Courts pursue a two-step inquiry in determining whether they have personal jurisdiction over a defendant in a particular matter. *SkyHop Techs., Inc. v. Narra*, 58

F.4th 1211, 1222 (11th Cir. 2023).   The first inquiry is "whether the exercise of jurisdiction is appropriate under the forum state's long-arm statute."   *Mut. Serv. Ins. Co. v. Frit Indus., Inc.*, 358 F.3d 1312, 1319 (11th Cir. 2004) (citing *Sculptchair, Inc. v. Century Arts, Ltd.,* 94 F.3d 623, 626 (11th Cir. 1996)).   Under the second inquiry, courts assess "whether the exercise of personal jurisdiction over the defendant would violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution[.]"   *Id.*   Since Alabama's long-arm statute confers jurisdiction to the fullest extent such jurisdiction is constitutionally permissible, these two inquiries collapse into one: whether the exercise of jurisdiction would satisfy the requirements of due process.   *Olivier v. Merritt Dredging Co*., 979 F.2d 827, 830 (11th Cir. 1992). To satisfy due process, "the defendant [must] have minimum contacts with the forum state and . . . the exercise of jurisdiction over the defendant [can]not offend 'traditional notions of fair play and substantial justice.'"   *Mut. Serv. Ins. Co.*, 358 F.3d at 1319 (quoting *Sculptchair, Inc.*, 94 F.3d at 626)).

*Venue.*   "When venue is challenged by a Rule 12(b)(3) motion, the Plaintiff has the burden of showing that venue in the forum is proper."   *Pritchett v. Paschall Truck Lines, Inc.*, 714 F. Supp. 2d 1171, 1172 (M.D. Ala. 2010).   "The court must accept the complaint's allegations as true, unless those allegations are contradicted by a defendant's affidavit testimony."   *In re Blue Cross Blue Shield Antitrust Lit.*, 225 F. Supp. 3d 1269, 1290 (N.D. Ala. 2016)*.*   And "[i]f an allegation in the complaint is challenged, 'the court may examine facts outside of the complaint to determine whether venue is proper' and 'may make factual findings necessary to resolve [the] motion[.]'"   *Id*. (quoting *Pritchett*, 714 F. Supp. 2d at 1172).

*Transfer.*   Lastly, "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought[.]"   28 U.S.C. § 1404(a).   "The plaintiff's choice of forum should not be disturbed unless it is clearly outweighed by

other considerations." *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 260 (11th Cir. 1996) (citation omitted).  But the district court has "broad discretion in weighing the conflicting arguments as to venue." *England v. ITT Thompson Indus. Inc.*, 856 F.2d 1518, 1520 (11th Cir. 1988).  Courts must engage in an "individualized, case-by-case consideration of convenience and fairness." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (citation omitted).

## III.   BACKGROUND

Cryptocurrency is an intangible digital currency.  One way to acquire cryptocurrency is to "mine" for it.  This case concerns the software—called firmware—that tells cryptocurrency mining machines *how* to do that mining. Firmware impacts a cryptocurrency machine's mining speed.  The faster a machine can operate, the more cryptocurrency it can mine; the more a machine can mine, the more lucrative the machine.

In 2017, Plaintiff Mark Grams, a resident of Alexander City, Alabama, began developing code that optimized cryptocurrency mining machines.  His first firmware code optimization (FCO) enhanced the Antminer S17 Series mining machine, and he sold the code for $30,000.  Defendant John Chain brokered that deal.  After the Antminer sale, Grams began developing code to optimize a different mining machine—the Whatsminer.  He called this FCO the MicroBT Whatsminer Asic Miner (or WAO2).  According to the Amended Complaint, "WAO2 contains numerous trade secrets, including algorithms and logic, hardware interaction, communication protocols, calibration and configuration data, power management techniques, performance optimization techniques, error handling and recovery processes, integration of third party components, and security measures[.]"  (Doc. 52 at 8.)

As with the Antminer FCO, Grams agreed to work with Chain to try to monetize WAO2.  The plan called for Chain to find companies that wanted to install

Grams's WAO2 firmware on their mining machines, and those companies would then either (1) pay Grams a licensing fee to use the WAO2 firmware, or (2) give Grams a percentage of the cryptocurrency mined with the WAO2 firmware—known as a "developer fee."  Chain was to receive 50% of any new contract he helped Grams acquire.

In the Spring of 2020, Chain began negotiating with Defendant Treis Blockchain, LLC, and Treis's employees and members (the "Individual Defendants")—Defendants Brian Lamberti,[3] Michael Bolick, Senter Smith, and David Pence.  Treis was interested in installing the WAO2 firmware on its Whatsminer machines and then selling those optimized machines to third parties. Initially, the deal was that Chain and Grams would receive a developer fee for the cryptocurrency mined on the machines that Treis sold to third parties.

Their arrangement began in the Summer of 2020.  Among other things, Grams installed and began testing the WAO2 firmware on Treis's machines, repaired Treis's broken machines that Treis sent to Grams in Alabama, and personally sold ten of Treis's machines to an Alabama-based customer.  Grams performed much of his work for Treis from his home in Alabama and engaged in frequent email and phone communication with Treis from Alabama.  As the Amended Complaint describes the arrangement, "Gram's [sic] home in Alabama became Treis's physical workshop for broken machines and the site of its tech support for all WAO2 related questions." (*Id.* at 15.)  After fixing or updating the Treis machines, Grams would send or hand-deliver the machines back to Treis in South Carolina.  On at least one occasion, in September 2021, Lamberti, along with a Treis intern, visited Grams's home in Alabama to pick up several machines.

---

[3] Lamberti is incorrectly identified in the Amended Complaint as a member, rather than employee, of Treis.  (*See* doc. 60 at 2 n.1 (citing doc. 60 at 53).)

Eventually, in the Fall of 2020, Treis began negotiating to acquire the rights to the WAO2 firmware from Chain.  During these negotiations, Chain falsely represented to Treis that the WAO2 firmware was solely owned by Chain Enterprises, LLC ("CEL") and that Grams was a business partner and member of CEL.  Grams alleges that he was left entirely in the dark about the negotiations and transaction, although Treis and Defendant Cevon Technologies, LLC contest this. (*See id.* at 18–20; doc. 95-1 at 2–3; doc. 90-1 at 5–6.)  Ultimately, Cevon, rather than Treis directly, acquired the WAO2 firmware from Chain.  Cevon was 50% owned by Treis and 50% owned by CEL.  Treis's initial capital contribution to Cevon was $100, and CEL's initial capital contribution was "all intellectual property that it owns or exclusively licenses related to firmware and dual phase immersion cooling systems for crypto-currency and blockchain applications."  (*Id.* at 19 (citation omitted).)

By April 2021, Grams no longer trusted Chain as Grams had only received $4,300 in developer fees from his deal with Treis, yet his earnings "should have been much higher."  (*Id.* at 25.)  Because the developer fees were sent to an electronic wallet that Chain and Grams shared, Grams suspected that Chain was stealing from him.  So, Grams informed Treis that he would no longer work with Chain.  According to Grams, "Treis directors expressed shock that Grams was not a member of CEL" and "represented that they had no idea that Grams was the owner of WAO2 and had not given or sold it to Chain or CEL."  (*Id.*)  Then, in September 2021, Treis sued Chain in Delaware state court, alleging, among other things, that Chain had misrepresented to Treis that CEL employed Grams and that Grams's and Chain's developer fee was actually a scheme to steal from Treis.

Having decided that Chain was the problem and that they could trust each other despite the pending litigation, Grams, Treis, Cevon, and the Individual

Defendants continued working together.[4]  According to Grams, his work under this arrangement largely mirrored the work he had performed prior to the revelations of Chain's dishonesty.  (*Id.* at 26.)  As part of the arrangement, Grams traveled from Alabama to Pennsylvania to work on Treis's machines, and to South Carolina to meet with Treis.  According to Grams, Treis also agreed that Grams would receive a developer fee.

But unbeknownst to Grams, Treis (but not Cevon) sold 1,000 computers containing Grams's WAO2 firmware to Stronghold Mining, LLC in December 2021.  In February 2022, Lamberti informed Grams that Treis had sold the machines with the WAO2 firmware on them, but Lamberti said that the firmware had been removed prior to the sale.  Not believing Lamberti, Grams contacted Stronghold and discovered that the machines *did* in fact contain the firmware.  He also discovered that his developer fee was blocked—meaning that Stronghold could use and benefit from the WAO2 firmware without paying Grams.  After it was informed that Grams, and not Treis, owned the WAO2 firmware, Stronghold told Grams that it would remove the WAO2 firmware from its Treis machines but, according to Grams, Stronghold did not do so.  And indeed, to this day, Treis is either (1) still using the WAO2 firmware on its internal machines and blocking Grams's receipt of developer fees, or (2) using a pirated version of the firmware to avoid paying Grams his developer fees.

Grams filed this lawsuit in May 2023, bringing eighteen claims against nine defendants.  All Defendants have moved to dismiss the case for lack of personal

---

[4] The Amended Complaint includes statements indicating that Grams simultaneously worked with Treis, (*see, e.g.*, doc. 52 at 9), and Cevon, (*see, e.g.*, *id.* at 20 (quoting an email from Bolick in which Bolick states that "Treis has agreed that [Grams] can continue to work for Cevon[.]")), and that Grams's work benefitted both LLCs.  Moreover, it appears that the Individual Defendants also worked on behalf of both LLCs.  In other words, the contours separating Treis and Cevon (not to mention the Individual Defendants who were involved in both) appear to have been, at best, poorly defined.

jurisdiction and improper venue, and Treis, the Individual Defendants, Cevon, and Stronghold have also moved to transfer the case to the United States District Court for the District of South Carolina.  Following a status conference on November 21, 2023, the Court stayed the briefing schedule as to the Defendants' Rule 12(b)(6) arguments until it had ruled on their Rule 12(b)(2), 12(b)(3), and transfer motions.

## IV.   DISCUSSION

### A. Personal Jurisdiction

All of the Defendants move to dismiss for lack of general and specific personal jurisdiction.  Grams concedes (by failing to respond to Defendants' argument) that there is no general jurisdiction here.

A court may exercise specific jurisdiction over a defendant when the claim arises from or relates to conduct purposely directed at a forum state.  *Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc.*, 786 F.2d 1055, 1057 (11th Cir. 1986). Accordingly, courts pursue a three-step inquiry when determining whether to exercise specific jurisdiction over a defendant.  This analysis asks (1) whether the claims "'arise out of or relate to' at least one of the defendant's contacts with the forum"; (2) whether the defendant "'purposefully availed' [it]self of the privilege of conducting activities within the forum state"; and (3) "whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.'"  *SkyHop Techs.*, 58 F.4th at 1229 (citation omitted).  The plaintiff bears the burden on the first two elements, while the defendant bears the burden on the third element.  *Id.* (citing *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013)).

The first prong—relatedness—"focus[es] on . . . whether there is a strong relationship among the defendant, the forum, and the litigation.  The principal way to establish this relationship is through an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation."  *Id.* (citation and

internal quotation marks omitted).  But, "[i]mportantly, the Supreme Court [has] rejected the contention that specific jurisdiction may attach only when the defendant's forum conduct directly gave rise to the plaintiff's claims." *Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1275 (11th Cir. 2022) (citation omitted).

The second prong, purposeful availment, "consider[s] whether [the defendant] purposefully availed itself of the benefit of [Alabama]'s laws." *SkyHop Techs.*, 58 F.4th at 1230.  This analysis requires the plaintiff to show that "the defendant . . . had contacts with the forum that were his own choice and not random, isolated, or fortuitous.  And those contacts must show that the defendant deliberately reached out beyond its home such as by entering a contractual relationship centered in the forum." *Id.* (citation and internal quotation marks omitted).  Two tests can satisfy purposeful availment: the *Calder* "effects test" and the "minimum contacts" test. *See Del Valle*, 56 F.4th at 1275 (citing *Calder v. Jones*, 465 U.S. 783, 790 (1984)). Meeting either test is sufficient to show purposeful availment.  *SkyHop Techs.*, 58 F.4th at 1230.

"Under the effects test, a nonresident defendant's single tortious act can establish purposeful availment without regard to whether the defendant had any other contacts with the forum state." *Del Valle*, 56 F.4th at 1276 (citation omitted). If the allegations of the complaint reveal "the commission of an intentional tort, expressly aimed at a specific individual in the forum whose effects were suffered in the forum," then the defendants committing the intentional tort have a substantial connection to the forum under *Calder*.  *Licciardello v. Lovelady*, 544 F.3d 1280, 1288 (11th Cir. 2008).  Knowledge of the plaintiff's location in a state can also support a finding of purposeful availment under the *Calder* effects test.  *See SkyHop Techs.*, 58 F.4th at 1230–31 (finding the effects test satisfied where defendant "knew . . . that it was in a partnership with a[n out-of-state] company.  Indeed, [defendant corporation's owner] made three separate trips to Florida to meet with [plaintiff's

9

corporation's founder].   So [defendant corporation] had reason to know that its decision . . . could force it to defend against a lawsuit in Florida."). Thus, the "plaintiff's residence in the forum may, because of defendant's relationship with the plaintiff, enhance defendant's contacts with the forum.  Plaintiff's residence may be the focus of the activities of the defendant out of which the suit arises." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780 (1984). *See also Calder*, 465 U.S. at 788 ("The plaintiff's lack of 'contacts' will not defeat otherwise proper jurisdiction, but they may be so manifold as to permit jurisdiction when it would not exist in their absence." (citation omitted)).  The basic policy principle behind this analysis is that "[a]n individual injured in [his home state] need not go [out of state] to seek redress from persons who, though remaining [out of state], knowingly cause the injury in [the home state]." *Id.* at 790.

The other purposeful availment test—the minimum contacts test—"asks whether th[e defendant's] contacts [with the forum state] (1) are related to the plaintiff's cause of action; (2) involve some act by which the defendant purposefully availed himself of the privilege of doing business within the forum; and (3) are such that the defendant should reasonably anticipate being haled into court in the forum." *Del Valle*, 56 F.4th at 1276 (citation omitted).  Here, courts "identify all contacts between the nonresident defendant and the forum state and ask whether, individually or collectively, those contacts satisfy the relevant criteria." *Id.*

The third and final prong of the specific jurisdiction analysis—the traditional notions of fair play and substantial justice prong—asks the court to consider: (1) the burden on the defendant; (2) the forum's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; and (4) the judicial system's interest in resolving the dispute.  *See id.* at 1277; *SkyHop Techs.*, 58 F.4th at 1231.  None of the Defendants in this case contest this prong, so it is satisfied and will not be discussed any further.

Recall that there are eighteen claims against nine defendants in this action. Although "a court may hold it has specific personal jurisdiction over a defendant as to one claim but not as to another in the same suit," *Argos Glob. Partner Servs., LLC v. Ciuchini*, 446 F. Supp. 3d 1073, 1086 (S.D. Fla. 2020), a "district court ha[s] personal jurisdiction over the entire case" where "all of the claims ar[i]se from the same jurisdiction generating event," *Cronin v. Wash. Nat. Ins. Co.*, 980 F.2d 663, 671 (11th Cir. 1993). The parties do not dispute that misappropriation of trade secrets, a claim Grams brings against all Defendants, is a tort. (*See, e.g.*, doc. 90 at 10 n.3; doc. 63 at 24–26.) This means that Grams can satisfy the purposeful availment prong of the specific jurisdiction analysis for his misappropriation claims via either the *Calder* effects test or the minimum contacts test. *See also Ala. Aircraft Indus., Inc. v. Boeing Co.*, No. 20-11141, 2022 WL 433457, at *8 n.14 (11th Cir. Feb. 14, 2022) (per curiam) ("There is no dispute that misappropriation of trade secrets is a tort claim."); *Ecolab Inc. v. IBA, Inc.*, No. 22-CV-479 (ECT/DTS), 2023 WL 7091853, at *7 (D. Minn. Oct. 26, 2023) ("[C]ourts have found as a legal matter that trade-secret claims are intentional torts for purposes of applying *Calder*'s effects tests." (citing *Coronacide, LLC v. Wellness Matrix Grp., Inc.*, No. 8:20-cv-816-CEH-AAS, 2021 WL 1060356, at *7 (M.D. Fla. Mar. 19, 2021))). Moreover, because Grams's essential claim in this lawsuit is that the Defendants misappropriated his WAO2 firmware and have caused him significant financial harm, each of Grams's non-misappropriation claims is directly related to the Defendants' alleged misappropriation of Grams's WAO2 firmware. *See* 18 U.S.C. § 1839(5)-(6) (defining "misappropriation" and acquisition by "improper means"). Accordingly, the Court will exercise pendent jurisdiction over Grams's additional claims against each Defendant where there is specific personal jurisdiction over that Defendant as to Grams's misappropriation claims. *See Demetriades v. Kaufmann*, 698 F. Supp. 521, 528 (S.D.N.Y. 1988) (finding that misappropriation claim in unfair competition

context served as the basis for pendent jurisdiction because "[a]lthough [the plaintiffs make] separate claims, they are not unrelated.  To the contrary, they are constituent parts of a single action designed to recompense plaintiffs for the unauthorized appropriation of their property.").

In other words, because the traditional notions of fair play and substantial justice prong is already satisfied, establishing personal jurisdiction here requires Grams to show that (1) his claims are related to each Defendant's contacts with Alabama, and (2) that each Defendant purposefully availed itself of the benefits of Alabama law—which can be satisfied under either the *Calder* or minimum contacts tests.  As discussed below, Grams has sufficiently established specific (and therefore personal) jurisdiction over each Defendant.

### 1.  John Chain and Chain Enterprises, LLC

The misappropriation claims against Chain allege that Chain stole Grams's WAO2 firmware and his associated trade secrets, and that Chain, through CEL, conveyed the WAO2 firmware to Treis without authorization.  Chain argues that no specific jurisdiction exists over him because "[n]othing alleged in Plaintiff's Amended Complaint indicates that [he] purposefully availed [hi]msel[f] of the privileges of conducting business in the State of Alabama."  (Doc. 63 at 3.)  More specifically, Chain states that "[t]here are no allegations that John Chain was ever in the state of Alabama, negotiated business deals in Alabama, or even spoke to anyone in Alabama other than the Plaintiff himself."  (*Id.* at 23.)  According to Chain, this means that Grams is unable to satisfy either the minimum contacts or the *Calder* effects tests.  (*Id.* at 23–26.)  Chain's declaration in support of his motion effectively restates these arguments.  (*See* doc. 63-2.)

Chain first worked with Grams, who resided and worked in Alabama, in 2019 to sell Grams's initial FCO.  Then, in February of 2020, Chain learned about Grams's WAO2 firmware and "asked if he could help Grams monetize it."  (Doc. 52 at 8.)

Grams and Chain came to an agreement, and Chain negotiated a deal between Grams and Treis.  (*See id.* at 9–10.)  Chain subsequently introduced Grams to Treis's directors through a group chat where the group discussed Grams's work in Alabama on Treis's machines.  Moreover, the work that Grams performed in Alabama led to the developer fees that served as Chain's remuneration for brokering the deal between Grams and Treis.  Chain's declaration does not contradict these allegations.

Although Chain's contacts with Alabama pertaining to Grams's first FCO are unrelated to the current litigation, Chain's Alabama contacts connected to the WAO2 firmware are related to his alleged misappropriation of the WAO2 firmware.  Moreover, these WAO2-related contacts with Alabama gave Chain "fair warning" that he could be subjected to jurisdiction in the state under the minimum contacts test.  *Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1356 (11th Cir. 2000) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).  Chain's decision (1) to approach Grams with a business opportunity and (2) to enter into a contractual relationship with Grams indicate that his contact with Alabama was not random or isolated.  Instead, Chain "deliberately reached out beyond [his] home . . . by entering a contractual relationship centered in [Alabama]."  *SkyHop Techs.*, 58 F.4th at 1230 (citation and internal quotation marks omitted).  *See also Ruiz de Molina*, 207 F.3d at 1357 (finding specific jurisdiction "[a]lthough . . . defendants had no direct contact whatsoever with Alabama" because the defendants "chose to do business with an Alabama resident; they expected to receive a benefit from that business; they knew that the insurance they were procuring was for a boat owned by an Alabama resident which was located in Alabama and which would necessarily traverse Alabama waters; they undertook to and did procure insurance for the boat; they authorized Smith to issue a binder for that insurance and to send it to [the plaintiff] in Alabama; and they received a commission from the insurance

premium.").  Therefore, the Court has specific jurisdiction over Chain under the minimum contacts test.

The Court also has personal jurisdiction over Chain under the *Calder* effects test.  As the Amended Complaint makes clear, the value of the WAO2 firmware is that it increases profitability for cryptocurrency miners and therefore negatively impacts the firmware's true owner whenever the firmware is misappropriated without remuneration.  And that financial impact is felt wherever the true owner is located.  *See Licciardello*, 544 F.3d at 1287–88 (defendant's "us[e of Florida plaintiff's] trademarked name and . . . picture on a website accessible in Florida" satisfies *Calder*'s effects test because the defendant "individually targeted [the plaintiff] in order to misappropriate his name and reputation for commercial gain."). *See also Brennan v. Roman Cath. Diocese of Syracuse New York, Inc.*, 322 F. App'x 852, 856 (11th Cir. 2009) (per curiam) (noting that "[t]he 'effects' test provides that due process is satisfied when the plaintiff brings suit in the forum where the 'effects' or 'brunt of the harm' caused by the defendant's intentional tortious activity was suffered").  What is more, Chain appeared to *know* that Grams was in Alabama.  *See Army Times Pub. Co. v. Watts*, 730 F.2d 1398, 1400 (11th Cir. 1984) (finding the *Calder* effects test met where "[t]he defendant obviously knew that the effect of any injury . . . would be primarily focused in Alabama, the plaintiffs' state of residence.").  Accordingly, to the extent Chain claimed ownership of and sold Grams's WAO2 firmware, he committed an intentional tort expressly aimed at Grams within the Middle District of Alabama and therefore subjected himself to specific jurisdiction here under the *Calder* effects test.

Because CEL is the company under which Chain operated, Grams's misappropriation claim against CEL is brought under the same count as his claim against Chain.  CEL makes the same arguments as Chain.  (*See* Doc. 63 at 16–19.)

And Grams offers a similar response.  (*See* doc. 79 at 12–13, 18–22.)  For the same reasons that Chain is subject to specific jurisdiction, CEL is too.

### 2.  Treis Blockchain, LLC

Grams alleges that Treis used Grams's WAO2 firmware without his authorization and that Treis wrongfully sold the firmware to Stronghold.  Treis argues a lack of specific jurisdiction because a plaintiff's connection, such as that of Grams, to a forum is insufficient on its own to establish minimum contacts.  (*See* doc. 60 at 15.)  Grams responds that Treis did in fact establish minimum contacts with Alabama because Treis had a long-term contractual relationship with Grams, sent cryptomining machines to Alabama for Grams to repair, visited Alabama on at least one occasion to pick up machines, and profited from the arrangement with Grams.

"[A]lthough physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact." *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (citations omitted).

The Amended Complaint alleges and the record shows that Treis sent machines to Alabama for Grams to repair and that "Gram's [sic] home in Alabama became Treis's physical workshop for broken machines and the site of its tech support for all WAO2 related questions."  (Doc. 52 at 14–15.)  While Treis contests this characterization, Treis acknowledges that it "loan[ed]" machines to Grams.  (Doc. 60 at 41.)  Treis also does not contest that Treis's members frequently contacted Grams about adjustments they wanted him to make to their machines.  (*See, e.g.*, doc. 52 at 17.)[5]  Further, Treis does not dispute that "Lamberti himself

---

[5] Treis states that it "never 'directed' Grams regarding the Firmware.'" (Doc. 90-1 at 7.)  Grams responds in his declaration that he "did receive directives from Treis, as documented throughout [the] complaint."  (Doc. 95-1 at 3.)

drove out to Gram's [sic] lab in Alabama with a Treis intern to pick up all of the machines Grams had brought back from Pennsylvania to repair[.]" (*Id.* at 14.)

Grams also alleges that he had a contract with Treis, although Treis's declaration brings this claim into question. (*See* doc. 60 at 41 (stating that initial negotiations regarding the WAO2 firmware were with CEL and Chain, and that therefore Treis never had a contract "wherein Grams would repair and/or maintain Treis' computers.").) But Grams's declaration again counters the argument, indicating that Treis and Grams did have an agreement of some sort. (*See* doc. 95-1 at 2–3.) Thus, to the extent Treis is alleged to have "entered a contract with an Alabama-based [plaintiff, it] can be constitutionally held to answer in Alabama for failing to fulfill its contractual duties, even if its alleged misconduct occurred outside the State." *Empirian Health, LLC v. Specialty RX, Inc.*, No. 2:22CV639-MHT, 2023 WL 7553555, at *2 (M.D. Ala. Nov. 14, 2023).

And finally, Treis's numerous requests that Grams adjust the WAO2 firmware is undoubtedly related to this litigation.

In total, Treis had sufficient minimum contacts with Alabama for specific jurisdiction to exist.

### 3. Lamberti, Pence, Bolick, and Smith

Grams's misappropriation claims against Lamberti, Pence, Bolick, and Smith charge them with profiting off Grams's WAO2 firmware after acquiring the firmware through misrepresentation. According to Grams, specific jurisdiction exists because each of them knew that Grams would be injured in Alabama because of their misappropriation. These four individuals respond that the Court lacks specific jurisdiction over them because they have no connection to Alabama. As to the *Calder* effects test, they say that the fact that Grams was allegedly injured in Alabama is insufficient itself to establish specific personal jurisdiction without a showing that these individuals had contacts with the State. In conducting this

analysis, the Court bears in mind that the corporate employees' "status as employees does not somehow insulate them from jurisdiction. Each defendant's contacts with the forum must be assessed individually." *Calder*, 465 U.S. at 790. Nevertheless, as was the case in *Calder*, these four individuals "are primary participants in an alleged wrongdoing intentionally directed at a[n Alabama] resident, and jurisdiction over them is proper on that basis." *Id*. Moreover, because Grams's claim is that their contacts with Alabama were tied to the misappropriation of the WAO2 firmware, the relatedness prong of the specific jurisdiction analysis is satisfied.

### a. Lamberti

Lamberti was involved in encouraging Grams to modify his WAO2 firmware to make it operate faster, (doc. 52 at 40, 42), and Lamberti told Grams (allegedly falsely) that the firmware had been removed from the machines Treis sold in February 2022 to Stronghold, (*id.* at 42). According to the Amended Complaint, these activities were all undertaken to misappropriate Grams's WAO2 firmware. Lamberti's declaration does not contradict these allegations, (*see* doc. 60 at 52–54), and so these allegations plus the allegations that Lamberti served as a primary actor in the misappropriation of Grams's WAO2 firmware establish specific jurisdiction over Lamberti under the *Calder* effects test.

### b. Pence and Bolick

The Amended Complaint alleges that Pence and Bolick induced Grams to put his firmware on Treis's machines by falsely claiming that Treis had pending machine sales and that Grams would make thousands of dollars in developer fees by working with Treis. (Doc. 52 at 12, 15.) Like Lamberti, Pence and Bolick also encouraged Grams to improve Treis's machines' functioning by texting him firmware-related directives. (*Id.* at 17, 22–23.) Moreover, Pence and Bolick are alleged to have been primary participants in the alleged wrongdoing. Pence's and Bolick's declarations do not contradict these allegations, (*see* doc. 60 at 49–51, 57–58), although Bolick's

declarations on behalf of Treis state that Grams requested to put the WAO2 firmware onto Treis's machines to "beta test" the firmware, (*see id.* at 40–42; doc. 90-1 at 4). But Grams's responsive declaration contests this assertion, stating that "[he] never asked Treis to work as a Beta tester for [his] firmware." (Doc. 95-1 at 2.) Accordingly, construing all reasonable inferences in favor of Grams, Grams has sufficiently established this Court's specific jurisdiction over Pence and Bolick under the *Calder* effects test: the alleged misappropriation was intentional, aimed at Alabama, and Pence and Bolick would have known that Grams would suffer the effects of the tort in Alabama.

### c. Smith

The allegations and evidence as to jurisdiction over Smith are the most tenuous of all the Individual Defendants. For example, the Amended Complaint alleges that Smith was copied on text messages and email threads throughout the alleged misappropriation period, (*see id.* at 9–10, 37–38), and that Smith was aware that Grams claimed ownership of the WAO2 firmware, (*see id.* at 25–26). But, unlike with Lamberti, Pence, and Bolick, the Amended Complaint is short on details about Smith's specific involvement in the misappropriation. That said, Smith's declaration, (*see* doc. 60 at 55–56), does not contest any of these allegations. This is a close call, but because Smith's declaration acknowledges that he is one of Treis's Managing-Directors,[6] (*id.* at 55), and the Amended Complaint alleges that Smith was a primary participant in the misappropriation of Grams's WAO2 firmware along with Treis's other members, the Court concludes that it also has specific jurisdiction over Smith under the *Calder* effects test.

---

[6] The Court construes Smith's declaration as indicating that he is one of Treis's *Managing* Members, meaning that he has substantial managerial authority over the business.

18

### 4. Cevon Technologies, LLC

According to Grams, Cevon was "formed for the exclusive purpose of carrying out the agreement" in which Chain and CEL sold WAO2 firmware to Treis. (Doc. 79 at 4.)    Thus, Cevon's raison d'etre was allegedly the intentional misappropriation of Grams's firmware.  Bolick's declaration executed on behalf of Cevon does not contest that Cevon's formation was tied to the WAO2 firmware acquisition (*see* doc. 60 at 44 ("Cevon was formed solely as a holding company")), although it does contradict the Amended Complaint's allegation that Cevon employed Grams (*see* doc. 52 at 20 (quoting an email from Bolick stating Grams "can continue to work for Cevon[.]"); *contra* doc. 60 at 45 ("Cevon never had any agreements with Mark Grams, including any employment, independent contractor, or membership agreements.")).[7]  Regardless of whether Cevon employed Grams, however, nothing in Defendants' declarations questions the Amended Complaint's allegations that Cevon was used as a tool through which Treis, Lamberti, Bolick, Pence and Smith convinced Chain to add his firmware to Treis's machines.  And although it appears Treis ultimately sold machines containing Grams's firmware to Stronghold, the Amended Complaint also states that Cevon was involved in the transaction, (doc. 52 at 53)—an allegation that the declarations also do not contest. As such, Grams's misappropriation claim is clearly related to the conduct Cevon is alleged to have committed.  Moreover, the Court finds that the purposeful availment prong of the specific jurisdiction analysis is satisfied under the *Calder* effects test.

---

[7] In a subsequent declaration, Bolick, on behalf of Cevon, states that "[f]ollowing the formation of Cevon, Grams participated in Cevon's weekly meetings to coordinate with Treis and CEL regarding the development of the Firmware . . ., wherein the Firmware was discussed as being developed for *Cevon*."  (Doc. 90-1 at 7 (first and second alteration added).)

### 5. Stronghold Digital Mining, LLC

The claim that Stronghold misappropriated Grams's firmware comes not from the fact that Stronghold purchased the firmware from Treis,[8] but from the allegations that, after being informed that the firmware belonged to Grams, Stronghold falsely represented to Grams that it would remove Grams's firmware from the Treis machines it had purchased. (*Id.* at 55–56.) Stronghold's declaration asserts that it removed the WAO2 firmware from its machines upon learning that Grams claimed ownership of the firmware. (*See* doc. 90-2 at 4–6.) But the declaration does not rebut, as the Amended Complaint alleges, that Stronghold continued to use the machines before the WAO2 firmware was removed, or that it does not to this day use a pirated version of the WAO2 firmware to avoid paying Grams his developer fees. Accordingly, this alleged misappropriation of the WAO2 firmware is related to the misappropriation claim Grams brings here, and it satisfies the *Calder* effects test for the same reasons that the other defendants' behavior satisfies the test: Stronghold's alleged misappropriation was an intentional tort aimed to injure Grams in Alabama by using Grams's firmware without his authorization and without compensating him.

### B. Improper Venue

The Defendants also move for dismissal under Rule 12(b)(3) on grounds of improper venue. According to them, no substantial part of the events or omissions giving rise to the Amended Complaint occurred within the Middle District of Alabama, or anywhere else in Alabama for that matter. (*See* doc. 60 at 28; doc. 63 at 26.) Grams did not counter this argument in his response. Instead, he focuses on the Defendants' motion to transfer. Regardless, venue is proper in this District

---

[8] Indeed, the Amended Complaint indicates that Stronghold initially was unaware that it did not have a legal right to use the firmware. (Doc. 52 at 44.)

because a substantial part of the events giving rise to Grams's claims in this case occurred in the Middle District of Alabama.

The federal venue statute provides, in relevant part, that venue is proper in a district where "a substantial part of the events" that give "rise to the claim occurred" or "a substantial part of the property that is the subject of the action is situated." 28 U.S.C. § 1391(b)(2). The Eleventh Circuit has interpreted this statute to mean that "[o]nly the events that directly give rise to a claim are relevant. And of the places where the events have taken place, only those locations hosting a 'substantial part' of the events are to be considered." *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11th Cir. 2003). "Substantiality is a qualitative inquiry, and is 'determined by assessing the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum.'" *McArdle v. Carter*, No. 2:09-CV-297-WKW, 2010 WL 2683375, at *3 (M.D. Ala. July 6, 2010) (citation omitted). The statute "thus contemplates some cases in which venue will be proper in two or more districts." *Jenkins Brick Co.*, 321 F.3d at 1371.

Here, the misappropriation of Grams's firmware occurred in large part within the Middle District of Alabama because Grams's communications with Chain, CEL, Treis, and most of the others were here, as was the work that Grams performed on the firmware and many of Treis's machines. Although Treis's declaration states that Grams installed the WAO2 firmware on machines in South Carolina, (*see* doc. 60 at 40–42; doc. 90-1 at 4–5), Treis does not appear to contest—as the Amended Complaint alleges—that *some* machines *were* sent to Alabama, and that Grams was asked to modify the WAO2 firmware from his home in Alabama. While it is true that numerous events related to this litigation occurred in Pennsylvania and South Carolina, (*see, e.g.*, doc. 52 at 14, 33), a substantial part of the events leading to this lawsuit occurred within the Middle District of Alabama. It may be that venue is also proper in another district, but whether a different venue is also appropriate is not

21

determinative of whether *this* venue is appropriate. *See Morgan v. N. Miss. Med. Ctr.*, 403 F. Supp. 2d 1115, 1122 (S.D. Ala. 2005) ("[U]nder § 1391, a plaintiff does not have to select the venue with the *most* substantial nexus to the dispute, as long as she chooses a venue where a substantial part of the events giving rise to the claim occurred." (emphasis in original)). Indeed, it is well-recognized that there can be multiple districts where venue is proper when considered solely by where a substantial part of the events occurred. *See Fed. Ins. Co. v. Shaw Indus., Inc.*, No. 1:23-CV-1367-RDP, 2024 WL 2884558, at *3 (N.D. Ala. June 7, 2024) ("Because § 1391(b)(2) allows a suit to be brought in *any* district where a substantial part of the events or omissions giving rise to the claim occurred, venue can be—and often is— proper in multiple districts."). Accordingly, venue is proper in the Middle District of Alabama, and the motion to dismiss for improper venue is due to be denied.

### C. Interest of Justice and Forum Non Conveniens

#### 1. Transfer

Treis, Lamberti, Pence, Bolick, Smith, Cevon, and Stronghold, but not Chain or CEL, move to transfer this case to the District of South Carolina pursuant to either 28 U.S.C. § 1404(a), if venue in the Middle District of Alabama is proper, or 28 U.S.C. § 1406(a), if venue in the Middle District of Alabama is improper. *Compare* 28 U.S.C. § 1404(a) ("For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented.") *with* 28 U.S.C. § 1406(a) ("The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.").

Having already found that venue is proper in the Middle District of Alabama under § 1391(b), the motion to transfer is properly analyzed under 28 U.S.C.

§ 1404(a).   Transferring under § 1404(a) requires consideration of two questions: (1) "whether the action could originally have been brought in the proposed transferee district"; and (2) "whether the balance of convenience favors transfer." *Folkes v. Haley*, 64 F. Supp. 2d 1152, 1155 (M.D. Ala. 1999).  There is no definitive test to determine the propriety of a transfer under § 1404(a), but courts commonly consider nine factors:

> (1) the convenience of the witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances.

*Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 n.1 (11th Cir. 2005) (citations omitted).  And "[d]istrict courts have broad discretion in deciding whether to transfer an action to a more convenient forum." *Johnston v. Foster-Wheeler Constructors, Inc.*, 158 F.R.D. 496, 503 (M.D. Ala. 1994) (citing *England*, 856 F.2d at 1520). Crucially, "the plaintiff's privilege of choosing his venue . . . places the burden on the defendant to demonstrate why the forum should be changed." *Johnston*, 158 F.R.D. at 503.

Assuming Grams could have brought this action in the District of South Carolina,[9] Treis, Lamberti, Pence, Bolick, Smith, Cevon, and Stronghold have not met their burden to show that the balance of convenience factors favors transfer.

---

[9] Treis, the Individual Defendants, Cevon, and Stronghold state that they consent to jurisdiction and venue in South Carolina, (doc. 60 at 1), although as Grams notes, (doc. 79 at 38–39), it is not clear that *consenting* to jurisdiction is the same thing as showing that the transferee venue is one where the suit could have originally been brought.  *See Kearney v. Home Depot USA, Inc.*, No. CV 17-5806, 2018 WL 11488411, at *5 (E.D. La. July 31, 2018) ("although Defendant states that it is waiving any potential challenge to personal jurisdiction, such a waiver is not sufficient to show that venue is one where the suit originally could have been brought.  Considering that Defendant's

### a. Convenience of the witnesses

Treis, Lamberti, Pence, Bolick, Smith, Cevon, and Stronghold write that "[t]he convenience of the witnesses favor transfer because the majority of the witnesses are located in South Carolina and all known witnesses other than Plaintiff reside outside of Alabama." (Doc. 90 at 21.)  But as Grams points out, "Defendants' reference to vague 'all known witnesses' appears to interchange witnesses with parties, as they do not name a single witness, explain why the witness is necessary, indicate what their testimony will be, or identify whether they are employees[.]" (Doc. 79 at 41.)  And indeed, "'a general allegation that witnesses will be necessary, without identifying those necessary witnesses and indicating what their testimony at trial will be" is insufficient to justify transfer. *J.I. Kislak Mortg. Corp. v. Connecticut Bank & Tr. Co., N.A.*, 604 F. Supp. 346, 348 (S.D. Fla. 1985).  Moreover, "transfer may be denied when the witnesses, although in another district, are employees of a party and their presence can be obtained by that party."  *Mason v. Smithkline Beecham Clinical Labs.*, 146 F. Supp. 2d 1355, 1361 (S.D. Fla. 2001).

Since Treis, Lamberti, Pence, Bolick, Smith, Cevon, and Stronghold have failed to produce any facts showing that transfer would benefit witnesses, generally or specifically, this factor does not support transfer.

### b. Location of relevant documents and the relative ease of access to sources of proof

While there may be more relevant documents in South Carolina than Alabama, this factor does not strike the Court as worthy of any significant consideration given modern technology and the ability to easily send documents electronically with the press of a button.  *See Weintraub v. Advanced Corr.*

---

only argument is that it waives any potential challenge to personal jurisdiction, it does not meet its *prima facie* burden of showing that personal jurisdiction is appropriate in the proposed transferee district." (footnote omitted)).  Regardless, it is assumed that the Defendants have met their burden as to this first prong for the purposes of this analysis.

*Healthcare, Inc.*, 161 F. Supp. 3d 1272, 1283 (N.D. Ga. 2015) ("Since the predominance of electronic discovery in the modern era, most courts have recognized that the physical location of relevant documents is no longer a significant factor in the transfer inquiry." (collecting cases)).

That said, access to *some* of the machines that either still do use, or formerly contained, Grams's firmware would be easier if this case were transferred to South Carolina. But even so, it is not obvious that this factor weighs in favor of transfer to South Carolina specifically since there are machines containing WAO2 in both South Carolina and Pennsylvania. This factor weighs in favor of transfer to South Carolina, but only slightly since transfer to South Carolina would not resolve all issues relating to access to proof.

### c. Convenience of the parties

Conducting court proceedings in this District undoubtedly would be less convenient for most of the Defendants than conducting these proceedings in South Carolina. But conducting these proceedings in South Carolina would also be less convenient for Grams, as well as for Chain and CEL. Treis, the Individual Defendants, Cevon, and Stronghold state that "five of the nine Defendants are in South Carolina, and the other Defendants have consented to personal jurisdiction in South Carolina," (doc. 90 at 22), but the record does not show that Chain and CEL have voiced their consent to jurisdiction in South Carolina, nor do they seek transfer to South Carolina. And even if Chain and CEL had expressly consented to jurisdiction in South Carolina, "when a transfer of venue would merely shift the inconvenience from the defendant to the plaintiff, the plaintiff's choice of forum should not be disturbed." *Trinity Christian Ctr. of Santa Ana, Inc. v. New Frontier Media, Inc.*, 761 F. Supp. 2d 1322, 1328–29 (M.D. Fla. 2010). Further, Treis, Lamberti, Pence, Bolick, Smith, Cevon, and Stronghold have not shown with any specificity how continuing with proceedings in this District would inconvenience

them.  (*See* doc. 90 at 22.)  Simply stating without citation to law that transfer is warranted to the district where five of nine defendants reside and where certain others have consented to jurisdiction does not show that the proposed forum is better suited for the convenience of the parties as a general consideration, especially since other parties reside in other forums including Grams in Alabama, Chain in Wyoming, and CEL in Nevada.  This factor does not support transfer.

### d.  Locus of operative facts

Treis, Lamberti, Pence, Bolick, Smith, Cevon, and Stronghold argue that this factor favors transfer because "a substantial portion of the facts giving rise to Plaintiff's claim occurred in South Carolina and/or Pennsylvania." (*Id.*)  Once again, the fact that the moving defendants concede that *both* South Carolina and Pennsylvania are home to operative facts weighs against transfer to South Carolina. *See Clinton v. Sec. Benefit Life Ins. Co.*, No. 19-24803-CIV, 2020 WL 6120565, at *6 (S.D. Fla. June 29, 2020) ("When there are multiple loci of operative facts and no single locus is primary in this respect, courts treat this factor as neutral in the Section 1404(a) analysis."), *report and recommendation adopted*, No. 19-24803-CIV, 2020 WL 6120554 (S.D. Fla. July 21, 2020); *Gubarev v. Buzzfeed, Inc.*, 253 F. Supp. 3d 1149, 1166 (S.D. Fla. 2017) ("[B]ecause there are arguably multiple loci of operative facts, one of which is Plaintiff's choice of forum . . ., this factor does not support transfer.").  And as the Court has already noted, a substantial number of the events at issue occurred in Alabama.  This factor is neutral.

### e.  Availability of process to compel the attendance of unwilling witnesses

Treis, Lamberti, Pence, Bolick, Smith, Cevon, and Stronghold state that "[a]ll witnesses known to Defendants, such as the subsequent purchasers of the machines sold by Stronghold, would be beyond the Court's subpoena power in Alabama." (Doc. 90 at 23.)  This may be true, but it "is of less significance here, where there is

no indication the potential witnesses would be unwilling to appear." *Halbert v. Credit Suisse AG*, 358 F. Supp. 3d 1283, 1287 (N.D. Ala. 2018). *See also Mason*, 146 F. Supp. 2d at 1361–62 ("[T]ransfer may be denied . . . where the movant does not show that the witnesses would be unwilling to testify and that compulsory process would be necessary."). And as previously noted, the defendants moving for transfer have not identified who exactly those non-party witnesses may be, including any subsequent purchasers. This factor is neutral.

### f.  Relative means of the parties

The extent of the moving defendants' argument on this factor is a single sentence stating that "[t]he Parties' financial ability favors a transfer because Plaintiff has expressed a willingness to pursue his claims in multiple forums outside of Alabama if necessary." (Doc. 90 at 23.) Treis, Lamberti, Pence, Bolick, Smith, Cevon, and Stronghold once again do not cite case law to support this proposition, and it is unclear how a willingness to litigate in other forums is at all relevant to the parties' *relative means*. Grams for his part points out that he is a "lone individual" suing "entities engaged in multimillion dollar transactions." (Doc. 79 at 44.) While Grams's assertion seems logical, "[t]he parties have not extensively briefed their relative means to litigate this action, and 'not much else is known regarding the parties' financial means and their respective abilities to conduct litigation in a distant forum.'" *Mod. Pharmacy, LLC v. J.M. Smith Corp.*, No. 19-20369-CIV, 2019 WL 13223825 (S.D. Fla. Apr. 26, 2019) (citation omitted) (alteration adopted). Accordingly, "[t]he relative means of the parties is . . . a neutral factor here, where there is no evidence concerning the parties' financial positions." *Halbert*, 358 F. Supp. 3d at 1288.

### g.  Forum's familiarity with the governing law

Grams's Amended Complaint brings both federal law and Alabama state law claims against the Defendants. To the extent this case involves federal questions,

presumably no district court has any greater advantage over another in adjudicating that subset of claims. And to the extent this case concerns Alabama law, this factor clearly disfavors transfer. That said, the moving defendants argue that, under Alabama law, Grams's state law misappropriation claims are actually governed by South Carolina law, rather than Alabama law. *See Ala. Aircraft Indus., Inc.*, 2022 WL 433457, at *11 ("We are convinced that Alabama courts would hold that under Alabama law a misappropriation-of-trade-secrets injury occurs at the point of misappropriation."). But even if this is true, as the moving defendants also point out, the remainder of Grams's state law claims would apply Alabama state law. (*See* doc. 90 at 24.) And although indicating that South Carolina courts are capable of handling Grams's other state law claims because those claims are "not particularly complex," Treis, Lamberti, Pence, Bolick, Smith, Cevon, and Stronghold fail to show or even argue that South Carolina's misappropriation laws are particularly complex either. *See Holmes v. Freightliner, LLC.*, 237 F. Supp. 2d 690, 696 (M.D. Ala. 2002) ("Where no complex questions of foreign law are presented, courts consider this factor to be of less importance."). Accordingly, this factor is neutral.

### h. Weight accorded Grams's choice of forum

The moving defendants' sole argument as to the weight accorded Grams's choice of forum is that "Plaintiff's choice of Alabama is of minimal value in determining whether to transfer because none of the conduct complained of took place in Alabama." (Doc. 90 at 23.) The Court disagrees. "[A] plaintiff's choice of forum must be afforded considerable deference, where, as here, the plaintiff has elected to bring suit in the district in which he resides." *Mason*, 146 F. Supp. 2d at 1360–61 (citing *Patel v. Howard Johnson Franchise Sys.*, 928 F. Supp. 1099, 1101 (M.D. Ala. 1996)). Moreover, the Court has already concluded that a substantial part of the events giving rise to this lawsuit occurred in Alabama. *See Gould v. Nat'l Life*

*Ins. Co.*, 990 F. Supp. 1354, 1358 (M.D. Ala. 1998).  Accordingly, this factor weighs strongly against transfer.

### i. Trial efficiency and the interests of justice

Treis, Lamberti, Pence, Bolick, Smith, Cevon, and Stronghold write that efficiency and the interests of justice favor transfer here because (1) "the events . . . giving rise to Plaintiff's claims occurred in South Carolina or Pennsylvania; (2) the majority of witnesses and sources of proof are in South Carolina; and (3) all Defendants have consented to personal jurisdiction in South Carolina."  (Doc. 90 at 24.)  In other words, the moving defendants attempt to support their argument for transfer under the trial efficiency and interests of justice factor by bootstrapping other transfer factors into this consideration.  But these factors have already been considered and generally rejected as requiring transfer, and this particular factor concerns a different issue—"the forum in which judicial resources could most efficiently be utilized and the place in which trial would be most easy, expeditious, and inexpensive."  *Epler v. Air Methods Corp.*, No. 6:21-CV-461-PGB-DCI, 2021 WL 2806207, at *6 (M.D. Fla. June 4, 2021) (alteration adopted) (citation omitted).  "To satisfy its burden, the defendant must show that any purported gains in judicial efficiency will clearly outweigh the plaintiff's choice in forum," but the moving defendants do not even attempt to address this.  *Id.* (alteration adopted) (citation omitted).  Treis, Lamberti, Pence, Bolick, Smith, Cevon, and Stronghold have failed to satisfy their burden, and this factor is therefore neutral.

Of the *Manuel* factors, only the second factor—pertaining to access to a limited number of machines in South Carolina—supports transfer, and only slightly.  The remaining factors are either neutral or weigh against transfer.  All told, Treis, Lamberti, Pence, Bolick, Smith, Cevon, and Stronghold have failed to meet their burden.  The motion to transfer is therefore due to be denied.

## 2. *Forum non conveniens*

Chain and CEL make a perfunctory effort to argue that the Amended Complaint should be dismissed under the doctrine of *forum non conveniens*. (Doc. 63 at 29–30.) Chain and CEL give two reasons supporting this argument: first, that the machines with Grams's firmware are located in South Carolina and Pennsylvania; and second, that the majority of non-party fact witnesses are "likely to reside outside of Alabama" because "the nine named defendants reside in states outside of Alabama[.]" (Doc. 63 at 29.)

For the same reasons these factors were unpersuasive in the context of transferring this action to the District of South Carolina, these factors are also unpersuasive in the context of dismissal on *forum non conveniens* grounds. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947) ("unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."), *superseded by statute on other grounds*; *Wildfire Grp., LLC v. Prime Ins. Co.*, 974 F. Supp. 2d 1333, 1338 (M.D. Ala. 2013) ("Under the doctrine of *forum non conveniens*, 'when an alternative forum has jurisdiction to hear a case, and when a trial in the chosen forum would establish oppressiveness and vexation to a defendant out of all proportion to plaintiff's convenience, or when the chosen forum is inappropriate because of considerations affecting the court's own administrative and legal problems, the court may, in the exercise of its sound discretion, dismiss the case.'" (quoting *Wilson v. Island Seas Invs., Ltd.*, 590 F.3d 1264, 1269 (11th Cir. 2009))). Moreover, to succeed on a motion to dismiss on grounds of *forum non conveniens*, Chain and CEL must demonstrate "that (1) an adequate alternative forum was available, (2) the public and private factors weighed in favor of dismissal, and (3) the plaintiffs could reinstate their suit in the alternative forum without undue convenience or prejudice." *King v. Cessna Aircraft Co.*, 562 F.3d 1374, 1381 (11th Cir. 2009) (per curiam) (alterations adopted) (quoting *Leon v. Million Air, Inc.*, 251

F.3d 1305, 1310–11 (11th Cir. 2001)).  And while the Supreme Court and Eleventh Circuit have noted a litany of relevant factors, Chain and CEL cherry-pick a handful of those factors and unconvincingly assert that those cherry-picked factors favor dismissal.  *See King*, 562 F.3d at 1381; *Gulf Oil Corp.*, 330 U.S. at 508–09.  Chain's and CEL's *forum non conveniens* argument is unpersuasive and will be denied.

## V.    CONCLUSION

It is therefore **ORDERED** as follows:

1. *Defendants' Motion to Transfer or Alternatively to Dismiss Pursuant to Rule 12(b)(2)* (doc. 60) is **DENIED**.

2. *Defendants John Chain and Chain Enterprises, LLC's Motion to Dismiss Plaintiff's Amended Complaint* (doc. 63) is **DENIED** to the extent they move for dismissal under Fed. R. Civ. P. 12(b)(2) and 12(b)(3).

3. The stay (*see* doc. 85) issued as to the briefing on the Defendants' Motions to Dismiss under Fed. R. Civ. P. 12(b)(6) (docs. 62; doc. 63) for failure to state a claim is **LIFTED**.

4. Defendants' Motions to Dismiss under Fed. R. Civ. P. 12(b)(6) (doc. 62; doc. 63) are **DENIED** with leave to refile.  If the Defendants choose to refile these motions, they shall incorporate their previous argument as to Count V (the RICO claim) (doc. 95; doc. 96) into their renewed motions, and Plaintiff shall respond accordingly.

**DONE** on this the 8th day of July, 2024.

R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE

31